## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**National Association of Diversity Officers in Higher Education**;

**American Association of University Professors**;

**United Academics of Maryland-University of Maryland, College Park**;

**National Association of Minority Contractors**; and

**National Association of Minority Contractors, DMV Chapter**,

Plaintiffs

v.

**DONALD J. TRUMP**, in his official capacity as President of the United States; **THE UNITED STATES OF AMERICA; EXECUTIVE OFFICE OF THE PRESIDENT**;

**DEPARTMENT OF COMMERCE**; **HOWARD W. LUTNICK**, in his official capacity as Secretary of Commerce;

**DEPARTMENT OF DEFENSE; PETE HEGSETH**, in his official capacity as Secretary of Defense;

**DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY JR.**, in his official capacity as Secretary of Health and Human Services;

**Case No. 8:26-cv-01532**

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**DEPARTMENT OF THE INTERIOR**;
**DOUG BURGUM**, in his official capacity as
Secretary of the Interior;

**DEPARTMENT OF TRANSPORTATION**;
**SEAN DUFFY**, in his official capacity as
Secretary of Transportation;

**DEPARTMENT OF VETERANS
AFFAIRS**; **DOUG COLLINS**, in his official
capacity as Secretary of Veterans Affairs;

**DEPARTMENT OF JUSTICE**; **TODD
BLANCHE**, in his official capacity as Acting
U.S. Attorney General;

**DEPARTMENT OF AGRICULTURE**;
**BROOKE ROLLINS**, in her official
capacity as Secretary of Agriculture;

**DEPARTMENT OF ENERGY**; **CHRIS
WRIGHT**, in his official capacity as
Secretary of Energy;

**DEPARTMENT OF HOMELAND
SECURITY**; **MARKWAYNE MULLIN**, in
his official capacity as Secretary of Homeland
Security;

**ENVIRONMENTAL PROTECTION
AGENCY**; **LEE ZELDIN**, in his official
capacity as Administrator of the
Environmental Protection Agency;

**NATIONAL SCIENCE FOUNDATION**;
**BRIAN STONE**, in his official capacity as
Chief of Staff, performing the duties of
Director of the National Science Foundation;

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION**; **JARED ISAACMAN**, in his official capacity as Administrator of the National Aeronautics and Space Administration;

**SMALL BUSINESS ADMINISTRATION**; **KELLY LOEFFLER**, in her official capacity as Administrator of the Small Business Association;

**FEDERAL AVIATION ADMINISTRATION**; **BRYAN BEDFORD**, in his official capacity as Administrator of the Federal Aviation Administration;

**OFFICE OF MANAGEMENT AND BUDGET**; **RUSSELL VOUGHT**, in his official capacity as Director of the White House Office of Management and Budget;

**FEDERAL ACQUISITION REGULATORY COUNCIL**; **KEVIN RHODES**, in his official capacity as Chair of the Federal Acquisition Regulatory Council,

Defendants

**AMENDED COMPLAINT**

**INTRODUCTION**

1. Since its founding, this country's driving ethos has been equality of opportunity. But throughout our 250-year history, that promise of shared prosperity has remained elusive for large portions of society.

2. Through thoughtful, hard work to achieve a more perfect union, the United States has advanced towards our Founders' vision. Broad swaths of society recognize that achieving the Constitution's promise of "equal protection" requires acknowledging, accepting, and celebrating the varied experiences that shape our lives and stories. Studies have likewise shown that inclusive outreach broadens the workforce and promotes economic efficiency. Leading sectors of our society, both public and private, have promoted diversity, equity, and inclusion because they recognize that doing so is crucial to achieving long-term prosperity.

3. But to the Trump-Vance Administration, even acknowledging our differences is a threat. Rather than celebrating diversity and promoting inclusion, the Administration has pursued a relentless and reactionary campaign towards sameness, and towards defining white experience as the paradigm, seeking to stamp out any differences between people and experiences.

4. In doing so, the Administration has villainized the very concepts of equity, inclusion, and diversity, and rebranded the acronym "DEI" into something taboo. It has misconstrued the concept of diversity—recognizing similarities and differences—to mean advantaging marginalized communities at the cost of others. It has suggested that acknowledging race or ethnicity is necessarily improper. And it ignores that for many communities and people, the impacts of race are something imposed, not chosen. Through it all, this Administration has damaged America's competitiveness, eliminated lifelines for countless American companies, and chosen division over inclusion. It has also trampled constitutional rights.

5. This case arises from the President's March 26, 2026 Executive Order, Addressing DEI Discrimination by Federal Contractors, and subsequent actions by the Federal Acquisition Regulatory Council.

6. The Contractors Order equates most mentions of "race or ethnicity" to "racially discriminatory DEI activities." In doing so, it attempts to use intimidation to coerce much of the country to abandon efforts to promote inclusion and belonging, to forgo attempts to achieve more diverse communities and workplaces, and to ignore that this country's history requires many paths to reach equality. The Order is an unlawful attempt by the Administration to erase the realities of race, ethnicity, and the history of discrimination in this country, and to dismantle the architecture of equality.

7. The Administration views discussion of race and ethnicity as unlawful, and the very concepts of diversity, equity, and inclusion as discriminatory. But that is flat wrong. The Contractors Order sanctions legal, and laudable, expression on race or ethnicity, and in doing so, violates the free speech, free association, and due process rights of Plaintiffs and their members.

**PARTIES**

*Plaintiffs*

8. Plaintiff **National Association of Diversity Officers in Higher Education**[1] is the nation's leading association for chief diversity officers and professionals, with over 1,300 members.

---

[1] This complaint uses a number of acronyms, which are all defined here for convenience. "DEI" refers to diversity, equity, and inclusion. "DEIA" refers to diversity, equity, inclusion, and accessibility. Addressing DEI Discrimination by Federal Contractors, Exec. Order No. 14398, 91 Fed. Reg. 16147 (Mar. 26, 2026) is the "Contractors Order" or the "Order." Section 3 of Exec. Order No. 14398, 91 Fed. Reg. 16147, which provides mandated contract language for federal contractors and subcontractors, is the "Diversity Ban." The plaintiffs are the National Association of Diversity Officers of Higher Education ("NADOHE"), the American Association of University Professors ("AAUP"), United Academics of Maryland-University of Maryland, College Park ("UAM–UMD"), the National Association of Minority Contractors ("NAMC"), and the National Association of Minority Contractors, DMV Chapter ("NAMC–DMV"). Acronyms for agency defendants include the Department of Commerce ("Commerce"), the Department of Defense

NADOHE's members include diversity, equity, inclusion, and accessibility professionals who work at institutions of higher education, as well as institutions of higher education themselves. Many of NADOHE's individual and institutional members hold federal contracts or subcontracts. NADOHE brings this challenge on behalf of itself and its members.

9. Plaintiff **American Association of University Professors** is a membership association and labor union of faculty and academic professionals, with chapters at colleges and universities throughout the country. AAUP is committed to advancing academic freedom and shared governance, defining fundamental professional values and standards for higher education, promoting the economic security of academic workers, and ensuring higher education's contribution to the common good. The vast majority of AAUP's members work for entities that hold federal contracts or subcontracts, while some members are parties to such contracts themselves. AAUP brings this challenge on behalf of its members.

10. Plaintiff **United Academics of Maryland-University of Maryland, College Park** represents full- and part-time, tenured, tenure-track, professional-track, contingent, research, instructional, and library faculty at the University of Maryland, College Park. UAM–UMD works

---

("DOD"), the Department of Health and Human Services ("HHS"), the Department of the Interior ("DOI"), the Department of Transportation ("DOT"), the Department of Veterans Affairs ("VA"), the Department of Justice ("DOJ"), the Department of Agriculture ("USDA"), the Department of Energy ("DOE"), the Department of Homeland Security ("DHS"), the Environmental Protection Agency ("EPA"), the National Science Foundation ("NSF"), the National Aeronautics and Space Administration ("NASA"), the Small Business Administration ("SBA"), the Federal Aviation Administration ("FAA"), the Office of Management and Budget ("OMB"), and the Federal Acquisition Regulatory Council ("FAR Council"). Other agencies include the Office of Federal Contractor Compliance Programs ("OFCCP"), the Equal Employment Opportunities Commission ("EEOC"), and the Federal Communications Commission ("FCC"). *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 203 (2023), is "*SFFA*," the Infrastructure Investment and Jobs Act is "IIJA." The Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025), is the "Day 2 Anti-DEI Order." The Disadvantaged Business Enterprise program is the "DBE" program. The Federal Property and Administrative Services Act is the "Procurement Act," the Administrative Procedure Act is the "APA," and the False Claims Act is the "FCA."

to secure fair, equitable, and transparent working conditions for all campus workers; defend academic freedom; and oppose the punishment of scholars for conducting research and speaking in support of freedom, democracy, diversity, and inclusion. UAM–UMD's members all work for the University of Maryland, College Park, which is a federal contractor. UAM-UMD is the University of Maryland, College Park chapter of AAUP. As a result, many members of UAM-UMD are also members of AAUP. UAM-UMD brings this challenge on behalf of its members.

11. Plaintiff **National Association of Minority Contractors** is a nonprofit trade association dedicated to fostering business opportunities, building connections and networks, and advocating on behalf of its member contractors. NAMC was founded in 1964 and currently has 22 chapters across the country and approximately 3,500 members nationwide. It is the oldest minority-owned construction trade association in the United States and its members have an annual project capacity of over $1 billion nationally. NAMC members serve as federal contractors and subcontractors and routinely partner with other major federal contractors. NAMC membership is open to anyone, regardless of race or ethnicity, and NAMC has members who do not identify as racial minorities. NAMC brings this challenge on behalf of itself and its members.

12. Plaintiff **National Association of Minority Contractors, DMV Chapter** is a nonprofit trade association that is part of the NAMC network. Founded in 2022, NAMC–DMV serves contractors in the District of Columbia, Maryland, and Virginia region by striving to eliminate barriers that prevent minority contractors from thriving in the construction industry. NAMC–DMV's members include contractors and subcontractors who work on federal, state, and municipal contracts. NAMC–DMV membership is open to all people regardless of race or ethnicity, and NAMC–DMV has members who do not identify as racial minorities. NAMC–DMV brings this challenge on behalf of itself and its members.

4

*Defendants*[2]

13. Defendant **Donald J. Trump** is the President of the United States. He issued the Contractors Order on March 26, 2026. He is sued in his official capacity.

14. Defendant **United States of America** may be named as a defendant in any action seeking relief other than money damages against the United States. *See* 5 U.S.C. § 702.

15. Defendant **Executive Office of the President** is a federal agency headquartered in Washington, D.C.

16. Defendant **Department of Commerce** is a federal agency headquartered in Washington, D.C.

17. Defendant **Howard W. Lutnick** is the Secretary of Commerce. He is sued in his official capacity.

18. Defendant **Department of Defense** is a federal agency headquartered in Washington, D.C.

19. Defendant **Pete Hegseth** is the Secretary of Defense. He is sued in his official capacity.

20. Defendant **Department of Health and Human Services** is a federal agency headquartered in Washington, D.C.

21. Defendant **Robert F. Kennedy, Jr.** is Secretary of Health and Human Services. He is sued in his official capacity.

22. Defendant **Department of the Interior** is a federal agency headquartered in Washington, D.C.

23. Defendant **Doug Burgum** is Secretary of the Interior. He is sued in his official capacity.

24. Defendant **Department of Transportation** is a federal agency headquartered in Washington, D.C.

---

[2] Defendants other than President Trump and the United States of America are referred to collectively as "Agency Defendants."

25. Defendant **Sean Duffy** is Secretary of Transportation. He is sued in his official capacity.

26. Defendant **Department of Veterans Affairs** is a federal agency headquartered in Washington, D.C.

27. Defendant **Doug Collins** is Secretary of Veterans Affairs. He is sued in his official capacity.

28. Defendant **Department of Justice** is a federal agency headquartered in Washington, D.C.

29. Defendant **Todd Blanche** is Acting U.S. Attorney General. He is sued in his official capacity.

30. Defendant **Department of Agriculture** is a federal agency headquartered in Washington, D.C.

31. Defendant **Brooke Rollins** is Secretary of Agriculture. He is sued in his official capacity.

32. Defendant **Department of Energy** is a federal agency headquartered in Washington, D.C.

33. Defendant **Chris Wright** is Secretary of Energy. He is sued in his official capacity.

34. Defendant **Department of Homeland Security** is a federal agency headquartered in Washington, D.C.

35. Defendant **Markwayne Mullin** is Secretary of Homeland Security. He is sued in his official capacity.

36. Defendant **Environmental Protection Agency** is a federal agency headquartered in Washington, D.C.

37. Defendant **Lee Zeldin** is Administrator of the Environmental Protection Agency. He is sued in his official capacity.

38. Defendant **National Science Foundation** is a federal agency headquartered in Washington, D.C.

39. Defendant **Brian Stone** is Chief of Staff performing the duties of Director of the National Science Foundation. He is sued in his official capacity.

40. Defendant **National Aeronautics and Space Administration** is a federal agency headquartered in Washington, D.C.

41. Defendant **Jared Isaacman** is Administrator of the National Aeronautics and Space Administration. He is sued in his official capacity.

42. Defendant **Small Business Administration** is a federal agency headquartered in Washington, D.C.

43. Defendant **Kelly Loeffler** is Administrator of the Small Business Administration. She is sued in her official capacity.

44. Defendant **Federal Aviation Administration** is a federal agency within the United States Department of Transportation and headquartered in Washington, D.C.

45. Defendant **Bryan Bedford** is Administrator of the Federal Aviation Administration. He is sued in his official capacity.

46. Defendant **Office of Management and Budget** is directed to issue guidance on the Contractors Order to ensure compliance, and otherwise implement the Order in various ways.

47. Defendant **Russell Vought** is the Director of White House Office of Management and Budget. He is sued in his official capacity.

48. Defendant **Federal Acquisition Regulatory Council** is directed to amend the Federal Acquisition Regulation to implement the Contractors Order.

49. Defendant **Kevin Rhodes** is the Chair of the Federal Acquisition Regulatory Council. He is sued in his official capacity.

## JURISDICTION AND VENUE

50. This Court has subject matter jurisdiction over this matter because the claims arise under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because the Defendants are United States officials. 28 U.S.C. § 1346(a)(2).

51. This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers.

52. Venue lies in the District of Maryland because United Academics of Maryland-University of Maryland, College Park, and the National Association of Minority Contractors, DMV Chapter, are headquartered in this judicial district and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity. *See* 28 U.S.C. § 1391(e)(1).

## LEGAL BACKGROUND

53. The Contractors Order asserts a legal and moral premise that is fundamentally flawed. The Order claims that all diversity, equity, and inclusion activities constitute "racial discrimination," and that they are both "illegal" and "unethical." All of that is incorrect.

54. The Equal Protection Clause guarantees that the government shall not "deny to any person . . . the equal protection of the laws," U.S. Const. amend. XIV, § 1. Likewise, Congress has declared that "[a]ll persons within the jurisdiction of the United States shall have . . . the full and equal benefit of all laws." 42 U.S.C. § 1981(a).

55. Tragically, our country has often "failed to live up to [this] core commitment[]." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 203 (2023). Faced with our "ignoble history" of such "pernicious[]" failings as "state-mandated segregation," *id.*, Congress has recognized the moral imperative for remedial action and has explicitly authorized efforts to remedy discrimination and its continuing impacts.

8

56. Contractors who serve the federal government—the country's largest institution by nearly every metric—have both been victims of discrimination and beneficiaries of Congress's corrective measures.

57. Beginning in the late 1970s, Congress has repeatedly determined that race-based discrimination continues to exist in federal contracting. In the 1978 Amendments to the Small Business Act, for example, Congress recognized that "socially and economically disadvantaged groups" have "suffered the effects of discriminatory practices" in a manner that impedes their "full participation in our free enterprise system." Congress further recognized that the "opportunity" for full participation is not only necessary for "social and economic equality," it is also "essential if we are to . . . improve the functioning of our national economy." Accordingly, the 1978 Amendments created a training program for socially and economically disadvantaged small business owners in order to increase their ability to compete for federal contracts.

58. A decade later, at a 1988 hearing to address disparities in federal construction contracting, House Subcommittee on Commerce, Consumer Protection and Competitiveness Chairman James J. Florio recognized that "[m]inority contractors have a serious problem obtaining surety bonds, and thus a significant problem participating in many construction projects," and conceded that the "reduced competition hurts the taxpayers too."

59. As recently as 2021, Congress acknowledged that "while significant progress has occurred . . . , discrimination and related barriers continue to pose significant obstacles for minority-[]owned businesses seeking to do business" as federal contractors, recognizing that "discrimination across the United States poses a barrier to full and fair participation in surface transportation-related businesses of . . . minority business owners." IIJA, Pub. L. No. 117–58, § 11101(e)(3), 135 Stat. 429, 448–49 (2021) (codified at 23 U.S.C. 101 note).

9

60. In the bipartisan Infrastructure Investment and Jobs Act, Congress confirmed, after reviewing mountains of evidence, that "there is a compelling need for the continuation of [a program] to address race [] discrimination" in certain sectors of federal contracting.  IIJA, 135 Stat. at 449 (23 U.S.C. 101 note).

61. In other words, business development, training, and other efforts to increase opportunity remain vital tools for remedying the discrimination that continues to plague the country and burden federal contractors and subcontractors.

62. Contrary to the assertions made by President Trump in the Contractors Order, these activities are neither discriminatory themselves, nor illegal. To begin, the concepts of diversity, equity, and inclusion promote belonging and understanding. But the Order's reach is far broader. By equating expression on race and ethnicity with "DEI," the Contractors Order reaches a substantial amount of protected expression, including lawful remedial efforts, that touches on race without excluding or classifying individuals based on race.

63. Neither the Supreme Court nor the Fourth Circuit have held that activities promoting inclusion or studying race are improper, or that individuals or entities  receiving federal funds are prohibited from discussing or expressing themselves on topics related to race or ethnicity. *See, e.g.*, *SFFA*, 600 U.S. at 230-31 (explaining that any constitutional limits on race-based admissions do not prohibit universities from considering race for admission purposes in the context of an individual applicant's discussion of their lived experience).

64. Moreover, even activities that *do* classify individuals by race are nevertheless lawful so long as they seek to remedy discrimination and are narrowly tailored to that interest. The Supreme Court has repeatedly acknowledged that such remedial measures are permissible, saying in 1995 that "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is

10

not disqualified from acting in response to it." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995).

65. Multiple Supreme Court justices explicitly recognized the legality of such efforts in *Students for Fair Admissions v. Harvard*. Chief Justice Roberts, writing for the majority, noted that under well-established jurisprudence, individuals can discuss how race impacts their lives, "be it through discrimination, inspiration, or otherwise," without fear of violating the law. *SFFA*, 600 U.S. 181, 230 (2023). And Justice Kavanaugh, in concurrence, explained that under well-established jurisprudence, entities can "act to undo the effects of past discrimination in many permissible ways that do not involve classification[s] by race" without fear of violating the law. *Id.* at 317 (Kavanaugh, J., concurring) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 526 (1989) (Scalia, J., concurring in judgment)).

66. Nearly 30 years after the Supreme Court's decision in *Adarand*, the Court reaffirmed that its "precedents . . . permit . . . race-based government action" if based on "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *SFFA*, 600 U.S. at 207 (citing, *e.g.*, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007)); *see also Adarand*, 515 U.S. at 237 ("When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the 'narrow tailoring' test.").

## FACTUAL ALLEGATIONS

### A. Federal contractors build, educate, and care for the country.

67. Federal contractors and subcontractors are crucial to the safe, effective, and efficient functioning of the country, and contribute to nearly every aspect of society, and across nearly every agency of the federal government.

68. For example, federal contractors and subcontractors, many of whom are members of NAMC and NAMC-DMV, design and build many of our nation's buildings and highways, bridges, and byways providing the foundation for every aspect of the country's government and economic activity. DOI relied on contractors to help design and construct the National Museum of African American History and Culture.[3] DOD contracted to help reconstruct the Rockaway Boardwalk after Hurricane Sandy.[4] DOT relied on contractors to help with the construction of air traffic control towers.[5] And DOT has entered several "indefinite delivery, indefinite quantity contracts" that will allow federal contractors to design, construct, and provide engineering services for highways and bridges in over 31 states (including Maryland and Virginia), the District of Columbia, and two U.S. territories.

69. Similarly, the Department of Education relies on federal contractors and subcontractors— which include NADOHE's institutional members and institutions that employ individual members of NADOHE, AAUP, and UAM-UMD—to provide research, technical assistance, and data analysis to support the education of students across the country. For example, Education has awarded federal contracts to operate its Regional Educational Laboratories, where contractors provide technical assistance, research and evaluation support, and research-informed guidance to

---

[3] Contract Summary for DOI Contract with McKissack & McKissack, USASpending, https://perma.cc/RRY8-YMJX (last accessed Apr. 8, 2026); *see also National Museum of African American History and Culture*, McKissack & McKissack, https://perma.cc/L4RP-9EWN (last accessed Apr. 8, 2026).

[4] Contract Summary for DOD Contract with Ashnu International, USASpending, https://perma.cc/52D4-PZG4 (last accessed Apr. 8, 2026).

[5] Contract Summary for DOT Contract with Smoot Construction Co., USASpending, https://perma.cc/MN4Y-XQF9 (last visited Apr. 8, 2025).

educators, districts, states, and policymakers to improve education outcomes for the country's students.[6]

70. HHS uses federal contractors and subcontractors to deliver critical public health services. For instance, the agency has hailed the use of federal contracts as "essential" to the provision of healthcare to American Indian and Alaska Native communities; the purchase of public health supplies; and the delivery of "high quality, secure, and efficient information technology solutions that enable the Food and Drug Administration to promote and protect public health."[7]

71. Likewise, DOD, the nation's top user of federal contractors and subcontractors, relies on federal contractors to provide critical support services for the military.

72. These types of contracts are the norm across the federal government. Virtually every executive agency relies on federal contractors and subcontractors to complete its work serving the American people.

73. Each year, the federal government spends hundreds of billions of dollars on federal contracts, reaching $755 billion for Fiscal Year 2024.[8]

74. Beyond supporting the labor costs for federal contractors and subcontractors, federal contracts also fund a portion of "overhead" or "indirect costs" for federal contractors and subcontractors to ensure that they are able to maintain the infrastructure necessary to fulfill the contract terms.

---

[6] *The Regional Education Laboratory (REL) Program*, Inst. of Educ. Scis., https://perma.cc/P6XJ-NGM3 (last visited Apr. 8, 2026).

[7] *Public Health and Human Service Grants and Contracts*, Dep't of Health & Hum. Servs.: Off. of Inspector Gen. (July 15, 2025), https://perma.cc/WB8D-BBGL/.

[8] *A Snapshot of Government-Wide Contracting for FY 2024 (Interactive Dashboard)*, U.S. Gov't Accountability Off. (June 24, 2025), https://perma.cc/V72H-ACLC.

75. Contract-funded overhead costs for universities typically include expenses related to physical spaces and institutional functions such as human resources, payroll, and facilities management.

76. Employees of higher education institutions regularly rely on university resources funded by contract funds for "overhead" or "indirect costs."

77. Historically, the government hailed the importance of racial diversity among federal contractors and subcontractors. In response to learning that Black Americans were not given fair access to jobs in the defense industry, President Franklin D. Roosevelt in 1941 issued an executive order that outlawed discrimination based on race by federal contractors. In so doing, President Roosevelt explained that "the democratic way of life within the Nation can be defended successfully only with the help and support of all groups within its borders."[9]

78. Several presidents followed President Roosevelt and issued executive orders seeking to promote diversity among federal contractors.[10] For example, in 1961, against the backdrop of racial discrimination, President John F. Kennedy issued an executive order which prohibited federal contractors from engaging in race-based discrimination[11] and announced that "it is in the

---

[9] Reaffirming Policy Of Full Participation In The Defense Program By All Persons, Regardless Of Race, Creed, Color, Or National Origin, And Directing Certain Action In Furtherance Of Said Policy, Exec. Order No. 8802, 6 Fed. Reg. 3109 (June 7, 1941), https://perma.cc/8XJK-S92B.

[10] *See* Improving the Means for Obtaining Compliance With the Nondiscrimination Provisions of Federal Contracts, Exec. Order No. 10308, 16 Fed. Reg. 12303 (Dec. 6, 1951) (Truman); Approving the Revised Provision in Government Contracts Relating to Nondiscrimination in Employment, Exec. Order No. 10557, 19 Fed. Reg. 5655 (Sept. 8, 1954) (Eisenhower); Establishing the President's Committee on Equal Employment Opportunity, Exec. Order No. 10925, 26 Fed. Reg. 1977 (Mar. 8, 1961) (Kennedy).

[11] Establishing the President's Committee on Equal Employment Opportunity, Exec. Order No. 10925, 26 Fed. Reg. 1977 (Mar. 8, 1961), https://perma.cc/44XJ-9PYZ; *see also The Modern Civil Rights Movement and the Kennedy Administration*, John F. Kennedy Presidential Libr. & Museum (Mar. 31, 2026), https://perma.cc/7B6X-VPCS.

general interest and welfare of the United States to promote its economy, security, and national defense through the most efficient and effective utilization of all available manpower."[12]

79. Presidents have also acted to promote participation by minority-owned businesses in the country's economy. For instance, in 1969, with a goal of helping develop and strengthen minority-owned businesses, President Richard M. Nixon established the Office of Minority Business Enterprise, known as the Minority Business Development Agency since 1979, and the Advisory Council for Minority Enterprise.[13]

80. Our history of promoting diversity within federal contractors is evident from actions taken by federal agencies as well. Since its establishment in 1965 and until President Trump rescinded President Johnson's Executive Order 11246 on the first day of his second term in January 2025, the OFCCP worked to promote diversity among federal contractors and subcontractors and to ensure they comply with anti-discrimination laws.[14]

81. Congress, too, has recognized the importance of promoting diversity among federal contractors and subcontractors. For example, in 1978, Congress created the Business Development Program, recognizing in its enabling act that: "the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy."[15]

---

[12] *Id.*

[13] Prescribing Arrangements for Developing and Coordinating a National Program for Minority Business Enterprise, Exec. Order No. 11458, 34 Fed. Reg. 4937 (March 5. 1969), https://perma.cc/HE93-B9YY.

[14] Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[15] Act to Amend the Small Business Act and Small Business Investment Act of 1958, Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

82. For over eighty years, every branch of government has recognized that fostering diversity among contractors and subcontractors—the force multipliers of the federal government—fortifies the country's workforce.

**B. Defendants' campaign against federal contractors and "DEI."**

83. President Trump has consistently and emphatically waged a campaign against both "DEI" programs and federal contractors committed to the values of diversity, equity, and inclusion, beginning before his inauguration in January 2025 and continuing ever since.

84. In his 2024 presidential campaign, President Trump emphasized his opposition to "DEI," promising to "terminate every diversity, equity and inclusion program across the entire federal government,"[16] and referring to universities with diversity, equity, and inclusion programs as the "enemy."[17] Before the 2024 election, then-vice-presidential candidate J.D. Vance wrote that "DEI is racism, plain and simple" and declared it "time to outlaw it nationwide."[18]

85. Since taking office, President Trump and his Administration have continued their anti-DEI rhetoric. President Trump has referred to DEI as a "tyranny"[19] and "lawless . . . bullshit," which he has claimed to have "ended . . . across the entire federal government and the private sector."[20] Karoline Leavitt, the White House Press Secretary, referred to diversity, equity, and inclusion

---

[16] Michael D. Shear & Michael Gold, *Donald Trump's Promises*, N.Y. Times (Jan. 19, 2025), https://perma.cc/9NT7-NJPR.

[17] Alice Speri, *Trump Promises a Crackdown on Diversity Initiatives. Fearful Institutions Are Dialing Them Back Already*, The Guardian (Dec. 5, 2024, 7:00 EST), https://perma.cc/5SQR-PW7Y.

[18] JD Vance (@JDVance), X.com (Jun. 12, 2024, at 9:55 AM ET), https://perma.cc/C2PE-JH2Q.

[19] *See* Jessica Guynn, *DEI Explained: What is DEI and Why is it So Divisive? What You Need to Know*, USA Today (Mar. 4, 2025), https://perma.cc/LU52-NWR5.

[20] PBS Newshour, *WATCH: Trump Marks First 100 Days in Office With Focus on Grudges and Grievances*, at 1:19:47 (Youtube, Apr. 29, 2025), https://www.youtube.com/live/8OEMk-BcrAk?si=25HnN4SjwR9RfJMf&t=4787. Notably, the Contractors Order directly contradicts this claim. Addressing DEI Discrimination by Federal Contractors, Exec. Order No. 14398, 91 Fed. Reg. 16147 (Mar. 26, 2026) ("[S]ome entities continue to engage in DEI activities . . . .").

programs as a "scourge" that the President had campaigned on eliminating.[21] And multiple agency heads posted a video to the White House website, lauding that "DEI Is Dead Under the Trump Administration."[22]

86. This messaging has translated into policy and enforcement decisions. The administration has fired numerous high level government officials while citing their association with diversity, equity, and inclusion policies or ideas. The President has issued executive orders and memoranda targeting and ending diversity, equity, and inclusion programs in every sector of the federal government, both at home and abroad.[23] DOJ has initiated investigations into more than 70 major universities, law schools, and medical schools seeking evidence of "DEI in admissions processes."[24] Assistant Attorney General of the Civil Rights Division, Harmeet K. Dhillon, testified before a Senate subcommittee that DOJ was implementing President Trump's anti-DEI plan to ensure that "either DEI will die itself, or we will kill it."[25]

87. Meanwhile, the FCC has initiated investigations into diversity initiatives at many of the country's major media conglomerates and organizations, including Disney, ABC, NBC Universal, and Comcast.[26]

---

[21] Zoe Richards & Caroline Kenny, *Trump Orders All Federal Diversity, Equity and Inclusion Employees Placed on Paid Leave Starting Wednesday*, NBC News (Jan. 21, 2025, 9:53 PM EST), https://perma.cc/TK6Y-JB7H.

[22] *DEI is Dead Under the Trump Administration*, White House (Feb. 21, 2025), https://www.whitehouse.gov/videos/dei-is-dead-under-the-trump-administration/.

[23] *See, e.g.*, *Fact Sheet: President Donald J. Trump Removes DEI From the Foreign Service*, White House (Mar. 18, 2025), https://perma.cc/Y3K7-XCP8/.

[24] *Ending Illegal DEI Discrimination & Preferences–Enforcing Our Civil Rights Laws: Hearing Before S. Subcomm. on the Constitution*, 119 Cong. 2 (2025) (statement of Harmeet K. Dhillon, Assistant Att'y Gen., C.R. Div.), https://perma.cc/VM85-V6A8.

[25] *Id.* at 3.

[26] Melissa Hellmann, *'It's Not a Coincidence': Journalists of Color on Being Laid Off Amid Trump's Anti-DEI Push*, The Guardian (Dec. 31, 2025, 15:41 EST), https://perma.cc/HN4E-F8WY.

88. The administration's anti-DEI actions have often targeted federal contractors specifically. In March of 2025, President Trump rescinded a longstanding directive, dating from the Civil Rights Movement, that prohibited federal contractors from allowing segregated facilities on their premises.[27] In May, DOL released a budget justification for the 2026 fiscal year that proposed eliminating the OFCCP after President Trump issued an executive order that revoked the legal authority for the primary area of the office's enforcement of equal employment opportunity practices among federal contractors. In October of 2025, DOT issued an Interim Final Rule gutting elements of DOT's DBE program, and in turn eliminating a key mechanism for minority contractors to gain a foothold in the close-circle network of predominantly white contractors.[28]

89. The Trump-Vance Administration's policy changes have had ripple effects on the private sector as well. Under threat of retribution, corporations leading many major sectors of the U.S. economy have taken concerted efforts to pare down diversity efforts, at times directly citing the Trump Administration's anti-DEI campaign as the impetus for the shift.[29]

90. At every opportunity, the Administration has embraced and systematically implemented its anti-DEI campaign.

## I. President Trump's 2025 Anti-DEI Executive Orders.

91. On his first two days in office, President Trump issued a pair of executive orders seeking to eliminate diversity, equity, and inclusion from our nation's government, including by barring

---

[27] *See* Erica L. Green, *Trump Administration Dropped Policy Prohibiting Contractors From Having Segregated Facilities*, N.Y. Times (Mar. 21, 2025), https://perma.cc/RND4-BYCK.

[28] Disadvantaged Business Enterprise Program and Disadvantaged Business Enterprise in Airport Concessions Program Implementation Modifications, 90 Fed. Reg. 47969 (Oct. 3, 2025) (to be codified at 49 C.F.R. pts. 23 & 26), https://perma.cc/5V45-5VMN.

[29] Connor Murray & Molly Bohannon, *IBM Reportedly Walks Back Diversity Policies, Citing 'Inherent Tensions': Here Are All the Companies Rolling Back DEI Programs*, Forbes (Apr. 11, 2025, 11:27 AM EDT), https://perma.cc/4246-NVCH.

federal contractors who support and promote those principles from accessing federal funds through current or future contracts.

92. The Day 2 Anti-DEI Order was not shy about its purpose in eliminating diversity, equity, and inclusion programming from the federal government, calling such programming "dangerous, demeaning, and immoral" and baselessly asserting that DEI policies "undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system."[30]

93. To further that goal, the Day 2 Anti-DEI Order weaponized the federal contracting process by requiring all federal agencies to insert a new term in every contract or grant award.

94. That new term requires each contractor and grant recipient to "certify" that "it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."

95. On January 21, 2025, OPM directed all agency heads to, among other actions, "terminate any DEIA-related contractors" by close of business the following day, and provided template language for agency heads that explained the agency was "taking steps to . . . end all DEIA-related contracts in accordance with" the Day 2 Anti-DEI Order.[31] It also asked government employees to "report all facts and circumstances" about alleged efforts to "obscure the connection between [any] contract and DEIA or similar ideologies."[32]

96. NADOHE and AAUP, among others, challenged the 2025 Anti-DEI Executive Orders under the First and Fifth Amendments.[33] On appeal, the Fourth Circuit focused on the certification

---

[30] Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order No. 14173, 90 Fed. Reg. 8633, 8634 (Jan. 21, 2025) (revoking Executive Order 11246).

[31] Memorandum to Heads and Acting Heads of Departments and Agencies from Charles Ezell, Acting Dir., U.S. Off. of Pers. Mgmt. (Jan. 21, 2025), https://perma.cc/JSW5-89NC.

[32] *Id.*

[33] *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 283 (D. Md.) (citing *Bd. of Cnty. Com'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 675 (1996)),

19

provision's text that a contractor certify "compliance in all respects with all applicable Federal anti-discrimination laws," and concluded that the language protected the provision from facial attack because there is "no constitutional right to operate[] DEI programs that violate federal antidiscrimination law." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 103–04 (4th Cir. 2026) (cleaned up). In doing so, the court noted that "[i]f the President" or another government actor "misinterprets federal antidiscrimination law" and seeks to punish lawful expression, plaintiffs could challenge that restriction. *Id*. at 104.

## II.    The Contractors Order.

97. On March 26, 2026, President Trump took the next step in his campaign to equate any discussion of race, ethnicity, or difference with "illegal discrimination."

98. The Contractors Order defines two terms that are central to its scheme:

- "[R]acially discriminatory DEI activities" is defined as "disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program participation, or allocation or deployment of an entity's resources."

- "[P]rogram participation" is defined as "membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor."

---

*opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025), *and vacated and remanded*, 167 F.4th 86 (4th Cir. 2026). Other groups filed similar challenges to the executive order in the District of Columbia, *National Urban League v. Trump*, 783 F. Supp. 3d 61 (D.D.C. 2025), and in Illinois, *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025).

99. The Contractors Order then requires all executive departments and agencies to insert a new clause into all contracts by April 25 (the "Diversity Ban") that requires the contractor to agree that:

a. The contractor "will not engage in any racially discriminatory DEI activities" as defined by the Contractors Order;

b. The contractor will furnish any information the contracting agency requires to "ascertain compliance" with the clause;

c. Noncompliance with the clause can result in cancellation of the contract and ineligibility for any future government contract;

d. The contractor will report to the contracting agency "any subcontractor's known or reasonably knowable conduct that may violate" the clause;

e. The contractor will inform the contracting agency if a subcontractor sues the contractor and the suit puts the validity of the clause at issue;

f. The contractor "recognizes" that compliance with the clause is "material to the government's payment decisions for purposes of" the False Claims Act.

100. Next, the Contractors Order directs OMB to issue guidance aimed at ensuring that agencies comply with the Order. When a contractor or subcontractor fails to agree to the newly-inserted Diversity Ban, contracts will be terminated and contractors and subcontractors will be suspended or debarred from securing contracts in the future.

101. The Contractors Order sets forth a framework for the FAR Council to amend the Federal Acquisition Regulation to provide for the Diversity Ban to be included in all federal procurements, solicitations, and contracts moving forward and to remove any provisions that "conflict or are inconsistent" with the Diversity Ban. Finally, the Contractors Order instructs the Council to

facilitate agency implementation of the Diversity Ban by issuing deviation and interim guidance under subpart 1.4 of the Federal Acquisition Regulation.

102. The Order's definition of "racially discriminatory DEI activities" is both overbroad and imprecise. By its plain terms, it includes any "disparate treatment" in many practices that may routinely, necessarily, and legally recognize and vary based on race, such as recruitment designed to expand access to opportunities open to all, training or programming that raise awareness about or take steps to avoid racial or ethnic discrimination, spending on programs aimed at certain communities, or discussion forums open to the public but focused on particular groups. The definition is not limited to activities that violate federal anti-discrimination law.

103. By using the broad, opaque, and ill-considered terms like "recruitment," "program participation," and "deployment of . . . resources," the Contractors Order reaches a vast swath of contractor and subcontractor expression and activities that may differently affect or address race or ethnicity, even if those activities are justified, legal, and constitutionally protected.

104. On the same day that the President signed the Contractors Order, the White House issued a Fact Sheet outlining its policy rationales and concluding that the Order delivers on the Trump Administration's "promise to end DEI across the Federal Government."[34]

105. Using broad, opaque, and ill-considered terms, the Contractors Order targets expression about race and ethnicity, not to mention diversity, equity, and inclusion, that is constitutionally protected.

106. The Order itself exposes its motivation in a stream of baseless and unsupported allegations that "DEI activities" are "unethical and often illegal," "cause inefficiencies, waste, and

---

[34] *Fact Sheet: President Donald J. Trump Addresses DEI Discrimination by Federal Government*, White House (Mar. 26, 2026), https://perma.cc/SLK5-QCGG.

abuse," "impose artificial" and "unnecessary costs," "creat[e] excessive workforce turnover," "jeopardiz[e]" "efficient and high-quality work," and "reduc[e] the pool of available labor."

107. But decades of research conclusively demonstrate the opposite is true: Diversity and inclusion are an important "source of competitive advantage" and a "core enabler of growth and value creation" that helps companies that focus on diversity "pull[] ahead of the rest."[35]

108. Justified only by flawed assertions, the Contractors Order seeks to broadly curtail the ability of contractors and subcontractors to engage in First Amendment-protected speech and association on topics related to race, ethnicity, diversity, equity, and inclusion, thus impairing their ability to operate their businesses, even though their speech and association comply with federal antidiscrimination law.

109. For example, on its face, the Contractors Order appears to broadly forbid: voluntary associations or non-exclusive gatherings of employees if they are connected to race or ethnicity, even if such groups are open to all; any programming or support for contractors or employees of contractors who may face challenges due to their actual or perceived race or ethnicity; contractors or subcontractors hosting a speaker who discusses challenges they faced navigating their industry because of their race or ethnicity; targeted recruitment and advertising designed to expand access to non-exclusionary opportunities; or any resource allocation that highlights a particular race or ethnicity, even where the legality of such activities is well established.

110. Contracts cover a wide variety of projects ranging from building bridges and roads, to advancing STEM education, to developing medical infrastructure in rural communities, to pursuing more equitable health outcomes, to creating and making available accessible technology,

---

[35] McKinsey & Co., *Diversity wins: How inclusion matters* 13 (2020), https://perma.cc/84VH-CCLT.

23

to improving public transit for communities, to promoting the development of clean energy technology, and many more.

111. Absent this Court's intervention, contractors, subcontractors, and their employees—including Plaintiffs' members—will be forced to choose between chilling their constitutionally protected expression and risking the loss of federal funds or even criminal prosecution.

### III.   Implementation of the Contractors Order

112. The FAR Council began implementing the Contractors Order, including by issuing a class deviation and other mandates, in April.

*Information Collection*

113. On April 15, 2026, the FAR Council submitted a request for "emergency processing" under the Paperwork Reduction Act, 5 C.F.R. § 1320.13, of an information collection requirement to implement Section 3 of the Contractors Order, which requires agencies "to collect information to support the implementation of the [Contractors Order]."

114. The FAR Council asserted that it needed the request to be approved "no later than April 17, 2026," and argued that it had met the statutory requirements for emergency processing because the Contractors Order Section 3 required agencies to incorporate the Diversity Ban within 30 days, compliance with the Contractors Order "is essential to the mission of the agencies to ensure compliance with the [Contractors Order]," and the Contractors Order's "policy and purpose" language shows that allowing for the normal Paperwork Reduction Act process would cause public harm.

115. In support of its request for "emergency clearance," the FAR Council included a "Justification," which asserts that "[t]he burden applied to small businesses is the minimum" and that "[c]ollection of information on a basis other than contract-by-contract is not practical."

24

116. The "Justification" supports these assertions with a "Burden Estimate," allegedly based on "consultation with [unidentified] subject matter experts and data from SAM Contract Awards Management," which asserts that only one percent of award recipients will have to submit information pursuant to the Contractors Order, and that "the estimated time per response" to requests to "furnish all information and reports" pursuant to Section (3)(2) of the Contractors Order is one hour.

117. The "Justification" did not provide any basis for concluding that furnishing all information and reports will only take one hour or that only one percent of award recipients would have to submit information.

118. On information and belief, the FAR Council later withdrew the emergency request.

*FAR Council Implementation*

119. On April 17, 2026, the FAR Council issued guidance, as required by Section 5 of the Contractors Order, "to support" agency implementation.[36] The FAR Council Implementation provides the timeline and conditions for agencies to insert the Diversity Ban into contracts.

120. The FAR Council Implementation includes model language for agency deviations. Barring a separate statutory mandate, agencies may not revise the model deviation language unless they "request approval from the [FAR] Council."

121. The model deviation language in the FAR Council Implementation does not modify the Diversity Ban or definitions of "racially discriminatory DEI activities" or "program participation" in any way; the language is identical to what is set forth in the Contractors Order.

122. The model language incorporates failure to comply with the Diversity Ban into the list of bases for debarment or suspension. FAR §§ 9.406-2(b)(1)(viii); 9.407-2(a)(11).

---

[36] Memorandum on Agency Implementation of Executive Order 14398, Addressing DEI discrimination by Federal Contractors, Federal Acquisition Regulation Council (Apr. 17, 2026), https://perma.cc/YH8M-SHZ4 ("FAR Council Implementation").

25

123. The model language does not require a particular mental state or history of failing to comply with a contract clause to support debarment or suspension.

124. According to the FAR Council Implementation, agencies must insert the Diversity Ban language into all new solicitations and resulting contracts over $15,000[37] starting on April 24, 2026,[38] and bilaterally modify existing contracts to include the clause by July 24, 2026.

125. If a contracting party to a pre-existing contract refuses to agree to the bilateral modification to include the Diversity Ban, the FAR Council Implementation mandates that agencies consider whether the contract "no longer meets the agency's needs" and should be terminated for convenience.

126. The FAR Council Implementation emphasizes that the Diversity Ban "flows down to subcontracts at any tier, including those for commercial products and commercial services, for which the place of delivery or performance is in the United States."

127. The FAR Council Implementation also implements Section 4(c) of the Contractors Order by requiring agencies to report on their compliance to the Assistant to the President for Domestic Policy by July 24, 2026.[39] The report should include (1) when the deviation was issued; (2) whether it modified the model language; and (3) whether the agency's approach to applicability varies from the FAR Council Implementation.

128. Although the Paperwork Reduction Act process had not concluded, the FAR Council Implementation provides that agencies may enforce the information collection requirements of the Contractors Order, Sec. 3 (2-4) (i.e., for contractors to furnish records related to compliance and

---

[37] The FAR Council Implementation requires the language be inserted into "contracts valued over the micro-purchase threshold," which is defined in FAR § 2.101 as $15,000, subject to certain exceptions.

[38] The FAR Council Implementation excepts contracts "with a final expiration no later than December 31, 2026," whose modification is "at contracting officer discretion."

[39] July 24, 2026, is 120 days from March 26, 2026, the date the Contractors Order was issued, and comports with the timeline set forth in the Contractors Order itself.

report potential violators) until OMB approves the emergency request, at which point such collection will become mandatory for all agencies. On information and belief, the emergency certification has been withdrawn.

129. The Paperwork Reduction Act requires that, absent OMB providing emergency processing, before any agency "conduct[s] or sponsor[s] an information collection, it must open a 60-day period for public comment." 5 C.F.R. §§ 1320.5(a); 1320.8(d). Once that period closes and the agency considers the comments, 5 C.F.R. § 1320.5(a)(ii), the agency must submit all collected information for OMB review and concurrently publish a notice informing the public that comments may be submitted directly to OMB within 30 days of the notice's publication. 5 C.F.R. §§ 1320.10(a); 1320.11; 1320.12.

130. OMB has 60 days after receipt of the proposal and supporting documents or publication of the notice, whichever is later, to render a decision on the information collection request. 5 C.F.R. § 1320.10(b). Within this 60-day period, OMB must typically provide "at least 30 days for public comment after receipt of the proposed collection of information before making its decision." *Id.* In total, the duration of the typical Paperwork Reduction Act process is at least 90 days.

131. Although no rulemaking has concluded, the FAR Council Implementation "encourage[s]" agencies to "make their class deviations effective" to incorporate the Diversity Ban into contract language.

132. Even if the FAR Council began the request for comments on the FAR Council Implementation process today, all of the deadlines set forth in the FAR Council Implementation have either passed or will pass before the statutory timeline for notice and comment laid out in 41 U.S.C. § 1707, which requires 30 days for public commenting and 60 days for agency review of the comments.

27

**C. Plaintiffs and Their Members Rely on Federal Contracts and Subcontracts for Their Livelihoods.**

133. Plaintiffs' members are contractors, subcontractors, partners with, and employees of contractors or subcontractors that operate on contracts or contract-like instruments with various federal agencies.

134. Plaintiffs' members also engage in lawful expression to promote and contribute to equal access to opportunities for all. Plaintiffs' members recognize that issues at the intersection of race, ethnicity, opportunity, and access are of immense public concern. Their work ensuring that people from all backgrounds have access to opportunities for advancement is core to their mission and identities.

135. Pursuant to the Contractors Order, by April 25, 2026, the contracts that Plaintiffs, their prime contractors, and their employers have entered into with federal agencies should have been amended to include the Diversity Ban.

136. Many of Plaintiffs' members conduct activities that, under the Order, could result in cancellation of contracts awarded to them, their prime contractors, or their institutions. And because the Contractors Order also requires agencies to suspend and debar contractors and subcontractors for noncompliance with the Diversity Ban, many of Plaintiffs' members reasonably fear that their activities may jeopardize their, or their employers', ability to win future federal contracts.

137. Plaintiffs' members who are federal contractors and subcontractors reasonably fear that because of the Contractors Order, they face a choice between chilling their speech and losing their current federal contracts and subcontracts, permanently losing their ability to bid for future federal contracts or subcontracts, and facing civil or criminal punishment under the False Claims Act.

138. Plaintiffs' members who are employed by federal contractors or subcontractors reasonably fear that because of the Contractors Order, they face a choice between chilling their

28

speech and being responsible for their employer's loss of current federal contracts, permanent loss of their employer's ability to bid for future federal contracts or subcontracts, and putting their employer at risk of civil or criminal punishment under the False Claims Act.

139. Plaintiffs' members who are employed by federal contractors and subcontractors also reasonably fear that their employer may impose negative employment consequences upon them, such as job loss, change of duties, or decrease in hours or responsibilities, in order to avoid adverse consequences under the Contractors Order.

## I.   As organizations committed to promoting inclusion and opportunity, NAMC, NAMC-DMV, and NADOHE face existential threats due to the Contractors Order.

140. The Contractors Order threatens the work and long-term viability of NAMC, NAMC-DMV, and NADOHE.

141. NAMC, a nonprofit trade association focused on training minority contractors on how to pursue government contracting and advocate for access to business opportunities, serves as a gathering space for contractors from across the country. Operating in a traditionally white-dominated industry, NAMC works to promote the interests and opportunities of minority contractors by removing barriers to access and increasing transparency across trades.

142. NAMC fulfills its mission by providing a space through regular meetings and events for minority contractors, normally excluded from long established business networks, to meet with large prime contractors; providing training and access to project management software provided by NAMC sponsors; and providing updates and information about local, regional and national policy trends through events like the annual conference.

143. Many of NAMC's long-time partners are themselves federal contractors who depend upon NAMC to build connections with small businesses outside their networks. These partners help support and sponsor many of NAMC's activities, services, and training programs. NAMC

29

fears that these partnerships will suffer because of the Contractors Order's implication that contractors must avoid dedicating resources to building capacity and opportunity for minority contractors or risk losing their own federal contracts and subcontracts. At least 70 percent of NAMC's operating funds come from these sponsorships. Without these partnerships, NAMC's efforts to empower minority contractors will suffer.

144. Moreover, NAMC's leadership is deeply concerned that because of the Contractors Order, even talking about the organization's mission—to assist minority enterprises in starting up, growing, and contributing to the national economy—could lead to loss of contracts or partnerships. Because of the Contractors Order, NAMC is monitoring all aspects of its work carefully. The organization leadership feels a sense of chaos and uncertainty that hinders its ability to execute some of its core events and activities.

145. In addition, NAMC believes that the Order is intended to intimidate organizations, businesses, and institutions so that they will no longer pursue efforts to include people, businesses, and communities that have historically been excluded. If the Administration is successful in its campaign of intimidation, few will seek out NAMC's help and guidance in making connections and building business relationships between industry and minority contractors and minority construction workers. This would decimate one of NAMC's most important functions.

146. NAMC-DMV serves a similar role as NAMC but with a focus on contractors in the Maryland, D.C., and Virginia region. Run by a board of its members, NAMC-DMV's membership primarily works in construction contracting and contributes to major federal, state, and municipal projects. NAMC-DMV, through its member services and advocacy, promotes a contracting industry that provides access and opportunity to contractors from all backgrounds and demographics.

147. NAMC-DMV provides business development and engagement options for its members, including hosting sessions where larger general contractors and prime contractors can meet with members and advise them of upcoming opportunities and the expectations they have for subcontractors; regular sessions updating members on various federal, state and local public policy issues; and opportunities for sharing information and experiences among NAMC-DMV members themselves.

148. NAMC-DMV similarly partners with local sponsors, many of whom hold federal contracts, and helps build connections to NAMC-DMV members for business development and subcontracting needs. These sponsoring companies provide training, networking, and business support to NAMC-DMV members. Because of the Contractors Order, NAMC-DMV is concerned that it will lose these partnerships because sponsors will believe that their association with, and support for, minority contractors will be construed as forbidden DEI activities under the Order. Losing these connections would undermine NAMC-DMV's ability to effectively serve their members. Ninety percent of NAMC-DMV's operating expenses come from these sponsors. Losing their support would be devastating.

149. In addition, NAMC-DMV regularly asks some of its sponsors to support specific training and networking events. In light of the concerns expressed by their sponsors about the Contractors Order, NAMC-DMV is considering whether to significantly revise current plans for these events.

150. NAMC-DMV worries that it may need to chill its own speech and association with member or partner contractors and subcontractors, who will be unable to collaborate with NAMC-DMV for fear of violating the terms of the Contractors Order. For example, NAMC-DMV recently partnered with a Black business community organization to host a forum for D.C. mayoral candidates to discuss their plans for supporting Black businesses and the broader Black community. But in light of the Contractors Order, the organization is now anxious that it will no

31

longer be able to hold public education events like this in the future, or maintain its focus on ensuring that Black and minority businesses have a fair chance to compete in Washington DC, Maryland, and Virginia.

151. NADOHE works to enhance academic freedom and exploration by embracing a vision of academic excellence that includes faculty and students from all backgrounds. The organization strives to equip diversity professionals and institutions of higher education with the necessary tools to be successful in their roles and to advance equity, inclusion, access, and the value of belonging within their campus communities, using evidence-based practices. NADOHE's individual diversity officer members frequently work with multiple units on campus as part of their roles, including human resources, facilities management, and procurement. Some are classified as part of their institutions' human resources offices, because diversity, equity, and inclusion strategies are intertwined with ensuring that an institution does not engage in racially exclusionary and unlawfully discriminatory employment practices.

152. NADOHE serves its mission by providing professional development, career counseling, and other support to its members; publishing the peer-reviewed *Journal of Diversity in Higher Education*; and hosting a range of programs and events aimed at providing resources to members.

153. Because of the Contractors Order, NADOHE is concerned that its institutional members will pull back their support, out of fear that the Administration will consider any association with NADOHE to be "racially discriminatory DEI activities," which would then endanger both current and future federal contracts.

154. Similarly, due to the Contractors Order, NADOHE reasonably fears that individual members will cancel their memberships or stop participating in programming because their universities will no longer sponsor their participation, or because the individual members will lose

their jobs as a result of their institution's response to the Order, or out of concern that being seen as aligned with NADOHE will hamper their employment prospects in the long run.

155. The Contractors Order also threatens NADOHE's standing in its relationships with both its institutional and individual members. NADOHE's members look to NADOHE for guidance on lawful, evidence-based strategies for advancing inclusive excellence on campuses, and a core aspect of NADOHE's work entails developing standards of professional practice which provide that Chief Diversity Officers have ethical, legal, and practical obligations to frame their work as inclusive and to ensure full compliance with the legal and regulatory requirements for institutions. The Order's overbroad definition of "racially discriminatory DEI activities" causes NADOHE to fear that its members may feel that they can now no longer safely rely on NADOHE's guidance or participate in its programs. As a result, NADOHE fears that it will lose members and will face headwinds in seeking to attract new members. While the Administration's sustained assault on the values of diversity, equity, and inclusion have already harmed NADOHE, the Contractors Order has sharpened Defendants' attack on NADOHE's values and activities and puts a bullseye on NADOHE's relationships with its members, its reputation, and the heart of its work.

## II. Members of NAMC and NAMC-DMV, and NADOHE's institutional members, fear they must choose between exercising their First Amendment rights and maintaining their ability to work on federal contracts.

156. Members of NAMC and NAMC-DMV, and NADOHE's institutional members, are federal contractors and subcontractors.

157. According to the Contractors Order, NAMC, NAMC-DMV, and NADOHE institutional members who are contractors will have to comply with the Diversity Ban to maintain their contracts.

158. The Contractors Order also coerces NAMC, NAMC-DMV, NADOHE, and their members and NADOHE's institutional members who are subcontractors on federal projects to

33

comply with the Diversity Ban by requiring prime contractors to report any alleged violation of or litigation about the clause, and by threatening subcontractors with debarment.

159. The majority of NAMC membership works in construction contracting, typically on projects funded by government agencies including DOE, DOT, and the FAA.

160. The majority of NAMC-DMV membership works in construction contracting, sometimes as subcontractors on federal contracts but also with federal contractors on private, state, and local projects.

161. NADOHE has hundreds of active institutional members, including public and private colleges and universities. These institutional members are parties to contracts, subcontracts, or contract-like instruments with several different federal agencies, including but not limited to DOD, DOI, NASA, HHS, Commerce, VA, DOJ, DOT, EPA, DOA, the NSF, DOE, and DHS, and plan to seek more federal contracts and subcontracts. Since 2007, NADOHE's institutional members have entered thousands of federal contracts totaling well over $4 billion dollars.[40] Importantly, NADOHE's institutional members currently have hundreds of open federal contracts worth over $2 billion dollars.[41]

162. As federal contractors, NADOHE's institutional members will be subject to the terms of the Contractors Order.

### III. Individual members of Plaintiffs NADOHE, AAUP, and UAM-UMD help build supportive and diverse educational environments for all students at institutions of higher education that are federal contractors.

163. NADOHE, AAUP, and UAM-UMD have individual members who work at institutions of higher education that are federal contractors. Many of NADOHE's, AAUP's, and UAM-UMD's

---

[40] *Dep't of Def. to Western Univ. of Health Sci.*, USASpending, https://perma.cc/67VH-9YZ7 (last accessed Apr. 15, 2026).

[41] *Indefinite Delivery Vehicle, Dep't of Def. to Western Univ. of Health Sci.,* USASpending, https://perma.cc/U9B6-YJ3H (last accessed Apr. 15, 2026).

individual members engage in work that is funded by federal contracts. Nearly all of their members benefit from federal funding through indirect or overhead costs. The institutions that NADOHE's, AAUP's and UAM-UMD's members work for have secured more than 1,200 federal contracts and 300 subcontracts over the years, and have many ongoing and active contracts. The institutions that NADOHE's, AAUP's, and UAM-UMD's members work for have contracts with dozens of federal agencies, including VA, DOT, DOI, DOA, HHS, DOJ, DHS, the NSF, and NASA, to name a few.

164. According to the Contractors Order, these institutions of higher education will have to agree to the Diversity Ban to maintain their contracts.

165. NADOHE's individual members engage in activities designed to provide access, support, and resources to a diverse student body, including low-income students, first-generation students, students from historically underrepresented racial identities and marginalized groups, veterans, women, members of the LGBTQIA community, and people with disabilities. They also seek to ensure that institutions recruit from diverse applicant pools as they make hiring and other personnel decisions.

166. NADOHE's individual members include academic and administrative Chief Diversity Officers whose duties include leading, facilitating, and evaluating diversity, equity, inclusion, and accessibility efforts for their institution; and supporting core functions including curriculum, recruitment, retention, and success of students, faculty, and staff. Chief Diversity Officers are also responsible for strategic planning and accountability for outcomes and nondiscrimination, which may include serving as an institution's designated Equal Employment Opportunity coordinators; along with ensuring that diversity, equity, inclusion, and accessibility efforts are consistent with applicable laws.

167. AAUP represents, among others, academic professionals whose work focuses on topics related to diversity, including faculty and academic professionals that teach courses or in programs

focused on specific racial or ethnic identities (*e.g.*, Black studies, Latino studies, Asian studies, etc.), diversity, equity, and inclusion, and other subject matter targeted by the Executive Orders.

168. AAUP also represents a large number of faculty and academic professionals whose teaching, research, or other academic activities include equity-related topics, including many who rely on federal contracts to support their work. This is particularly true at medical schools or institutions that conduct health research, where AAUP represents a significant number of members who focus on medical and other scientific research related to whether and how race and ethnicity are connected with health outcomes.

169. Many of AAUP's members are employed at universities with active federal contracts, and some engage in work that is funded by federal contracts.

170. Academic professionals who are members of AAUP work at universities that have been awarded contracts from agencies across the federal government, including DHS, DOD, DOT, DOI, VA, DOJ, and HSS. Many of these contracts fund the salaries of medical school faculty, graduate students, and other researchers who focus on health equity. Others focus on the impact of climate change and other environmental risks on diverse communities.

171. UAM-UMD is comprised of employees at the University of Maryland, College Park.

172. The University of Maryland, College Park (UMD) has entered thousands of federal contracts, subcontracts, and contract-like instruments totaling over $700 million since 2007–the earliest year federal databases track federal contracts. To date, UMD has more than 50 active federal contracts, totaling more than $116 million. These contracts are with federal agencies including DOD, DOT, HHS, and VA.

173. UAM-UMD members engage in teaching and research across a range of disciplines, including some teaching and research that discusses and investigates issues relating to racial or ethnicity identity, such as how health outcomes may vary in connection with race or ethnicity, how

36

people may experience systems and institutions differently in connection with their race or ethnicity, and how people in specific racial or ethnic groups may benefit from policy interventions that are sensitive to their identities.

174. According to the Contractors Order, this work conducted by NADOHE's individual members and AAUP and UAM-UMD's members constitute "racially discriminatory DEI activities."

175. Because their higher education employers will soon be subject to contract terms prohibiting them from engaging in "racially discriminatory DEI activities," regardless of whether those activities comply with federal antidiscrimination law or are discriminatory at all, Plaintiffs' members fear that if they don't preemptively chill their own lawful activity, their employers will terminate their projects or lose federal contracts.

## D. Plaintiffs' Members' Speech, Expression, and Association is Already Being Chilled.

176. NADOHE members whose activities include advancing diversity, equity, and inclusion fear that their work might endanger their institutions' federal contracts and lead to adverse employment consequences.

177. For example, NADOHE Member A works in leadership at a medical center that has a university partnership in the western part of the United States. Both the university and the medical center are federal contractors. Because it is well understood that medical conditions show up differently in people based on factors including race and ethnicity, NADOHE Member A's employer has sought and evaluated that data to ensure it is able to provide quality care for all people. Based on its assessment of data, the medical center has undertaken efforts to expand its reach to try to ensure equal access to critical health services. For example, for years NADOHE Member A, on behalf of their employer, has been building a relationship and collaborating with a small number of educational institutions that predominantly serve students of color, including

traveling to do on-site programs and regularly participating in an annual program at one of the universities to celebrate and advance academic achievement. Over the last year, the medical center has instructed NADOHE Member A to limit their role in the relationship, but the collaboration has continued, albeit in a more limited way. NADOHE Member A also helps organize an annual event for the medical center to highlight and explore patient and employee experiences that often differ dramatically based on access to services. Based on guidance from their employer, NADOHE Member A has limited discussion of race and ethnicity at the event. Because of the Contractors Order, NADOHE Member A reasonably fears that the medical center will instruct them to terminate the relationship with the other educational institutions, stop participating in collaborative programs, and cease discussion of race and ethnicity entirely in order to avoid losing federal contracts. Even if the medical center does not mandate such changes, NADOHE Member A is considering how to change their own expression to ensure their activities don't threaten their employer's federal funding, which accounts for the majority of its operating budget. But for NADOHE Member A, the choice is one of life and death: without funding, the medical center would have to pull back its work, which is critical to saving lives. At the same time, without being able to understand and address how race and ethnicity affect medical outcomes, people whose race or ethnicity places them at higher risk for certain conditions will die.

178. Similarly, NADOHE Member B works in administration at a medical education institution on the west coast that is a federal contractor. NADOHE Member B has been asked by faculty members whether they will be fired for teaching or publishing work that includes references to race, including materials that reference statistically established differences in health outcomes correlated with race or ethnicity. This year, NADOHE Member B and their colleagues were instructed that the budget was cut to recruit from historically black colleges and universities (HBCUs) and predominantly Hispanic serving institutions (HSIs). NADOHE Member B

reasonably fears that the Contractors Order will further incentivize the institution to monitor and dissuade speech and activities concerning race, ethnicity, diversity, equity, or inclusion, and they and their colleagues will have to chill their own speech, face employment consequences, or otherwise may be responsible for the institution losing federal contracts.

179. Likewise, UAM–UMD members whose teaching, research, or campus activities involve topics related to diversity, equity, or inclusion fear that their work might endanger their institutions' federal contracts and lead to adverse employment consequences.

180. For instance, UAM–UMD Member A, a lecturer at the University of Maryland, College Park, is the faculty advisor for a student group that is dedicated to the recognition and professional advancement of professionals in a specific industry who identify with a particular racial and ethnic group. Membership in the student group is open to any student regardless of race or ethnicity, despite the group's focus. In order for the student group to be recognized by the university, it must have a faculty advisor. University recognition is critically important for the organization: it allows them to use university buildings for events and access university funds for group programming. These benefits are available to any eligible student group that is recognized by the university. Because of the Contractors Order, UAM–UMD Member A reasonably fears that they will be pressured or instructed to end their role as faculty advisor for the student group as a part of a larger withdrawal of university services for student groups that involve a racial or ethnic affinity, even if membership is open to all.

181. Another member, UAM-UMD Member B, is a faculty member at the University of Maryland, College Park, who conducts research that involves maternal health among mothers who identify as members of minority—i.e. non-white—races or ethnicities, who are statistically more likely to experience negative health outcomes. UAM–UMD Member B's teaching also includes discussions of race and ethnicity when pertinent to considering how different communities interact

with social institutions. Among other things, UAM–UMD Member B has chilled their own speech in teaching classes where discussion topics have included race or ethnicity, out of fear that even acknowledging differences in health or other outcomes associated with race or ethnicity in a classroom discussion could be weaponized to strip the university of federal contract funding. In addition, graduate students have discussed with UAM–UMD Member B whether continuing their academic research and interest in studying and mitigating racial disparities in health outcomes will make it impossible for them to launch academic careers, or whether changing their areas of research or self-censoring the way they express their intellectual inquiries will help preserve their professional opportunities. UAM–UMD Member B fears that their teaching and research put the university at risk of losing its federal contracts, and fears that they will be pressured or instructed to change or end their research to ensure that their school will not lose its federal contracts as a result of the Contractors Order. Alternatively, they are concerned that they will feel no choice but to chill their own expression to ensure their work does not lead to negative consequences for their university.

182. Similarly, AAUP members whose teaching, research, or campus activities involve topics related to diversity, equity, or inclusion also fear that their work might endanger their institutions' federal contracts and lead to adverse employment consequences.

183. For example, AAUP Member A is a professor of history at a university in the northeast United States that has federal contracts. Because Member A teaches American history to undergraduates and graduate students, their courses include discussion specific to the historical and current experience of Black people, Black social and political movements, and public policies that have targeted and excluded Black people. These topics are reflected in Member A's classroom discussions, syllabi, and occasionally in the titles of the courses they teach. Following the federal government's attacks on DEI, Member A has noticed a steep drop-off in enrollment for previously

40

in-demand courses as students have expressed fear that having course titles referencing race on their transcripts will hurt their employment prospects. Member A is concerned that the Contractors Order will incentivize university administration to dismantle or change departments, programs of study, or individual classes that explicitly reference race or ethnicity in order to decrease the risk that the institution's federal contracts will be canceled. Member A is aware that unless they change or shift their academic work, their courses and discussions may be targeted as part of such changes.

184. Members of NAMC and NAMC–DMV face direct consequences and potential repercussions to their professional reputations and viability of their businesses.

185. For example, NAMC Member A has decades of experience in construction operations and project supervision. Member A is the majority owner of a company that provides construction, infrastructure, and engineering services on federal contracts, as well as other state, local, and private contracts. One project on which they sometimes bid for a local government requires them to hire workers from some economically depressed zip codes. Since these areas include disproportionate numbers of minorities, NAMC Member A routinely advertises in a local newspaper oriented toward the Black community. Under the terms of the Contractor Order, NAMC Member A is worried that they will either have to stop this advertising or risk losing future contracting and subcontracting opportunities and relationships with long-time partners.

186. Other NAMC members rely on NAMC to gain access to professional networking events for exchanging industry information and trade tips. These events are open to all NAMC members and provide opportunities for those otherwise excluded from often white-dominated contracting communities to build stronger personal and professional connections. However, many of these members are now concerned that they can no longer support or participate in NAMC networking events where they associate with other NAMC members without jeopardizing their participation in federal contracting opportunities.

41

187. NAMC–DMV members face similar concerns. For example, NAMC–DMV Member A works to promote economic development in a historically Black and low-income community. Each year, they seek out opportunities to celebrate community culture and heritage, including by organizing events, sharing resources, and offering employees the chance to share their own reflections. NAMC–DMV Member A usually encourages their employees to participate in Emancipation Day celebrations, which commemorate the abolition of slavery in the District of Columbia. This day, April 16, is also an official holiday in Washington, D.C. In the wake of the Contractors Order, however, NAMC–DMV Member A worried that he could no longer encourage his employees to support efforts focused on Black heritage and history without running afoul of the Order's definition of banned activities.

188. The Contractors Order causes irreparable harm to the speech, association, and expression of Plaintiffs and their members.

## LEGAL CLAIMS

### COUNT ONE
### First Amendment
### Violation of Free Speech and Free Association, Overbreadth Doctrine

189. The allegations in paragraphs 1-188 are incorporated and reasserted as if fully set forth here.

190. Plaintiffs state this claim against all Defendants.

191. The First Amendment prohibits the government from "abridging the freedom of speech" or "the right of the people peaceably to assemble." U.S. Const. amend. I.

192. "The freedom of speech guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Fed. Elec. Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469 (2007) (cleaned up).

42

193. In the higher education context, "safeguarding academic freedom . . . [is] a special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). The Supreme Court has recognized that the special dispensation given to free speech in the university context, noting that "[s]cholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957).

194. Nor can the government burden protected association. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). When dealing with "the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618-19 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

195. As people, companies, and organizations committed to promoting opportunity and access for all, Plaintiffs and their members regularly engage in First Amendment protected expression on race, ethnicity, diversity, equity, and inclusion. For NADOHE, NAMC, and NAMC-DMV, constitutionally-protected expression and association on topics related to race and ethnicity is central to their organizational missions. Members of NAMC and NAMC-DMV are businesses who engage in constitutionally-protected speech and association on race, ethnicity, diversity, equity, and inclusion in the course of their everyday business. And for many members of NADOHE, AAUP, and UAM-UMD, constitutionally-protected speech on race and ethnicity is central to their

43

academic work, and protected expression and association on diversity, equity, and inclusion is core to their roles within the academic community and broader society.

196. On its face, the Contractors Order chills and aims to censor Plaintiffs' protected expression and association that concerns race, ethnicity, diversity, equity, or inclusion.

197. By threatening that contractors and subcontractors will lose access to federal contracts and subcontracts unless they agree that they "will not engage in" any of the expression that the Order pre-determines are "racially discriminatory," the Contractors Order impermissibly restricts the exercise of Plaintiffs' and their members'—contractors, subcontractors, and their employees—right to free speech and free association.

198. Moreover, the Contractors Order penalizes protected speech and association of Plaintiffs and their members on race and ethnicity by threatening civil and criminal penalties—including suspension of contracts, debarment from contracting, and liability under the False Claims Act—for expression on core matters of public concern.

199. Government regulation is facially invalid under the First Amendment where it fails to set adequate limits on the scope of prohibited expression, and thus "a substantial number of instances exist in which the Law cannot be applied constitutionally." *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988) (finding plaintiffs failed to identify regulated actors whose expression would be impaired by the allegedly overbroad law). The "overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications." *United States v. Hansen*, 599 U.S. 762, 769 (2023).

200. Regulations that sweep in substantial amounts of protected speech are unconstitutionally overbroad because they have a "deterrent effect on free expression." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984); *see also Cent. Radio v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) ("A regulation is unconstitutionally

overinclusive if it 'unnecessarily circumscrib[es] protected expression.'" (citing *Republican Party of Minn. v. White*, 536 U.S. 765 (2002))).

201. The doctrine of facial overbreadth exists because "the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad [government action] imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

202. The Contractors Order does just that. Members of NAMC, NAMC-DMV, and the institutional members of NADOHE are forced to either chill their own constitutionally protected expression and association and maintain their federal contracts and subcontracts, exercise their First Amendment rights and lose access to federal contracts and subcontracts, and partnerships with federal contractors and subcontractors, or attempt to do both and face the prospect of civil and criminal penalties.

203. For members of NADOHE, AAUP, and UAM-UMD, the Contractors Order chills their protected free speech, association, and academic freedom by "cast[ing] a pall of orthodoxy over the classroom" and violating the Supreme Court's mandate that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian*, 385 U.S. at 603 (citation omitted).

204. And for NADOHE, NAMC, and NAMC-DMV, the Contractors Order chills their organizational speech and association by forcing them to choose between exercising their First Amendment rights and maintaining their partnerships, sponsorships, and relationships with members and supporters who may fear the Administration will deem association with the organizations impermissible conduct under the Order.

205. Members of NAMC, and NAMC-DMV, and NADOHE's institutional members would be devastated by the loss of federal contracts or subcontracts, and their work with federal

45

contractors and subcontractors in the private sector and other government contracting contexts, which they rely upon for their ongoing viability. As a result, they will be forced to chill their protected expression in order to maintain access to contracts and avoid debarment or other penalties.

206. Likewise, because individual members of NADOHE, AAUP, and UAM-UMD recognize that their expression may threaten their employers' ability to obtain federal contracts and subcontracts, they, too, chill their protected expression to avoid consequences to their employment and their employers.

207. And NADOHE, NAMC, and NAMC-DMV are already suffering harm as sponsors, partners, and members express fear that associating with their organizations will be seen as violating the Contractors Order.

208. The Contractors Order is not justified by a substantial or compelling government interest and is not narrowly tailored to serve any such interest, nor is it substantially related to a sufficiently important governmental interest.

209. Accordingly, the Contractors Order violates the First Amendment's free speech and free association clauses, is unconstitutionally overbroad, and unlawfully chills the expression of Plaintiffs and their members.

## COUNT TWO
### First Amendment
### Content-based Discrimination, Unconstitutional Condition

210. The allegations in paragraphs 1-188 are incorporated and reasserted as if fully set forth here.

211. Plaintiffs state this claim against all Defendants.

212. The First Amendment prohibits the government from "abridging the freedom of speech" or "the right of the people peaceably to assemble." U.S. Const. amend. I.

46

213. The government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted). This is particularly true in the context of regulation that carries financial consequences, where allowing the government to impose content-based burdens on speech "raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

214. The First Amendment bars the government from using threats of legal sanction and other means of coercion to suppress disfavored speech. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l., Inc.*, 570 U.S. 205, 214, 218–19 (2013) (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001).

215. Nor can the government coerce a third party to punish, suppress, or control speech on the government's behalf. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

216. Plaintiffs and their members regularly exercise their First Amendment rights to free speech and free association on topics related to race, ethnicity, diversity, equity, and inclusion.

217. On its face, the Contractors Order both discriminates against protected expression and association based on expressive content and imposes an unconstitutional condition on the receipt of funds.

218. By prohibiting federal contractors and subcontractors from engaging in expression that the Order deems "racially discriminatory DEI activities," the Contractors Order discriminates against speech and association that relates to race, ethnicity, diversity, equity, and inclusion. The Order does not prohibit or restrict any other expression. Such content-based discrimination violates the First Amendment.

219. Moreover, by imposing a requirement that contractors agree that neither they, nor their subcontractors or employees, "engage in" any so-called "racially discriminatory DEI activities,"

47

the Contractors Order conditions the receipt of federal funds on contractors agreeing not to engage in expression or association that is protected by the First Amendment.

220. Further, the Contractors Order unlawfully coerces contractors to suppress and punish subcontractors' speech and association by requiring contractors either to certify to the expression and conduct of subcontractors, not certify and thereby lose their contracts, or certify to the expression and conduct of their subcontractors, a third party, under threat of civil and criminal penalties.

221. Plaintiffs and their members cannot engage in protected expression on topics related to race and ethnicity without facing cancellation and denial of contracts, permanent loss of opportunity to contract with the government, and through enforcement actions resulting in civil and criminal punishment. They would be able to engage in protected expression on other topics that the government prefers without facing the same consequences.

222. Even being investigated for violations of the new requirements imposed by the Contractors Order carries its own consequences, including the costs of conducting investigations, the potential costs of litigation, and the need to redirect dedicated resources from other purposes to engage with civil compliance investigations. Those harms are separate and apart from the reputational harm that befalls a contractor or subcontractor that is debarred or investigated.

223. Because of the unconstitutional condition imposed by the Contractors Order, members of NAMC and NAMC-DMV, and NADOHE's institutional members, are forced to chill their own protected speech and association in order to meet the new conditions, or to forgo federal contracts and subcontracts entirely, threatening their short- and long-term viability.

224. For the individual members of NADOHE, AAUP, and UAM-UMD, they reasonably fear that their own protected expression will mean that their employers cannot meet the new condition

48

and thus will lose access to funds that are critical to their survival. This chills their exercise of their First Amendment rights.

225. The Order's content-based discrimination and unconstitutional condition are not justified by a substantial or compelling government interest and is not narrowly tailored to serve any such interest, nor is it substantially related to a sufficiently important governmental interest.

226. Accordingly, the Contractors Order violates the First Amendment's prohibition on content-based discrimination and unconstitutional conditions and violates the First Amendment rights of Plaintiffs and their members.

**COUNT THREE**
**Ultra Vires**
**Contractors Order Section 3(6)**

227. The allegations in paragraphs 1-188 are incorporated and reasserted as if fully set forth here.

228. NADOHE, NAMC, and NAMC-DMV state this claim against all Defendants.

229. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327. "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (citation omitted). "[I]t remains the responsibility of the judiciary to ensure that the President act[s] within those limits" that Congress and the Constitution place on him. *Am. Forest Res. Council v United States*, 77 F.4th 787, 797 (D.C. Cir. 2023).

230. Under longstanding Supreme Court precedent, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

49

231. No source of law authorizes the Contractors Order's False Claims Act provision. That provision exceeds the President's authority under the sole statute cited as authority by the Order, the Procurement Act, 40 U.S.C. § 101 et seq. Accordingly, the Order's FCA provision is *ultra vires*.

232. The Procurement Act provides a circumscribed grant of authority to the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle." 40 U.S.C. § 121(a). Those policies must be "consistent with" the statute, *id.*, which requires a "close nexus between" the President's policies and the Act's "purpose [] to provide 'an economical and efficient system' for . . . procurement." *Liberty Mutual Ins. Co. v. Friedman*, 639 F.2d 164, 169, 170 (4th Cir. 1981) (quoting 40 U.S.C.§ 101). *See also Georgia v. President of the United States*, 46 F.4th 1283, 1295 (11th Cir. 2023) (the Act's "grant of authority" is "limited").

233. No "close nexus" exists between the FCA provision and the Procurement Act. Critically, the Contractors Order provides no "factual findings" in support of such a nexus. *Liberty Mutual*, 639 F.2d at 170. The Order does not explain how the imposition of FCA liability onto contractors and subcontractors will promote efficiency in government contracting. *See* Contractors Order § 1. Nor does the Contractors Order make any effort to explain why the threat of FCA liability is necessary to insulate the government from any costs that may be associated with the conduct described in the Order's definitions. *See generally* Contractors Order.

234. In the absence of the requisite "close nexus," neither the Procurement Act, the FCA, or any other source of law authorizes the President or the other Defendants to impose the FCA provision.

235. Accordingly, the FCA provision is *ultra vires*.

50

**COUNT FOUR**
**Fifth Amendment**
**Due Process Clause – Void for Vagueness**
**Contractors Order, Section 3**

236. The allegations in paragraphs 1-188 are incorporated and reasserted as if fully set forth here.

237. Plaintiffs state this claim against all Defendants.

238. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A government enactment is unconstitutionally vague in violation of the Fifth Amendment if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

239. Where a government regulation is "capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity [in the regulation] than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). Facial challenges in this context are particularly appropriate and essential because facial vagueness "may in itself deter constitutionally protected and socially desirable conduct." *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002) (citation omitted).

240. The Contractors Order fails to satisfy the constitutional minimum because it does not provide fair notice of what is prohibited and encourages and authorizes discriminatory enforcement because it fails to adequately define the scope of the circumstances when it applies.

241. Section 3 of the Contractors Order requires contractors to agree to the terms of the Diversity Ban "[i]n connection with the performance of work under" a federal contract, but it does not clarify whether the Diversity Ban is limited to the use of federal funds.

51

242. The clause also lends itself to subjective interpretation and arbitrary or even discriminatory enforcement. The Contractors Order allows agencies unfettered discretion to determine whether a program or activity is conducted "in connection with the performance of work under" a federal contract and provides no standards for making that determination.

243. Plaintiffs and their members cannot engage in protected speech, association, and expression on topics related to race and ethnicity without facing cancellation and denial of contracts for themselves or their employers, permanent loss of contracting opportunities with the federal government, and enforcement actions resulting in civil or criminal consequences.

244.  Accordingly, Section 3 of the Contractors Order is unconstitutionally vague and violates the Fifth Amendment rights of Plaintiffs' members.

**COUNT FIVE**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A) - Arbitrary and Capricious**
**FAR Council Implementation**

245. The allegations in paragraphs 1-188 are incorporated and reasserted as if fully set forth here.

246. Plaintiffs state this claim against Defendant Federal Acquisition Regulatory Council.

247. The APA provides that a court must "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

248. The FAR Council is an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

249. The FAR Council Implementation is final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

250. Agency action is arbitrary and capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (citation omitted); Agencies should, "[a]t the very least" address and give adequate reasons for abandoning reasonable "alternative way[s] of achieving the[ir] objectives." *Id.* at 48; *see also id.* at 43, 51. An agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"; it must instead "display awareness that it is changing position" and provide "good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Agency action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" it seeks to address. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (citation omitted). "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 30 (internal quotation marks and citation omitted).

251. The FAR Council Implementation is arbitrary and capricious in several ways.

252. First, the FAR Council Implementation did not consider the dire practical consequences of cancelling numerous contracts across every agency of the federal government and suspending or debarring an unknowable number of contractors and subcontractors. The FAR Council Implementation did not consider the effect of upending the federal contracting process, how much such losses will cost the federal government and taxpayers, how to replace the lost labor and expertise, or the impact significant numbers of un- or under-employed contractors and subcontractors will have on the economy and communities throughout the United States.

53

253. Second, the FAR Council Implementation did not consider the substantial reliance interests of countless businesses and workers in the contracting ecosystem on the ongoing management and operation of the established contracting process.

254. Third, the FAR Council Implementation did not indicate that any alternatives were considered, much less that reasonable alternatives were assessed and rejected.

255. Fourth, the FAR Council Implementation radically changed the landscape of federal contracting and subcontracting without providing a reasoned explanation that accounts for the relevant facts and without explaining why the new policy is better than the prior policy.

256. In particular, the FAR Council Implementation fails to articulate a reasoned explanation for adopting numerous procedures or departing from existing standards, including (1) the failure to provide any justification, much less a reasoned one, for requiring that all federal contracts include the Diversity Ban, other than to comply with the Contractors Order, which is not the type of reasoned explanation required by the APA; (2) the decision to allow the suspension or debarment of contractors for allegedly violating the Diversity Ban without any showing of a "willful failure" or "history of failure" to comply with a contract term, or that the action was "so serious or compelling a nature that it affects the [contractor's] present responsibility, as required by FAR §§ 9.406-2, 9.407-2 (2026); (3) the decision to require—without any explanation, process for handling special cases, or assessment of whether the resulting cancellations might outweigh the benefits of quick implementation—contracting officers to "make every effort to bilaterally modify existing contracts by July 24, 2026" or "consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience"; (4) the basis for adopting the timeframes set forth in the Contractors Order, including those that by definition cause agencies to violate the requirements of the Paperwork Reduction Act; (5) the failure to recognize the costs for long-term contracts, even while implicitly acknowledging the existence of

costs for short-term contracts; and (6) the failure to obtain OMB clearance or conduct notice and comment rulemaking before implementing the Contractors Order.

257. Accordingly, the FAR Council Guidance is arbitrary and capricious and must be set aside under 5 U.S.C. § 706(2)(A).

**COUNT SIX**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(B) – Contrary to Constitutional Right**
**FAR Council Implementation**

258. The allegations in paragraphs 1-188 are incorporated and reasserted as if fully set forth here.

259. Plaintiffs state this claim against Defendant Federal Acquisition Regulatory Council.

260. The APA requires that a reviewing court must "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B); *see, e.g.*, *Darden v. Peters*, 488 F.3d 277, 283–84 (4th Cir. 2007); *United States v. Williams*, 170 F.3d 431, 434 (4th Cir. 1999).

261. The FAR Council is an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

262. The FAR Council Implementation is final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

263. The FAR Council Implementation is contrary to the First Amendment and the Due Process Clause of the Fifth Amendment in violation of 5 U.S.C. § 706(2)(B) because it requires agencies to insert the Diversity Ban into new and existing contracts by specified dates.

264. By mandating that contractors agree with the Diversity Ban, the FAR Council Implementation chills and aims to censor protected expression and association of Plaintiffs and their members to the extent they concern race, ethnicity, diversity, equity, or inclusion. Moreover,

55

by adopting and implementing the Diversity Ban, the FAR Council Implementation discriminates based on content and penalizes protected speech and association by threatening and encouraging suspension of contracts, debarment from contracting, and civil and criminal liability. Because the Diversity Ban sweeps in substantial amounts of protected expression, fails to provide notice of what is prohibited, and encourages arbitrary enforcement, the FAR Council Implementation is unconstitutionally vague and overbroad.

265. The FAR Council Implementation is not justified by a substantial or compelling government interest and is not narrowly tailored to serve any such interest, nor is it substantially related to a sufficiently important governmental interest.

266. Because the FAR Council Implementation violates the First and Fifth Amendment, it is "contrary to [a] constitutional right," and must be set aside under 5 U.S.C. § 706(2)(B).

**COUNT SEVEN**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(D) – Without Observance of Procedure Required by Law**
**FAR Council Implementation**

267. The allegations in paragraphs 1-188 are incorporated and reasserted as if fully set forth here.

268. Plaintiffs state this claim against Defendant Federal Acquisition Regulatory Council.

269. Under the APA, a court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

270. The FAR Council is an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

271. The FAR Council Implementation is final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

272. By statute, agencies are subject to notice and comment requirements when they publish procurement policies, regulations, procedures, or forms. 41 U.S.C. § 1707. The statute sets out timelines and other procedural requirements for any procurement proposal that "relates to the expenditure of appropriated funds" and either "has a significant effect beyond the internal operating procedures of the agency issuing the" proposal, or "has a significant cost or administrative impact on contractors or offerors." *Id*. Such proposals:

   a. Cannot take effect until "60 days after it is published for public comment in the Federal Register" (41 U.S.C. § 1707(a)(1));

   b. May be expedited to go into effect not less than 30 days after publication in the Federal Register if there are "compelling circumstances" requiring earlier implementation (41 U.S.C. § 1707(a)(2));

   c. Must allow for a comment period no less than 30 days (41 U.S.C. § 1707(b));

   d. Must include in the opportunity to comment on the text (or a summary) of the proposal and the request for comments (41 U.S.C. § 1707(c));

   e. May forgo the required publication and comment only if "urgent and compelling circumstances make compliance with the requirements impracticable" (41 U.S.C. § 1707(d));

   f. Go into effect only on a temporary basis if notice and comment are waived, and then only if notice is published in the federal register, with provision for a 30 day public comment period (41 U.S.C. § 1707(e)(1)); and

   g. Only after the head of the agency who waived the notice and comment requirements considers the comments received while the proposal was temporarily in effect can that

agency head then issue a "final procurement policy, regulation, procedure, or form." 41 U.S.C. § 1707(e)(2).

273. The FAR Council Implementation was issued without observance of procedure required by law in violation of 5 U.S.C. § 706(2)(D) since it is a policy related to the expenditure of funds on federal contracts and subcontracts, has a significant effect beyond the internal operating procedures of the agency, and imposes significant costs and administrative impact on contractors. Nonetheless, the FAR Council Implementation did not comport with the notice and comment requirements of 41 U.S.C. § 1707.

274. The FAR Council Implementation took effect immediately, without waiting the mandated 60 days after publication for public comment, without seeking expedited notice and comment, and without invoking a waiver.

275. Accordingly, because the FAR Council Implementation was required to but did not comply with the requirements of 41 U.S.C. § 1707, it should be set aside pursuant to 5 U.S.C. § 706(2)(D) as agency action taken "without observance of procedure required by law."

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare unlawful, vacate, and set aside the FAR Council Implementation as arbitrary and capricious, contrary to a constitutional right, and issued without observance of procedures required by law, 5 U.S.C. § 706(2)(A), (B), (D);

b. Grant preliminary and permanent injunctive relief, a stay under 5 U.S.C. § 705, and vacatur under 5 U.S.C. § 706, prohibiting Agency Defendants, and all of their officers, employees, or agents from implementing, or taking any steps to implement, enforce, or otherwise give effect to the Contractors Order or any substantively similar order;

c.  Order Agency Defendants to: (1) strike any contract language implementing or effectuating the Contractors Order that has been inserted in any federal contract, contract-like instrument, contractors' sub contract, or subcontractor's lower-tier contract; (2) rescind any inter- or intra-agency implementation directives including but not limited to policies, procedures, guidance, or any other implementing document or instruction;

d.  Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

e.  Grant other relief as the Court deems necessary, just, and proper.

May 22, 2026

Sarah von der Lippe*
MINORITY BUSINESS ENTERPRISE
LEGAL DEFENSE AND EDUCATION
FUND
1104 East Capitol St. NE
Washington, DC 20002
T: (202) 744-5415
SCvdL@mbeldefwatchdog.org

*Counsel for Plaintiffs NAMC and NAMC-DMV*

Respectfully submitted,

*/s/ Brooke Menschel*
Brooke Menschel (MD Bar No. 31492)
Andrea J. Matthews*
Briana M. Clark*
Ross Snyder (MD Bar No. 32162)
Steven Y. Bressler (MD Bar No. 31881)
Brian Netter (MD Bar No. 31723)
Kristen Miller*+
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
F: (202) 796-4426
bmenschel@democracyforward.org
amatthews@democracyforward.org
bclark@democracyforward.org
rsnyder@democracyforward.org
sbressler@democracyforward.org
bnetter@democracyforward.org
consultantkmiller@democracyforward.org

*Counsel for Plaintiffs*

* Admitted pro hac vice
+Of Counsel

59