**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **National Association of Diversity Officers in Higher Education,** *et al.*, <br><br><br> Plaintiffs, <br><br> **v.** <br><br><br> **Donald J. Trump,** *et al.*, <br><br><br> Defendants. | Civil Case No. 8:26-cv-01532 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION AND 5 U.S.C. § 705 STAY**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.      This Administration's Break from Historic Support for Diversity as an

         Economic Good ....................................................................................................... 2

II.     The 2026 Anti-DEI Executive Order Regarding Contractors............................... 5

III.    FAR Council Implementation of 2026 Contractors Order ................................... 6

LEGAL STANDARD............................................................................................................ 7

ARGUMENT ....................................................................................................................... 8

I.      Plaintiffs Are Likely to Succeed on the Merits.................................................... 8

         A.      Plaintiffs are Likely to Establish Standing................................................. 8

         B.      The Order and Agency Actions Likely Violate the First Amendment. .................. 9

                 1.      The Contractors Order and FAR Implementation Restrict

                         Protected Speech and Association............................................. 10

                 2.      Defendants' Actions are Content-Discriminatory. ................... 14

                 3.      Defendants' Actions Violate the Unconstitutional Conditions

                         Doctrine. ..................................................................................... 16

         C.      Defendants' Actions Are Vague in Violation of the Fifth Amendment. .............. 18

         D.      The FAR Implementation Violates the APA. ......................................... 20

                 1.      The FAR Implementation is Reviewable Final Agency Action. .............. 20

                 2.      The FAR Implementation is Arbitrary and Capricious in

                         Numerous Ways.......................................................................... 21

                 3.      The FAR Implementation is Contrary to Constitutional Rights. .............. 24

II.     Plaintiffs Will Continue to Suffer Irreparable Harm Absent Relief. ............................ 24

III.    The Balance of Equities and Public Interest Favor an Injunction and Stay....................... 29

CONCLUSION................................................................................................................. 30

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*AAUP v. Trump*,
815 F. Supp. 3d 907 (N.D. Cal. 2025) ............................................................................ 18

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .............................................................................................. 16, 17, 18

*Air Evac EMS, Inc. v. McVey*,
37 F.4th 89 (4th Cir. 2022) .............................................................................................. 25

*Am. Acad. of Pediatrics v. FDA*,
379 F. Supp. 3d 461 (D. Md. 2019) .................................................................................. 20

*Am. Council of Learned Societies v. NEH*,
No. 25-cv-3923, 2026 WL 1256545 (S.D.N.Y. May 7, 2026) ........................................ 17

*Am. Fed'n of Teachers v. Dep't of Educ.*,
796 F. Supp. 3d 66 (D.Md. 2025) ......................................................................... 3, 13, 23

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .................................................................................................... 9, 10

*Baggett v. Bullitt*,
377 U.S. 360 (1964) .......................................................................................................... 20

*Bennett v. Spear*,
520 U.S. 154 (1997) .......................................................................................................... 20

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) .................................................................................................... 11, 14

*Casa de Maryland v. Wolf*,
486 F. Supp. 3d 928 (D. Md. 2020) .................................................................................... 8

*CASA, Inc. v. Trump*,
793 F. Supp. 3d 687 (D. Md. 2025) .................................................................................. 30

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) ............................................................................................................ 15

*D.N.N. v. Liggins,*
No. 25-cv-01613, 2026 WL 632371 (D. Md. Mar. 6, 2026) ............................................. 30

*DHS v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) .................................................................................................................... 23

*E.K. ex rel. Keely v. Department of Defense Education Activity,*
807 F. Supp. 3d 517 (E.D. Va. 2025) .................................................................................. 30

*Edgar v. Haines,*
2 F.4th 298 (4th Cir. 2021) .................................................................................................. 10

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ............................................................................................................... 21

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ............................................................................................................... 21

*FDA v. All. For Hippocratic Med.,*
602 U.S. 367 (2024) ................................................................................................................. 9

*FEC v. Wisconsin Right to Life, Inc.,*
551 U.S. 449 (2007) ............................................................................................................... 10

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ....................................................................................................... 18, 20

*Honeyfund.com Inc. v. Fla. Governor,*
94 F.4th 1272 (11th Cir. 2024) ........................................................................................... 13

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ................................................................................................................. 9

*J.O.P. v. U.S. DHS,*
409 F. Supp. 3d 367 (D. Md. 2019) .................................................................................... 23

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
385 U.S. 589 (1967) ............................................................................................................... 10

*Lance v. Coffman,*
549 U.S. 437 (2007) ................................................................................................................. 9

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,*
2 F.4th 330 (4th Cir. 2021) .......................................................................................... 25, 29

*League of Women Voters of North Carolina v. North Carolina*,
769 F.3d 224 (4th Cir. 2024) ................................................................... 29, 30

*McCullen v. Coakley*,
573 U.S. 464 (2014) ..................................................................................... 15, 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................................................................................... 21, 24

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
915 F.3d 197 (4th Cir. 2019) .............................................................................. 24

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
767 F. Supp. 3d 243 (D. Md. 2025), *opinion clarified*, 769 F. Supp. 3d 465
(D. Md. 2025), *and vacated and remanded,* 167 F.4th 86 (4th Cir. 2026) ......................... 4

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
167 F.4th 86 (4th Cir. 2026) ..................................................................... *passim*

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ............................................................................................ 17

*Nat'l Pub. Radio, Inc. v. Klavans*,
560 F. Supp. 3d 916 (D. Md. 2021) ................................................................. 30

*Nat'l Public Radio, Inc. v. Trump*,
No. 25-cv-1674, 2026 WL 877434 (D.D.C. Mar. 31, 2026) ..................................... 17, 18

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) ............................................................................... 22

*New York v. Trump*,
811 F. Supp. 3d 215 (D. Mass. 2025) ............................................................. 22

*Newsom v. Albemarle Cnty. Sch. Bd.*,
354 F.3d 249 (4th Cir. 2003) ..................................................................... 11, 16

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................ 8, 29

*Porter v. Bd. of Trs. of N.C. State Univ.*,
72 F.4th 573 (4th Cir. 2023) ............................................................................. 10

*Raso v. Lago*,
958 F. Supp. 686 (D. Mass. 1997), *aff'd*, 135 F.3d 11 (1st Cir. 1998) ............................. 12

iv

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)........................................................................................... 14

*Ridpath v. Bd. of Governors Marshall Univ.*,
  447 F.3d 292 (4th Cir. 2006) ........................................................................... 11

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984)........................................................................................... 10

*Roe v. Dep't of Def.*,
  947 F.3d 207 (4th Cir. 2020) ......................................................................... 7, 8

*Rogers v. Haley*,
  421 F. Supp. 2d 1361 (M.D. Ala. 2006) ........................................................ 12

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020)............................................................................................. 25

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)........................................................................................... 14

*Sackett v. EPA*,
  566 U.S. 120 (2012)........................................................................................... 21

*Shuford v. Ala. State Bd. of Educ.*,
  897 F. Supp. 1535 (M.D. Ala. 1995) .............................................................. 12

*Sierra Club v. Dep't of Interior*,
  899 F.3d 260 (4th Cir. 2018) ........................................................................... 24

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991)........................................................................................... 16

*Smith v. Goguen*,
  415 U.S. 566 (1974)........................................................................................... 18

*Speiser v. Randall*,
  357 U.S. 513 (1958)........................................................................................... 16

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016)........................................................................................... 20

*United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996)............................................................................................. 9

v

*United States v. South Carolina,*
   720 F.3d 518 (4th Cir. 2013) ................................................................. 7

*United States v. Williams,*
   553 U.S. 285 (2008) ............................................................................ 18

*Virginia v. Hicks,*
   539 U.S. 113 (2003) ............................................................................ 11

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) ................................................................................. 8

*Winters v. New York,*
   333 U.S. 507 (1948) ............................................................................ 18

## STATUTES & REGULATIONS

5 U.S.C. § 704 ............................................................................................ 20

5 U.S.C. § 705 ...................................................................................... 8, 30

5 U.S.C. § 706 .................................................................................... 20, 24

41 U.S.C. § 1707 ...................................................................................... 23

5 C.F.R. § 1320 ......................................................................................... 22

5 C.F.R. § 1320.5 ...................................................................................... 22

5 C.F.R. § 1320.8 ...................................................................................... 22

5 C.F.R. § 1320.10 .................................................................................... 22

5 C.F.R. § 1320.11 .................................................................................... 22

5 C.F.R. § 1320.12 .................................................................................... 22

5 C.F.R. § 1320.13 .................................................................................... 22

FAR § 2.101 ................................................................................................ 6

FAR § 9.406-2 ...................................................................................... 7, 22

FAR § 9.407-2 .......................................................................................... 22

Fed. R. Civ. P. 65 ..................................................................................... 30

Act to Amend the Small Business Act and Small Business Investment Act of 1958,
Pub. L. No. 95-507, 92 Stat. 1757 (1978)................................................................. 3

Addressing DEI Discrimination by Federal Contractors, Exec. Order No. 14398, 91
Fed. Reg. 16147 (Mar. 26, 2026)................................................................... *passim*

Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order
No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ............................................... 4, 15

Establishing the President's Committee on Equal Employment Opportunity, Exec.
Order No. 10925, 26 Fed. Reg. 1977 (Mar. 8, 1961)............................................ 3

Reaffirming Policy Of Full Participation In The Defense Program By All Persons,
Regardless Of Race, Creed, Color, Or National Origin, And Directing Certain
Action In Furtherance Of Said Policy, Exec. Order No. 8802, 6 Fed. Reg.
3109 (June 7, 1941), https://perma.cc/8XJK-S92B ............................................. 2

## OTHER AUTHORITIES

*A Snapshot of Government-Wide Contracting for FY 2024 (Interactive Dashboard)*,
U.S. Gov't Accountability Off. (June 24, 2025), https://perma.cc/V72H-
ACLC ................................................................................................................... 2

Contract Holders, U.S. Dep't of Transp.: Fed. Highway Admin. (Oct. 9, 2025),
https://perma.cc/L8XP-UXUG .............................................................................. 2

Erica L. Green, *Trump Administration Dropped Policy Prohibiting Contractors From
Having Segregated Facilities*, N.Y. Times (Mar. 21, 2025),
https://perma.cc/RND4-BYCK............................................................................... 4

*Fact Sheet: President Donald J. Trump Removes DEI From the Foreign Service*,
White House (Mar. 18, 2025), https://perma.cc/Y3K7-XCP8/ ........................... 3

*FY 2026: Budget in Brief*, Dep't of Lab. (2025), https://perma.cc/R5XK-VRUZ ........................ 4

Press Release, *Office for Civil Rights Initiates Title VI Investigations into Institutions of
Higher Education*, Dep't of Educ. (Mar. 14, 2025), https://perma.cc/9WWU-
CA9N .................................................................................................................... 3

Joe Zapata, *The President Who Re-Segregated the Federal Government*, Time: Made
by History (Oct. 14, 2025, 9:00 PM ET), https://perma.cc/4DXR-29MW/ ......................... 3

Melissa Hellmann, *'It's Not a Coincidence': Journalists of Color on Being Laid Off
Amid Trump's Anti-DEI Push*, The Guardian (Dec. 31, 2025, 15:41 EST),
https://perma.cc/HN4E-F8WY ................................................................................ 3

Memorandum to Heads and Acting Heads of Departments and Agencies from Charles Ezell, Acting Dir., U.S. Off. of Pers. Mgmt. (Jan. 21, 2025), https://perma.cc/JSW5-89NC ................................................................................... 4

Memorandum on Agency Implementation of Executive Order 14398, Addressing DEI discrimination by Federal Contractors, Federal Acquisition Regulation Council (Apr. 17, 2026), https://perma.cc/YH8M-SHZ4. ........................................ *passim*

*Minority-owned Businesses,* SBA (Aug. 14, 2025), https://perma.cc/C959-96P9 ....................... 13

PBS Newshour, *WATCH: Trump Marks First 100 Days in Office With Focus on Grudges and Grievances*, (Youtube, Apr. 29, 2025), https://www.youtube.com/live/8OEMk-BcrAk?si=25HnN4SjwR9RfJMf&t=4787........................................................................... 3

*Public Health and Human Service Grants and Contracts*, Dep't of Health & Hum. Servs.: Off. of Inspector Gen. (July 15, 2025), https://perma.cc/WB8D-BBGL/............... 2

*The Regional Education Laboratory (REL) Program*, Inst. of Educ. Scis., https://perma.cc/P6XJ-NGM3 ....................................................................................... 2

**INTRODUCTION**

The United States relies on federal contractors, subcontractors, and their employees to build, protect, and preserve the "more perfect union" that our Constitution foresees. But for many on the frontlines of this work, that promise has remained stubbornly out of reach. Despite decades of research, policymaking, and introspection that have driven progress towards a more inclusive society and economy to achieve the Founders' vision, the Trump-Vance Administration has pursued a relentless and reactionary campaign towards sameness and exclusion, damaging economic prosperity while villainizing inclusion, diversity, and equity.

On March 26, 2026, the administration launched its latest attack, an executive order targeting federal contractors that brands as "racially discriminatory DEI activities" most acknowledgments of discrimination against non-white people and celebrations of race or ethnicity not centered on the country's European heritage. By mandating that contractors either agree to the Administration's anti-diversity perspective or forgo work on federal contracts entirely, the Administration seeks to coerce contractors to sign away their, and their subcontractors', constitutional rights. But in doing so, Executive Order 14398 ("Contractors Order") violates the First and Fifth Amendments by infringing on constitutional guarantees of free speech and association and because its provisions are unconstitutionally vague and overbroad.

In implementing the Contractors Order, the Federal Acquisition Regulatory Council exacerbated the problem by wholesale adopting the Contractors Order's language and timeframes without reason or justification. The FAR Council's implementation is contrary to constitutional rights, and is arbitrary and capricious, and therefore violates the Administrative Procedure Act.

The Contractors Order and FAR Council's implementation are already devastating Plaintiffs, their members, and countless others. But absent relief from this Court, they will be forced to choose between preserving their livelihoods and chilling their own speech and

1

association between now and the July 24, 2026, deadline imposed by the Contractors Order and FAR Implementation for incorporating the mandatory "agreement" into contracts. The Court should enjoin the Administration's unlawful attempt to dismantle the architecture of equality through the Contractors Order and should stay the FAR Implementation.

**BACKGROUND**

### I.    *This Administration's Break from Historic Support for Diversity as an Economic Good*

The Federal Government relies on contractors and subcontractors to provide essential services. The scale of the work performed by contractors is staggering,[1] as contractors construct roads,[2] educate children,[3] protect our health,[4] and more. Yet racism and other discrimination have long ravaged the contracting sector and constrained its productivity.

Since the 1940s, administrations of both parties have worked to address the long-term impacts of this discrimination with an eye towards societal gains, including through the creation of the Office of Federal Contract Compliance Programs ("OFCCP") and the promulgation of anti-discrimination executive orders.[5] In 1961, President Kennedy explained that a diverse workforce "is in the general interest and welfare of the United States" because it ensures "the most efficient

---

[1] *A Snapshot of Government-Wide Contracting for FY 2024 (Interactive Dashboard)*, U.S. Gov't Accountability Off. (June 24, 2025), https://perma.cc/V72H-ACLC (showing federal expenditures of over $755 billion on contracts during FY 2024).

[2] *See, e.g.*, Contract Holders, U.S. Dep't of Transp.: Fed. Highway Admin. (Oct. 9, 2025), https://perma.cc/L8XP-UXUG.

[3] *See, e.g.*, *The Regional Education Laboratory (REL) Program*, Inst. of Educ. Scis., https://perma.cc/P6XJ-NGM3.

[4] *See, e.g.*, *Public Health and Human Service Grants and Contracts*, Dep't of Health & Hum. Servs.: Off. of Inspector Gen. (July 15, 2025), https://perma.cc/WB8D-BBGL/.

[5] *See, e.g.*, Reaffirming Policy Of Full Participation In The Defense Program By All Persons, Regardless Of Race, Creed, Color, Or National Origin, And Directing Certain Action In Furtherance Of Said Policy, Exec. Order No. 8802, 6 Fed. Reg. 3109 (June 7, 1941), https://perma.cc/8XJK-S92B.

2

and effective utilization of all available manpower."[6] Congress declared in the Small Business Act of 1978 that "the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy."[7]

Despite the federal government's longstanding recognition that diversity, equity, and inclusion benefit the economy and society writ large, the Trump-Vance Administration has waged a tireless crusade against the very concepts. Last year, President Trump proclaimed that "DEI" amounts to "lawless . . . bullshit."[8] The administration has since expanded its target beyond so-called "DEI" to any effort to celebrate non-white communities or address discrimination against them. The Trump-Vance Administration has removed high ranking officials, including non-white employees, based on their purported support for "DEI" policies,[9] upended how the federal government approaches diversity, equity, and inclusion,[10] and investigated private institutions based on their values.[11]

---

[6] Establishing the President's Committee on Equal Employment Opportunity, Exec. Order No. 10925, 26 Fed. Reg. 1977 (Mar. 8, 1961).

[7] Act to Amend the Small Business Act and Small Business Investment Act of 1958, Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

[8] PBS Newshour, *WATCH: Trump Marks First 100 Days in Office With Focus on Grudges and Grievances*, at 1:19:47 (Youtube, Apr. 29, 2025), https://www.youtube.com/live/8OEMk-BcrAk?si=25HnN4SjwR9RfJMf&t=4787.

[9] *See* Joe Zapata, *The President Who Re-Segregated the Federal Government*, Time: Made by History (Oct. 14, 2025, 9:00 PM ET), https://perma.cc/4DXR-29MW/.

[10] *See, e.g.*, *Fact Sheet: President Donald J. Trump Removes DEI From the Foreign Service*, White House (Mar. 18, 2025), https://perma.cc/Y3K7-XCP8/.

[11] Melissa Hellmann, *'It's Not a Coincidence': Journalists of Color on Being Laid Off Amid Trump's Anti-DEI Push*, The Guardian (Dec. 31, 2025, 15:41 EST), https://perma.cc/HN4E-F8WY (describing investigation of media outlets for their diversity initiatives); Press Release, *Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education*, Dep't of Educ. (Mar. 14, 2025), https://perma.cc/9WWU-CA9N (announcing investigations into 45 universities alleged "racial preferences and stereotypes in education programs and activities" following the issuance of a subsequently-vacated Dear Colleague Letter); *see also Am. Fed'n of Teachers v. Dep't of Educ.*, 796 F. Supp. 3d 66 (D.Md. 2025) ("*AFT*") (vacating the Dear Colleague Letter).

Federal contractors have been a prime target of this campaign. Since early 2025, the administration has rescinded a civil rights era directive that prohibited segregated facilities at federal contractors' sites,[12] gutted OFCCP's ability to enforce anti-discrimination laws amongst contractors,[13] proposed to eliminate the office entirely,[14] and more. The administration has also worked to prohibit federal contractors and subcontractors from promoting diversity, equity, or inclusion. On his second day in office, the President issued an executive order that called DEI programming "dangerous, demeaning, and immoral," implied that such programs are per se illegal, and required all federal contractors to "certify" that they do not "operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."[15]

This Court preliminarily enjoined that "certification provision" on the grounds that it likely violated the First Amendment. The Court found that the provision "unconstitutionally restricted, and retaliated against, contractors' and grantees' free speech rights even within the scope of the pertinent programs." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 283 (D. Md. 2025) (cleaned up), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025), *and vacated and remanded*, 167 F.4th 86 (4th Cir. 2026). The Fourth Circuit ultimately vacated the injunction, focusing on the certification provision's text that required "compliance in all respects with all applicable Federal anti-discrimination laws." *Nat'l Ass'n of Diversity Officers in Higher*

---

[12] *See* Erica L. Green, *Trump Administration Dropped Policy Prohibiting Contractors From Having Segregated Facilities*, N.Y. Times (Mar. 21, 2025), https://perma.cc/RND4-BYCK.

[13] *See* Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[14] *FY 2026: Budget in Brief*, Dep't of Lab. (2025), https://perma.cc/R5XK-VRUZ.

[15] *See* Exec. Order No. 14173, 90 Fed. Reg. at 8634, *supra* n. 13. In implementing the order, the Office of Personnel Management ("OPM") directed agency heads to "terminate any DEIA-related contractors" by close of business on January 22, 2025. Memorandum to Heads and Acting Heads of Departments and Agencies from Charles Ezell, Acting Dir., U.S. Off. of Pers. Mgmt. (Jan. 21, 2025), https://perma.cc/JSW5-89NC.

*Educ.*, 167 F.4th 86, 103 (4th Cir. 2026). However, the Fourth Circuit warned that "[i]f the President" or another government actor seeks to punish protected First Amendment activity that is consistent with Federal anti-discrimination law, plaintiffs could challenge that restriction. *Id.*

## II.    The 2026 Anti-DEI Executive Order Regarding Contractors

Notwithstanding the Fourth Circuit's admonition, the President issued the Contractors Order on March 26, 2026, which claims to ban "racially discriminatory DEI activities" but reaches non-discriminatory expression protected by the First Amendment. The Order's central mechanism requires that all federal contractors agree that they will "not engage in any racially discriminatory DEI activities" as defined by the Order in "connection with the performance of work performed under [their] contract" and that they will comply with various reporting and enforcement terms ("Diversity Ban").[16] Critically, "racially discriminatory activities" is defined as "disparate treatment based on race or ethnicity in the recruitment, employment (*e.g.*, hiring, promotions), contracting (*e.g.*, vendor agreements), program participation, or allocation or deployment of an entity's resources."[17] The Diversity Ban is not limited to activities that violate federal anti-discrimination law, *see infra* Sec. II.B, and it does not clarify whether the restriction is limited to the use of federal funds. *See infra* Sec. II.C.

The Contractors Order specifies severe consequences for failing to comply with its restrictions: the relevant contract "may be canceled, terminated, or suspended," the contractor "may be declared ineligible for further Government contracts," and the contractor may be subject to civil and criminal actions under the False Claims Act.[18] To aid enforcement, the Diversity Ban requires contractors to agree that they will (1) furnish any information the contracting agency

---

[16] Addressing DEI Discrimination by Federal Contractors, Exec. Order No. 14398, 91 Fed. Reg. 16147 (Mar. 26, 2026).
[17] *Id*.
[18] *Id.* at 16148.

5

requires to "ascertain compliance;" (2) report to the contracting agency "any subcontractor's known or reasonably knowable conduct that may violate" the clause; (3) inform the contracting agency if a subcontractor sues the contractor and the suit puts the validity of the clause at issue; and (4) "recognize[]" that compliance with the clause is "material to the government's payment decisions for purposes of" the False Claims Act.[19]

The Contractors Order also mandates agency implementation actions:[20]

- The Office of Management and Budget ("OMB") must develop and issue implementation "guidance" and coordinate with others to compile a list of "economic sectors" allegedly most likely to engage in the banned activities.

- The Federal Acquisitions Regulation Council ("FAR Council") must amend regulations that govern federal contracts—the Federal Acquisitions Regulations ("FAR")—in light of the Order and issue interim guidance authorizing any necessary deviations while rulemaking is underway.

- "Consistent" with OMB and FAR Council directives, contracting agencies must enforce the Order against those who fail to comply with the Diversity Ban, including by "cancel[ling], terminat[ing], [or] suspend[ing]" contracts and by "tak[ing] appropriate action to suspend and debar" contractors.

- The Department of Justice ("DOJ") must consider bringing enforcement actions under the False Claims Act against contractors who violate the Order.

### III.    FAR Council Implementation of 2026 Contractors Order

On April 17, 2026, the FAR Council issued its implementation memorandum,[21] providing agencies with model language, imported from the Contractors Order, to implement the directive. The Implementation requires agencies to insert the Diversity Ban into new contracts[22] starting on

---

[19] *Id*.

[20] *Id.* at 16148-49.

[21] Memorandum on Agency Implementation of Executive Order 14398, Addressing DEI discrimination by Federal Contractors, Fed. Acquisition Regul. Council (Apr. 17, 2026), https://perma.cc/YH8M-SHZ4 ("FAR Implementation").

[22] The FAR Implementation requires that the Diversity Ban be inserted into "contracts valued over the micro-purchase threshold," which is defined in FAR § 2.101 as $15,000, subject to certain exceptions.

April 24, 2026, and, by July 24, 2026, to make efforts to "bilaterally modify" existing contracts to include the clause.[23] If a contractor refuses to agree, the Implementation instructs agencies to consider terminating existing contracts "for convenience."[24] The Implementation also specifies that the Diversity Ban is binding on all subcontracts under the prime contract.[25]

The FAR Implementation adds a new basis for debarring contractors for "failure to comply with the requirements of the [Diversity Ban] clause."[26] While the provision governing most debarment requires a "preponderance of the evidence" showing a "serious" violation of the contract terms, such as (1) a "willful failure to perform in accordance with the terms" or (2) "a history of failure to perform, or of unsatisfactory performance[,]"[27] the Implementation does not require that the failure to comply with the Diversity Ban was "willful" or part of a "history" of noncompliance.

The FAR Council provided no justification for these changes beyond citing the Contractors Order itself, and it fails to explain any of the deadlines, any alternatives that were considered, any cost-benefit analysis that was conducted, or reliance interests or the impact on third parties.

## LEGAL STANDARD

Courts grant preliminary injunctions to "protect the status quo," "prevent irreparable harm during the pendency of a lawsuit," and allow the Court to "render a meaningful judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citation omitted). To obtain preliminary relief, the moving party must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the

---

[23] The FAR Implementation excepts contracts "with a final expiration no later than December 31, 2026," whose modification is "at contracting officer discretion." FAR Implementation at 2.
[24] *Id*.
[25] *Id*.
[26] *Id.* at 5.
[27] *Compare* FAR § 9.406-2(b)(1)(i).

balance of equities tips in [its] favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)) (cleaned up). In cases against the government, the balance of equities and public interest factors merge into a single inquiry. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Whether to stay agency action under 5 U.S.C. § 705 turns on these same factors. *Casa de Maryland v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020).

## ARGUMENT

The administration has put federal contractors in an impossible bind: sign away their freedoms of speech and association or forgo doing business—either directly or indirectly—with the government. This imposition likely violates the First and Fifth Amendment and the Administrative Procedure Act, Plaintiffs will suffer irreparable harm absent preliminary relief, and such relief would serve the public interest.

### I.      Plaintiffs Are Likely to Succeed on the Merits.

### A.      Plaintiffs are Likely to Establish Standing.

Plaintiffs easily demonstrate that they are likely to establish Article III standing here, and in numerous ways. In the First Amendment context, Plaintiffs need only meet the "somewhat relaxed" standing requirements by showing objectively reasonable chilling of expression." *NADOHE v. Trump*, 167 F.4th 86, 96-97 (4th Cir. 2026) (*"NADOHE I"*) (affirming that NADOHE and AAUP had both organizational and associational standing to challenge the certification provision in President Trump's January 21, 2025, executive order). For both Plaintiffs and their members, chilling speech and association has become the necessary outcome of choosing between self-censorship, losing contracts, and civil and criminal liability. "The injury posed by [this type of] lose-lose-lose choice is real." *NADOHE I*, 167 F.4th at 98.

Four Plaintiffs—the National Association of Diversity Officers in Higher Education

("NADOHE"), the American Association of University Professors ("AAUP"), the National Association of Minority Contractors ("NAMC"), and NAMC-DMV—have standing to sue on their own behalf because the Contractors Order and FAR Implementation "directly affect[] and interfere[] with [Plaintiffs'] core business activities," *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see* Declaration of Emelyn A. dela Peña ("NADOHE Decl.") ¶¶ 7, 9-12, 22-26, 35; Declaration of Todd Wolfson ("AAUP Decl.") ¶¶ 6, 8-11, 23-26; Declaration of Wendell R. Stemley ("NAMC Decl.") ¶¶ 1, 12, 33-52; Declaration of Jim Simpson ("NAMC-DMV Decl.") ¶¶ 1, 15, 17, 22-32.

As associations, each Plaintiff also has standing on behalf of its members (1) who "have standing to sue in their own right"; (2) where the interests at issue "are germane to the organization's purpose"; and (3) participation of individual members is not required. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). These factors are easily met here. Plaintiffs' members have "demonstrate[d] the now-familiar elements of injury in fact, causation, and redressability." *Lance v. Coffman*, 549 U.S. 437, 439 (2007). *See generally e.g.*, *infra* Sec. III. The Plaintiff organizations exist to help "ensure that people who are traditionally excluded from contracting . . . have many of the same opportunities as those who have not been excluded," NAMC Decl. ¶ 12, and to "foster[] inclusive academic environments." NADOHE Decl. ¶ 12. Finally, participation of individual members is unnecessary because the relief sought is equitable. *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996).

**B.    The Order and Agency Actions Likely Violate the First Amendment.**

"The First Amendment prohibits government from abridging the freedom of speech" or the "corresponding right to associate with others." *Americans for Prosperity Found. v. Bonta,* 594 U.S. 595, 606 (2021). The Contractors Order and the FAR Implementation encroach on both

freedoms: in a vague way, they impose overbroad restrictions that infringe on speech and expressive association; discriminate based on content; and violate the unconstitutional conditions doctrine by requiring contractors to cede protected rights in exchange for government contracts.

### 1.    The Contractors Order and FAR Implementation Restrict Protected Speech and Association.

"The freedom of speech guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469 (2007) (cleaned up). "Implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The risk of chilling these sacred rights is sufficient to trigger First Amendment scrutiny. *See, e.g.*, *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) (speech); *Bonta*, 594 U.S. at 618-19 (association). Moreover, First Amendment interests are due special deference here, where the restrictions impede expression in the higher education context, because "safeguarding academic freedom . . . [is] a special concern of the First Amendment," *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967); *see also Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023) (expression "related to scholarship or teaching" warrants special First Amendment consideration) (cleaned up).

By their terms, the Contractors Order and FAR Implementation regulate First Amendment protected speech and association. They restrict how companies, universities, and employees approach recruitment and which hiring avenues they prioritize. NAMC Decl. ¶¶ 37-38, 40-41, 56-57; NADOHE Decl. ¶ 33; *see also* Declaration of Karin Rosemblatt ("UAM-UMD Decl.") ¶ 18. They limit the ability of people to associate with those who share their experiences, even where

10

opportunities are open to all. NADOHE Decl. ¶¶ 22-23, 25-26, 29, 32-33; NAMC Decl. ¶¶ 35-44; UAM-UMD Decl. ¶¶ 15-16. And they hinder the ability to operate and promote programming that celebrates the richness of this country, NAMC-DMV Decl. ¶ 37; study and teach about its people, AAUP Decl. ¶¶ 20, 22; and generally discuss key matters of public concern, NADOHE Decl. ¶ 32; NAMC Decl. ¶¶ 51-52, 58. If Plaintiffs, their members, or their partners violate these terms, federal contractors and subcontractors will lose work, or worse. In order to avoid the devastating effects that accompany a violation of the Diversity Ban, Plaintiffs and their members are forced to chill their own speech and association. But the government simply cannot "intimidate [contractors] into silence" without implicating the First Amendment and unlawfully chilling speech. *See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 316 (4th Cir. 2006) (cleaned up).

The overbreadth doctrine prohibits government actions that punish "a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-119 (2003) (cleaned up). Such actions, like the Contractors Order and FAR Implementation here, are particularly dangerous because their "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 257, 260 (4th Cir. 2003) (applying overbreadth standard to strike down middle school dress code that would ban clothing with the mascot of the nearby high school). Accordingly, "any enforcement" of such a law is "totally forbidden," as "the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted." *Broadrick*, 413 U.S. at 612-13.

Defendants run roughshod over these standards, as the "number of examples of the unnecessarily broad nature [of the Diversity Ban] is practically limitless." *Newsom*, 354 F.3d at

11

260; *see generally* NADOHE Decl. ¶¶ 22-23, 29; NAMC Decl. ¶¶ 36, 41, 44, 46, 50; UAM-UMD Decl. ¶¶ 12-23. The Diversity Ban purports to reach nearly all speech and association that touches race or ethnicity and results in disparate "allocation or deployment of an entity's resources"— including "recruitment," "contracting," and other protected programs—if such expression relates to federal contract work.[28] That restriction sweeps in an extraordinary amount of protected speech and association.

For example, Plaintiffs and their members sometimes recruit, including for contract-funded opportunities, in a manner designed to ensure that qualified non-white applicants have an opportunity to apply, such as by advertising in news outlets widely read by a Black community or building relationships with educational institutions that predominantly serve students of color. *See e.g.*, NAMC Decl. ¶ 56; NADOHE Decl. ¶¶ 17-18, 32. This kind of recruiting involves expressive speech (*i.e.*, advertising) and association. It is nondiscriminatory[29] and protected by the First Amendment: the opportunities for which Plaintiffs and their members recruit are open to everyone. *See e.g.*, NADOHE Decl. ¶ 29; NAMC Decl. ¶¶ 11, 15, 47, 54-55. Indeed, the very purpose of such recruitment is to make opportunities available to a wider group of people.[30] Even so, such activities are banned under the Contractors Order and FAR Implementation because they involve "disparate treatment based on race" in "recruitment" and the "allocation of resources."

---

[28] Contractors Order, 91 Fed. Reg. at 16147; *see infra* Sec. I.C, discussing the vagueness of the Contractors Order's scope.

[29] *E.g.*, *Raso v. Lago*, 958 F. Supp. 686 (D. Mass. 1997), *aff'd*, 135 F.3d 11 (1st Cir. 1998) (concluding that "affirmative recruitment of minority applicants" does not provide any benefit or preference and thus does not violate equal protection guarantees); *Rogers v. Haley*, 421 F. Supp. 2d 1361 (M.D. Ala. 2006) (recruitment program was not discriminatory where there was no basis to believe it led to "anything other than hiring or promoting the best qualified applicant regardless of race" but merely ensured that "'[q]ualified white candidates simply have to compete with qualified black candidates'" (cleaned up)).

[30] *Shuford v. Ala. State Bd. of Educ.*, 897 F. Supp. 1535, 1551-1553 (M.D. Ala. 1995) (distinguishing inclusive and exclusive techniques, noting that the former "seek to ensure that as many qualified candidates as possible make it to the selection process").

12

Likewise, the plain terms of the Diversity Ban prohibit many trainings conducted by Plaintiffs and their members. For instance, construction contractors frequently encounter "racist environments on the worksite," such as "racist symbols (like nooses) and graffiti." NAMC Decl. ¶ 61. To address this kind of racism, contractors have conducted "trainings and [made] other efforts to improve the environment on work sites." *Id.* In the higher education context, contract-funded "overhead" or "indirect costs" may pay for these trainings, workshops, and faculty development programs. NADOHE Decl. ¶ 20. These programs involve protected speech and association,[31] and are often conducted specifically to comply with federal, state, and local laws that prohibit discrimination. NADOHE Decl. ¶ 19. Yet, these trainings are prohibited by the Diversity Ban because they require an "allocation . . . of . . . resources" in a "disparate" manner "based on race." Nor does the Diversity Ban allow contractors, subcontractors, or employees to "allocate[] . . . resources" to address problems affecting particular communities. For example, the Diversity Ban seems to prohibit universities from dedicating resources to research on disparate negative health outcomes for particular races. UAM-UMD Decl. ¶¶ 16-18; NADOHE Decl. ¶ 33.[32]

The overbreadth of the Contractors Order and FAR Implementation are exacerbated by the Diversity Ban's unconstitutionally vague scope that leaves open whether it applies beyond federally-funded projects.[33] As result, Plaintiffs and their members are forced to chill privately-funded expression so as not to jeopardize their access to public funding, including:

---

[31]*See AFT*, 796 F. Supp. 3d at 111 (explaining the Trump-Vance Administration's Dear Colleague Letter, which would, inter alia, bar teaching or training on "systemic and structural racism," regulated speech and violated the First Amendment); *see also generally Honeyfund.com Inc. v. Fla. Governor*, 94 F.4th 1272 (11th Cir. 2024) (state statute barring training on "diversity, equity, and inclusion issues" violated First Amendment (cleaned up)).

[32] The Diversity Ban reaches activities that the government itself has historically engaged in, such as the Small Business Administration's practice of allocating resources based on race or ethnicity towards "high quality counseling and training" for "minority-owned businesses" to "help level the playing field." *Minority-owned Businesses,* SBA (Aug. 14, 2025), https://perma.cc/C959-96P9.

[33] Contractors Order, 91 Fed. Reg. at 16147 (emphasis added); *see also infra* Sec. II.C.

- Services and training open to everyone, but designed to increase opportunities of interest to minority students or employees. NAMC Decl. ¶¶ 38, 41, 57, 59, 61; *see also* NADOHE Decl. ¶¶ 19, 21;

- Study, teaching, and research that explores how to address disparate experiences and outcomes correlated with race or ethnicity, such as statistically established differences in health outcomes, infrastructure safety, or environmental hazards. NADOHE Decl. ¶¶ 32-33; UAM-UMD Decl. ¶¶ 16-17; AAUP Decl. ¶¶ 15, 17; NAMC Decl. ¶¶ 51-52;

- Membership dues, in-kind donations, and time and financial contributions to support the nondiscriminatory activities of organizations with "diversity" or "minority" in their name or mission. NAMC Decl. ¶¶ 37-43; NADOHE ¶¶ 21-22;

- Forums on how to combat racial discrimination. NAMC Decl. ¶ 30; NADOHE ¶ 26;

- Serving as faculty advisors to student groups that are open to everyone, yet nevertheless are dedicated to advancing a particular racial or ethnic group in a particular profession. UAM-UMD Decl. ¶¶ 14-15;

Already, NADOHE and NAMC members have chilled their involvement—and are considering cancelling their memberships—out of fear that associating with the organizations will constitute "racially discriminatory DEI activity." NADOHE Decl. ¶¶ 23-26; NAMC Decl. ¶¶ 37-44 (providing multiple examples, including a delayed donation by one sponsor who needed to "check with the legal team" about whether the donation would run afoul of the Contractors Order). Likewise, some contractors have begun "purg[ing] . . . diversity efforts related to race or ethnicity from . . . forward-facing materials." NAMC Decl. ¶ 41. In other words, the overbroad Diversity Ban is "caus[ing]" Plaintiffs, their members, and "others not before the court to refrain from constitutionally protected speech" and association. *Broadrick*, 413 U.S. at 612.

### 2.    *Defendants' Actions are Content-Discriminatory.*

The Contractors Order and FAR Implementation also violate the "axiomatic" principle "that the government may not regulate speech based on its substantive content[.]" *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Government actions that do so are "presumptively unconstitutional," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and only

14

survive if they "satisfy strict scrutiny—that is [they] must be the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

Nonetheless, the Diversity Ban distinguishes permissible from impermissible speech "based on the topic discussed or idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022) (cleaned up). By prohibiting "disparate treatment based on race or ethnicity"—including in lawful speech or association—the Contractors Order bans expression that celebrates particular ethnicities or recognizes and/or addresses different experiences based on race. For example, it prohibits trainings that address anti-Black racism or advocacy against poor environmental outcomes in majority-minority communities. But the Diversity Ban *does not* reach sexual harassment trainings or advocacy against animal abuse. In other words, the Ban is impermissibly "content-based" because it "single[s] out specific subject matter for differential treatment." *City of Austin*, 596 U.S. at 69.

The content-discriminatory Diversity Ban cannot survive strict scrutiny because it is not the "least restrictive" means of serving, much less "narrowly tailored" to, the Contractors Order's stated interest in ending racial discrimination (much less the non-existent justification in the FAR Implementation). *McCullen*, 573 U.S. at 478, 486. Indeed, the 2025 anti-DEI Executive Order offers a less intrusive alternative: that Order requires every contractor to "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."[34] The 2025 Order thus targets only activities that violate antidiscrimination law, which already prohibits racial discrimination, without explicitly restricting lawful expressive activities.[35]

---

[34] Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order No. 14173, 90 Fed. Reg. 8633 § 3(b)(iv) (Jan. 21, 2025).

[35] *Id.*; *see also NADOHE I*, 167 F.4th at 103 (concluding that the Certification Provision of the 2025 anti-DEI Executive Order "requires only that plaintiffs certify compliance with federal antidiscrimination laws").

*See also McCullen*, 573 U.S. at 490-92 (state's interest in preventing obstructed sidewalks outside abortion clinics could have been accomplished through preexisting ordinances that generally outlawed sidewalk obstructions, rather than resorting to a new law that prohibited anyone from standing within 35 feet of abortion clinics).

Moreover, the overbroad Diversity Ban is "significantly overinclusive"—and thus not "narrowly tailored"—because it restricts a substantial amount of speech that does not implicate the government's stated interest. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991). Defendants cannot seriously argue that activities that are open to everyone and designed to *combat* discrimination are themselves discriminatory. *See also supra* 10-11 (describing anti-discrimination efforts chilled by the Diversity Ban). "[T]here is simply no evidence in the record" to support such a claim, which "strongly suggests that the ban on [DEI activities] [is] not necessary" to the government's purported goal of ending racial discrimination in government contracting. *See Newsom*, 354 F.3d at 259.[36]

### 3. *Defendants' Actions Violate the Unconstitutional Conditions Doctrine.*

Defendants' actions also run afoul of the unconstitutional conditions doctrine, which prohibits the government from "deny[ing] a benefit to a person on a basis that infringes his constitutionally protected" rights—such as "freedom of speech" or the right to freely associate— "even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc. ("AID")*, 570 U.S. 205, 214 (2013) (cleaned up). Put differently, the government may not produce indirectly "a result which [it] could not command directly." *Speiser v. Randall*, 357 U.S. 513, 526 (1958). This principle "applies with particular force where the government conditions

---

[36] For this reason, Defendants' actions would not survive scrutiny even if they were content-neutral. While content-neutral speech restrictions need not be the "least restrictive" means of serving the state's interest, they must still "be narrowly tailored" to avoid "burden[ing] substantially more speech than is necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 486.

funding decisions on the . . . suppression of ideas." *Am. Council of Learned Societies v. NEH*, No. 25-cv-3923, 2026 WL 1256545, at *41 (S.D.N.Y. May 7, 2026) (citing *AID*, 570 U.S. at 213).

The government may not impose "conditions that seek to leverage funding to regulate speech outside of the contours of the program itself," even if it may "define the limits of the government spending program." *AID*, 570 U.S. 214-15. Nor may the government "leverage" its "funding" to impose "a disproportionate burden calculated to drive certain ideas . . . from the marketplace." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998); *see also NADOHE I*, 167 F.4th 86, 103 (explaining that while the government has "'wide latitude to set spending priorities,'" that "latitude isn't limitless"(citing *Finley*, 524 U.S. at 588)). And it certainly may not regulate speech that occurs on the recipient's "own time and dime." *Id.* at 219 (holding that government could not require grantees to adopt a policy opposing prostitution).

The Diversity Ban included in the Contractors Order and FAR Implementation "falls on the unconstitutional side of the line," *AID*, 570 U.S. at 217, for two reasons. *First*, by discriminating against content, *supra* Sec. II.B.2, the Diversity Ban improperly imposes "a disproportionate burden calculated to drive . . . from the marketplace" any expressive activity that celebrates a particular racial or ethnic group or attempts to address discrimination or differences in experience based on race. *See Finley*, 524 U.S. at 587. The Contractors' Order makes clear that the Defendants' goal is to eliminate all "diversity, equity, and inclusion" activities, which the Order claims, without support, are "unethical and often illegal."[37] Thus it is unsurprising that the Diversity Ban restricts expression in a manner that is not "tailored and germane" to the Order's purported purpose of ending racial discrimination. *Nat'l Public Radio, Inc. v. Trump*, No. 25-cv-1674, 2026 WL 877434, at *22 (D.D.C. Mar. 31, 2026); *see generally supra* 15 (discussing

---

[37] Contractors Order, 91 Fed. Reg. at 16147.

nondiscriminatory expression, including trainings to combat racial discrimination, that are barred by the Diversity Ban). The Diversity Ban's conditions lack "any apparent connection" to the anti-discrimination "goals" that the government purports to advance across all federal contracts. *See AAUP v. Trump*, 815 F. Supp. 3d 907, 959 (N.D. Cal. 2025).

*Second*, the Ban extends to activities that fall "outside of the contours of the program." *AID*, 570 U.S. at 214-15. Because the Diversity Ban's terms are not limited to expression with federal funds, *see infra* Sec. II.C, it hinders private speech and association that is far beyond the limits of the federal program itself.

### C.  Defendants' Actions Are Vague in Violation of the Fifth Amendment.

The Contractors Order and FAR Implementation also violate the Fifth Amendment's Due Process Clause because the Diversity Ban is unconstitutionally vague. "[A] basic principle of due process" is that enactments are unconstitutional where they are "not clearly defined," since vague laws leave people unable "to steer between lawful and unlawful conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). A law can be unconstitutionally vague if it either "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or "is so standardless that it authorizes or seriously encourages discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The Diversity Ban does both. And when a government enactment is "capable of reaching expression sheltered by the First Amendment," the vagueness doctrine "demands a greater degree of specificity" than otherwise required. *Smith v. Goguen*, 415 U.S. 566, 573 (1974). If a law is so vague as to "permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech," that law is "void, on its face." *Winters v. New York*, 333 U.S. 507, 509 (1948).

18

The Diversity Ban is precisely that vague. Both the Contractors Order and the FAR Implementation describe the terms that contractors must abide by "[i]n connection with the performance of work under this contract."[38] But they do not clarify—and instead leave open to interpretation—what constitutes "in connection with" work "under this contract." Does the Diversity Ban reach only that portion of work that is directly funded by the covered contract? Or does it extend to any expression by a contractor or subcontractor? Or does the "in connection with" language leave to agencies to determine whether particular expression relates to the qualifying contract? The Contractors Order does not say, and any of those interpretations is reasonable.

This ambiguity leaves contractors without fair notice of just how much of their speech and association the Contractors Order and FAR Implementation regulate. And it leaves implementing agencies with unbounded discretion to move the line in different cases. But for contractors—along with subcontractors, employees, and partners—knowing what expression is subject the Diversity Ban is consequential, since "noncompliance" can result in loss of existing contracts, suspension or debarment from future contracts, and civil and criminal liability. Plainly, the Diversity Ban incentivizes those who work on contracts or hope to do so in the future to avoid any expression that could conceivably fall within the widest reading of the language—an understanding that sweeps up scores of First Amendment protected expression. *See supra* Sec. II.B.1.

Indeed, the vagueness is already leading contractors with decades of experience to self-censor to avoid running afoul of the Diversity Ban. NAMC-DMV notes that its members have been consistently "confused about how much of [their] current work is allowed under [the Diversity Ban's] terms." NAMC-DMV Decl. ¶ 25. NAMC's President is similarly "much more reserved" and "cautious" now, since he is worried that "highlight[ing] issues regarding race or

---

[38] Contractors Order, 91 Fed. Reg. at 16147-48 (Sec. 3); FAR Implementation at 9.

different communities" could endanger NAMC. NAMC Decl. ¶¶ 50-51. Across the board, Plaintiffs and their members are suppressing both public and private expression to avoid falling within the scope of the Diversity Ban. NAMC Decl. ¶¶ 24, 46, 49-52, 54, 57, 61; AAUP Decl. ¶¶ 20, 21; NADOHE Decl. ¶ 33; NAMC-DMV Decl. ¶¶ 38, 44. And many of their partners are doing the same. *See, e.g.*, NAMC Decl. ¶ 37 (NAMC partners are "concerned that partnering with us in any way will be seen as violating the Contractors Order and its implementation"). Defendants' actions are leading contractors and subcontractors, as well as their employees and partners, to "steer far wider of the unlawful zone" to avoid "forbidden areas," creating exactly the kind of wide-spanning chill that the void for vagueness doctrine seeks to prevent. *Grayned*, 408 U.S. at 109 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)). The Constitution demands more.

### D.     The FAR Implementation Violates the APA.

The Administrative Procedure Act ("APA") requires courts to hold unlawful and set aside "final agency action," 5 U.S.C. § 704, that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or that is "contrary to [a] constitutional right," *id.* § 706(2)(B). The FAR Implementation is reviewable final agency action that is arbitrary and capricious as well as contrary to a constitutional right.

#### 1.     *The FAR Implementation is Reviewable Final Agency Action.*

Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156, 178 (1997) (cleaned up). Courts take a "pragmatic approach . . . to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (cleaned up). Agency action is "immediately reviewable when it gives notice of how a certain statute will be applied even if no action has yet been brought." *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 487 (D. Md. 2019) (cleaned up).

The FAR Implementation marks the consummation of the agency's decision-making process: it provides the framework for government-wide implementation of the Diversity Ban.[39] And it is an action that determines rights, obligations, and from which legal consequences flow because it determines how other agencies must implement the Contractors Order. The Implementation creates obligations by imposing steps agencies "must" take, a timeline that they "must" follow, default language—adopted verbatim from the Contractors Order—that agencies must use absent being granted an exception, and reporting and review responsibilities.[40]

### 2. The FAR Implementation is Arbitrary and Capricious in Numerous Ways.

Agency action is arbitrary and capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted); *see also id.* at 51-52. For example, when an agency changes position, it must provide "good reasons for the new policy," and "take[] into account" any "serious reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agency actions are arbitrary and capricious when the agency "failed to consider an important aspect of the problem" or to address "logical" and reasonable "alternative way[s] of achieving the[ir] objectives." *State Farm*, 463 U.S. at 43, 48. The FAR Implementation fails to meet these standards in several respects, any of which is sufficient to set it aside.

---

[39] That the Contractors Order separately requires the FAR Council to "amend the Federal Acquisition Regulation," Contractors Order, 91 Fed. Reg. at 16148-49 (Sec. 5(a)), or that the FAR Implementation claims the FAR Council "intends to conduct rulemaking," FAR Implementation at 3, are besides the point. The FAR Implementation still bears all the hallmarks of final agency action, and "[t]he mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

[40] FAR Implementation at 2, 4-5.

*First*, the FAR Council did not provide a reasoned explanation, or any explanation at all, for radically overhauling the federal contracting process—beyond citing the Contractors Order—for its litany of requirements. The Contractors Order does not relieve the FAR Council of its obligation to provide a reasonable justification. *See, e.g.*, *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) ("final agency actions, even if implementing an executive order, are subject to judicial review under the APA."); *New York v. Trump*, 811 F. Supp. 3d 215, 235, 235 n.9 (D. Mass. 2025) (same, collecting cases). Yet the FAR Implementation provided no reasoned explanation for adopting procedures or departing from existing standards, including:

- requiring that all federal contracts include the Diversity Ban;

- allowing the suspension or debarment of contractors for allegedly violating the Diversity Ban without any showing of a "willful failure" or "history of failure" to comply with a contract term, or that the action was "so serious or compelling a nature that it affects the [contractor's] present responsibility," as required by FAR §§ 9.406-2, 9.407-2 (2026);

- requiring—without any explanation, process for handling special cases, or assessment of whether the resulting cancellations might outweigh the benefits of quick implementation—contracting officers to "make every effort to bilaterally modify existing contracts by July 24, 2026" or "consider whether, absent the modification, the contract no longer meets the agency's needs and should therefore be terminated for convenience";

- adopting the timeframes set forth in the Contractors Order, including those that cause agencies to violate the requirements of the Paperwork Reduction Act and the notice and comment procedures required by 41 U.S.C. § 1701[41]; and

---

[41] The Paperwork Reduction Act ("PRA") provides a process and timeline for obtaining approval for information collections. 5 C.F.R. § 1320. Barring emergency processing, 5 C.F.R. § 1320.13, the Act requires a 60-day period for public comment before an agency can impose information collection requirements, 5 C.F.R. §§ 1320.5(a); 1320.8(d). Following public comment, the agency must consider the input, 5 C.F.R. § 1320(a)(ii), submit collected information to OMB for review, 5 C.F.R. §§ 1320.10(a); 1320.11; 1320.12, and often notify the public that comments may be submitted directly to OMB within 30 days, 5 C.F.R. §§ 1320.10(a); 1320.12(c). OMB then has 60 days, and typically no less than 30 days, to render a decision. 5 C.F.R. §§ 1320.10(b); 1320.11(c)-(e); 1320.12(d). In total, the typical PRA process lasts at least 90 days. Even if the FAR Council began the PRA process on April 17, the same day it issued the FAR Implementation, the earliest OMB could have approved the information collection would have

- failing to obtain OMB clearance or conduct notice and comment rulemaking before implementing the Contractors Order.

*Second*, the FAR Implementation failed to consider the reliance interests of contractors, subcontractors, and their employees and partners. Countless businesses and workers, not to mention their families and communities, rely on the stability and ongoing operation of the contracting ecosystem. Yet with one fell swoop, the FAR Implementation upended the established contracting process. Defendants' action shows that they were not "cognizant that longstanding policies[, such as the existing FAR] may have engendered serious reliance interests that must be taken into account." *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

*Third*, the FAR Implementation failed to consider or even acknowledge important aspects of the problem, namely the impact, including costs and lost labor, of upending the federal contracting process; the practical effect of suspending or debarring countless experienced contractors and subcontractors with expertise working with the federal government; or the disruption to the economy and society caused by cancelling contracts across nearly every agency in the federal government. *See AFT*, 796 F. Supp. 3d at 109 (agency failed to consider an important aspect of the problem when it ignored whether and how disruptive its new approach to affected parties would be); *J.O.P. v. U.S. DHS*, 409 F. Supp. 3d 367, 378 (D. Md. 2019) (agency failed to consider important aspect of the problem where it ignored reliance interests). Moreover, while the Contractors Order baselessly claims that "DEI activities" are "unethical and often illegal" and

---

been July 17, 2026, 91 days later. Meanwhile, under 41 U.S.C. § 1707, any procurement policy that "has a significant cost or administrative impact on contractors" may "not take effect" until the agency has allowed at least 30 days for public comment. 41 U.S.C. § 1707(a). Even where a policy is approved on a "temporary" basis, the agency must provide for a public comment period of 30 days beginning the day the notice was published. 41 U.S.C. § 1707(e)(1). Either way, if the FAR Council proceeded through the § 1707 notice and comment process starting immediately after they received OMB approval under the PRA, even at lightning speed and assuming all possible waivers and temporary approvals, the earliest the FAR Council could approve its Implementation would be August 16, 2026. That is weeks after the Implementation's July 24, 2026, deadline for incorporating the Diversity Ban into existing contracts.

"cause inefficiencies, waste, and abuse," the FAR Implementation failed to consider that both courts and counsel in an earlier action disagree. *See, e.g.*, *NADOHE I*, 167 F.4th at 104 (noting the government's concession that there is "absolutely" diversity, equity, and inclusion activity "that falls comfortably within the confines of the law"); *see also State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious when its basis for decision "runs counter to the evidence before the agency"). The FAR Implementation fails to address any of these significant concerns, which are each undoubtedly an "important aspect of the problem" that Defendants "entirely failed to consider." *State Farm*, 463 U.S. at 43; *see also Sierra Club v. Dep't of Interior*, 899 F.3d 260 (4th Cir. 2018) ("[A]gency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the voice made.")

*Finally*, the FAR Implementation does not indicate that any alternatives were considered, much less if or why they were rejected.

### 3.  *The FAR Implementation is Contrary to Constitutional Rights.*

When final agency action is contrary to a constitutional right, the APA requires that it be held unlawful and set aside. 5 U.S.C. § 706(2)(B). Because the FAR Implementation violates the First and Fifth Amendments, *see supra* Sec. I.A and I.B, it also violates the APA and should be held unlawful and set aside.

## II.    Plaintiffs Will Continue to Suffer Irreparable Harm Absent Relief.

The Contractors Order and the FAR Implementation have already imposed—and will continue to impose—irreparable harm on Plaintiffs and their members. Irreparable harm exists where, without court intervention, plaintiffs will suffer harm that is "neither remote nor speculative, but actual and imminent," and that "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019). There is no question that is the case here.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted); *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (finding same). Moreover, the "prospect of an unconstitutional enforcement" establishes the "necessary irreparable injury." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (citation omitted). Plaintiffs and their members have established that they regularly engage in lawful speech and association related to race, ethnicity, diversity, equity, and inclusion, that those are core issues of public concern, *e.g.*, NADOHE Decl. ¶ 9; NAMC Decl. ¶ 53, and that because of the Diversity Ban, they face unconstitutional enforcement. This protected expression includes:

- Hosting network events and providing opportunities for historically marginalized groups and individuals to gain access to otherwise exclusionary industries, *see* NAMC Decl. ¶¶ 28, 31; NAMC-DMV Decl. ¶¶ 9, 11, 22, 29; NADOHE Decl. ¶ 10;

- Teaching courses or leading research efforts on topics relating to race, ethnicity, diversity, equity, or inclusion, *see* AAUP Decl. ¶ 13; NADOHE Decl. ¶ 21;

- Providing trainings that are open to everyone and focused on helping address or mitigate the effects of racial discrimination in the relevant industry, *see* NAMC Decl. ¶ 30;

- Advising on best practices for promoting equal opportunity and inclusive environments in compliance with federal, state, and local laws, *see* NADOHE Decl. ¶¶ 19, 22; NAMC Decl. ¶ 36;

- Creating mentorship and networking opportunities for underserved groups and individuals, *see* NADOHE Decl. ¶¶ 10; NAMC Decl. ¶ 15; NAMC-DMV Decl. ¶¶ 15, 32;

- Publishing materials relating to improving diversity, inclusion, and equity, *see* NADOHE Decl. ¶¶ 10, 11; and

- Dedicating resources to activities that celebrate diversity and equity or that highlight the cultural heritage of certain groups, *see* NADOHE Decl. ¶¶ 17, 21, 34; NAMC Decl. ¶ 46, NAMC-DMV Decl. ¶ 38; UAM-UMD Decl. ¶¶ 14-15.

The Contractors Order and FAR Implementation put all of this work at risk. *See generally, e.g.*, Declaration of Peter Little (showing agency implementation of the Diversity Ban). Plaintiffs have described the impacts of the Order and its implementation as an "existential" threat, NAMC-DMV Decl. ¶ 32; NADOHE Decl. ¶ 35, and a "catastrophic" danger, NAMC Decl. ¶ 64. The harm Plaintiffs have already suffered as a result of the Order and Implementation is striking.

*Lost Funding.* Plaintiffs NADOHE, AAUP, NAMC, and NAMC-DMV each face a dramatic and devastating loss of financial support traceable to coercive effects of the Contractors Order and FAR Implementation, which make members and sponsors fear that associating with groups that promote inclusion, diversity, and equity will negatively impact their ability to work on contracts. Both AAUP and NADOHE, which are "dependent on" members' dues to fund their activities, are facing a decline in membership. AAUP Decl. ¶ 24; *see also* NADOHE Decl. ¶¶ 4 n.1, 23, 24, 26. For NADOHE, losing institutional members, who provide the organization with both legitimacy and financial support, "will have a . . . devastating effect." NADOHE Decl. ¶ 24. Meanwhile, both NAMC and NAMC-DMV rely heavily on partners and sponsors to help fund the events and programming they provide for their members—sponsorship funds account for more than half of NAMC's funding, NAMC Decl. ¶¶ 38, 42, and ninety percent of NAMC-DMV's operating expenses, NAMC-DMV Decl. ¶ 32. Since the Contractors Order was issued, both organizations face the specter of a rapid decline in such support. Based on conversations with long-time partners, NAMC-DMV is reasonably "very worried that [its] sponsors will not be able to continue supporting" the group in the future, which would make it difficult for NAMC-DMV to "effectively serve our members and continue much of our programming" and would have a "devastating effect" on the organization. NAMC-DMV Decl. ¶¶ 31-32. Meanwhile, NAMC estimates that it has already lost around half of its long-term sponsorships and partnerships because

of the administration's attacks on "DEI" and attributes approximately eighty percent of that as coming from the Contractors Order. NAMC Decl. ¶ 44.

*Lost Employment*. Many of Plaintiffs' members face the loss of work, even to the point of going out of business, due to the Contractors Order. Because federal contractors now fear working with "any business that is officially associated with a 'minority' association," NAMC predicts that "[m]any members will go belly up over the next few years" if the effects of the Contractors Order go unabated. NAMC Decl. ¶ 66; *see also* NAMC-DMV Decl. ¶¶ 40-43 (similar). For one NAMC-DMV member, refusing to alter her speech in support of diversity and against racial discrimination means she stands "to lose business, money, and opportunities." NAMC-DMV Decl. ¶ 42. The same is true for AAUP members whose studies "concentrate on topics directly impacted by the order" and who, because of the Contractors Order, are "restricted in their teaching, research, and scholarship," which will make it "much more difficult . . . to find positions and advance." AAUP Decl. ¶ 22; *see also* UAM-UMD Decl. ¶ 18 (UAM-UMD member's professional trajectory will likely be restricted because of the Order). Economic opportunity and employment prospects are shrinking for the members who make up the lifeblood of these organizations.

*Suppressed Association.* The Contractors Order and FAR Implementation are suppressing Plaintiffs' and their members' association by punishing contractors for engaging in purportedly "racially discriminatory DEI activities," even where the expression involved is nondiscriminatory and constitutionally protected, and for working with others who do so. As a result, the Order both deters membership in Plaintiffs' organizations, AAUP Decl. ¶ 18; NADOHE Decl. ¶¶ 4 n.1, 23, 24, 26, and chills their relationships with long-time partners and sponsors, NAMC Decl. ¶¶ 36, 37, 38, 40, 41; NAMC-DMV Decl. ¶ 28. NAMC already faces loss of financial support and in-kind services, as "local and state governments, universities, corporations, and longstanding partners"

are all "concerned that partnering with us in any way will be seen as violating the Contractors Order and its implementation." NAMC Decl. ¶¶ 37, 42, 55. A similar trend is playing out for NAMC-DMV and NADOHE. NAMC-DMV Decl. ¶ 30; NADOHE Decl. ¶¶ 29, 30. Meanwhile, the Order and Implementation also threaten longstanding relationships that NAMC-DMV has developed with other groups of minority contractors because NAMC-DMV worries that facilitating such relationships would put the organization at risk. NAMC-DMV Decl. ¶ 39.

Plaintiffs' members' freedom of association has been affected too. As just one example, NAMC-DMV's members are concerned that they can no longer associate with other historically Black organizations out of fear of the increased scrutiny such connections will bring. NAMC-DMV Decl. ¶ 49; *id.* ¶ 54 (members fear they must abandon programming intended to benefit at-risk Black communities); *see also, e.g.*, NADOHE Decl. ¶ 32. This chill on association has been quick and expansive. And it only risks getting worse with time.

*Chilled Speech.* The Contractors Order and FAR Implementation have already suppressed the constitutional expression of both Plaintiffs and their members. NAMC has pulled back from discussing issues affecting Black communities, like declining infrastructure and under-investment, out of fear that doing so might be seen as "racially discriminatory DEI activities" and will harm its members. NAMC Decl. ¶¶ 50-52. NAMC's President polices his speech in order to avoid saying "anything that might make associating with us even more dangerous for members or sponsors worried about complying with the Contractors Order." NAMC Decl. ¶ 52. This chill to NAMC's speech extends to forgoing discussing "the discrimination and exclusion that minority contractors have faced and continued to face, or even mention[ing] the full name of our organization," out of fear that "it might put our sponsors and partners at risk of losing out on their federal contracts or subcontracts" as a result of the Order. NAMC Decl. ¶¶ 36, 45. Like NAMC, NADOHE must

28

"consider[] whether to change how we describe [our] core values or face loss of membership." NADOHE Decl. ¶ 22.

Plaintiffs' members' speech is also chilled. NADOHE members have decreased their use of the words diversity, equity, and inclusion. NADOHE Decl. ¶ 31. AAUP's members have changed how they study, teach, and discuss topics relating to race or ethnicity. AAUP Decl. ¶¶ 20, 21; *see also* NADOHE Decl. ¶¶ 32-33. NAMC and NAMC-DMV members feel increasingly unable to call out or name discrimination when it happens on work sites. NAMC Decl. ¶¶ 24, 61; NAMC-DMV Decl. ¶ 44. NAMC members fear providing safety trainings in languages other than English, out of concern that doing so violates the Diversity Ban. NAMC Decl. ¶¶ 59-60. NAMC members feel unable to discuss their status as Black-owned businesses, or their efforts to decrease discrimination in their communities, out of fear that such expression will hinder future work opportunities. NAMC Decl. ¶¶ 54, 57. One NAMC-DMV member fears that encouraging employees to celebrate Emancipation Day, an official holiday commemorating the abolition of slavery in the District of Columbia, "would violate the Order and be considered [a] banned activit[y]." NAMC-DMV Decl. ¶ 37. No matter how highly Plaintiffs and their members value their right to free speech, they are already engaging in self-censorship for fear of losing access to federal contracts or worse.

### III.    The Balance of Equities and Public Interest Favor an Injunction and Stay.

The final two factors— balance of the equities and the public interest—merge where the government is a party. *Nken*, 556 U.S. at 435. Here, both favor Plaintiffs.

The government "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (citation omitted). Instead, "upholding constitutional rights serves the public interest." *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 248

29

(4th Cir. 2024) (citation omitted). This is particularly true in the context of "the well-settled public interest in the freedom of expression." *See Nat'l Pub. Radio, Inc. v. Klavans*, 560 F. Supp. 3d 916, 929 (D. Md. 2021).

Because a preliminary injunction and Section 705 stay would merely require Defendants to respect constitutional law and maintain the status quo, the balance of equities and public interest tilt in Plaintiffs' favor and demand relief. By contrast, the Contractors Order and FAR Implementation are unconstitutional, violate the APA, and will continue to harm Plaintiffs and their members absent Court intervention.

## CONCLUSION[42]

Because all four factors weigh in favor of Plaintiffs, this Court should preliminarily enjoin the Contractors Order and stay the FAR Implementation under § 705 of the APA. As set forth in Plaintiffs' motion, the Court should enjoin Defendants from giving effect to the Contractors Order or the FAR Implementation.

---

[42] The Court should not require Plaintiffs to post bond under Federal Rule of Civil Procedure 65(c). "In public interest cases like this one," courts regularly waive bond or find that "nominal bond may be appropriate." *See CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 702 (D. Md. 2025). Notably, courts "frequently waive[] imposition of bond by imposing a nominal bond of zero dollars where fundamental constitutional rights are at stake." *D.N.N. v. Liggins*, No. 25-cv-01613, 2026 WL 632371, at *35 (D. Md. Mar. 6, 2026) (cleaned up). Where plaintiffs "stand to lose [a] fundamental right . . . if they do not obtain preliminary relief, and a substantial bond could forestall judicial review of [an] Executive Order," waiver is appropriate. *See CASA*, 793 F. Supp. 3d at 701-02; *E.K. ex rel. Keely v. Department of Defense Education Activity*, 807 F. Supp. 3d 517, 548 (E.D. Va. 2025) (waiver of bond appropriate where "the injunction restores the status quo" and disruption to the government's process "does not outweigh the impact on Plaintiffs' First Amendment rights" (cleaned up)). Here, the Court should waive bond or impose no more than a nominal bond because enjoining the Contractors Order and staying the FAR Implementation will only restore the status quo that existed before those unlawful enactments, and any harm to Defendants is far outweighed by the harm to the constitutional and statutory rights of Plaintiffs and their members.

Dated: June 4, 2026

Sarah von der Lippe*
MINORITY BUSINESS ENTERPRISE
LEGAL DEFENSE AND EDUCATION
FUND
1104 East Capitol St. NE
Washington, DC 20002
T: (202) 744-5415
SCvdL@mbeldefwatchdog.org

*Counsel for Plaintiffs NAMC and
    NAMC-DMV*

Respectfully submitted,

*/s/ Brooke Menschel*
Brooke Menschel (D. Md. Bar No. 31492)
Andrea J. Matthews*
Briana M. Clark*
Ross Snyder (D. Md. Bar No. 32162)
Steven Y. Bressler (D. Md. Bar No. 31881)
Brian Netter (D. Md. Bar No. 31723)
Kristen Miller*+
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
F: (202) 796-4426
bmenschel@democracyforward.org
amatthews@democracyforward.org
bclark@democracyforward.org
rsnyder@democracyforward.org
sbressler@democracyforward.org
bnetter@democracyforward.org
consultantkmiller@democracyforward.org

*Counsel for Plaintiffs*

*Admitted pro hac vice
+Of Counsel

31