# EXHIBIT 3

Declaration of Emelyn A. dela Peña ("NADOHE Decl.")

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **National Association of Diversity Officers in Higher Education**; *et al.*, <br><br> Plaintiffs <br><br><br> v. <br><br> **Donald J. Trump**, in his official capacity as President of the United States, et al., <br><br> Defendants. | <br><br><br><br><br><br><br> **Case No. 8:26-cv-1532** |

## <u>DECLARATION OF EMELYN A. DELA PEÑA</u>

I, Emelyn dela Peña, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and under the laws of the United States of America, that the following is true and correct:

1.    I am the President and Chief Executive Officer of the National Association of Diversity Officers in Higher Education ("NADOHE"), one of the plaintiffs in this case. I was hired into this role in February 2026.

2.    Prior to becoming the President and CEO, I was involved in NADOHE as the official designee of an institutional member from 2022 to 2025.  I also served as chapter president for the Southern California Chapter of NADOHE from 2023 until I started my position as NADOHE's President and CEO.

3.    I hold a Doctorate of Education in Educational Leadership.  In my career, I have served as a Campus Diversity Officer and Director of the Women's Center at a large state university on the West Coast, the Assistant Dean of Student Life for Equity, Diversity, and Inclusion at an Ivy

League university on the East Coast, the Associate Vice Chancellor for Student Affairs and Dean of the Center for Diversity & Inclusion at a large private university in the Midwest, the Associate Vice Provost for Inclusion, Community & Integrative Education at another top-ranked university, and as Vice President for Diversity, Equity, and Inclusion at a private Jesuit research university that was designated both as an Hispanic Serving Institution (HSI) under the federal Higher Education Act and as an Asian American and Native American Pacific Islander Serving Institution (AANAPISI) under the federal Higher Education Opportunity Act. I therefore am personally familiar with the roles of and challenges faced by NADOHE's diversity professional members.

4.      NADOHE is a non-profit, 501(c)(3) tax-exempt organization that is the country's leading association for chief diversity officers and professionals in postsecondary education, with over 1,300 members as of the date of this Declaration.[1]

5.      Our membership includes hundreds of active institutional members, including public, private, and religiously affiliated colleges and universities. Our institutional members form a national and international network of senior diversity leaders in higher education who are committed to professionalizing their diversity, equity, and inclusion efforts, guided by NADOHE's standards of professional practice and integrating evidence-based frameworks into their campus operations. NADOHE provides members a network of data, benchmarking, and organizational accountability, where each member institution contributes to and draws from shared strategic resources, legislative updates, and peer-to-peer consulting. In addition to institutional members, NADOHE has individual members who serve as diversity, equity, inclusion, and accessibility professionals to higher education institutions. NADOHE's membership also includes

---

[1] As described below, NADOHE has suffered a significant loss of membership because of this Administration's attacks on the values of diversity, equity, and inclusion. But the March 26, 2026, Executive Order that we are challenging here sharpens those attacks, threatens additional losses of membership, and presents an existential threat to NADOHE.

administrators, professionals, scholars, retirees, independent consultants, and students who share a commitment to access, equity, and equal opportunity. NADOHE's membership categories are: Institutional member/international institutional member, individual member/international individual member, corporate member (an entity that is not an American or international institution of higher education), professional organization/associate member, retiree member, and student member.

6.      NADOHE's membership eligibility rules do not address the race, ethnicity, or other demographic characteristics of any member.

7.      NADOHE strives to equip diversity professionals and institutions of higher education with the necessary tools to be successful in their roles and to advance equity, inclusion, and the value of belonging within their campus communities using evidence-based practices. Through embracing the values of inclusion and excellence for faculty, staff, and students from all backgrounds, NADOHE's members seek to enhance academic freedom and exploration.

8.      This declaration is based on my personal knowledge, gathered through my own experiences and my conversations with NADOHE members.

*NADOHE Mission and Work*

9.      NADOHE's core values include excellence, diversity, equity, inclusivity, and scholarship, which are now more than ever core issues of public concern. NADOHE pursues its mission by, among other things, offering its members resources that support professional development, informal career counseling, and other support that aids diversity professionals in ensuring the competent delivery of critical activities within an institution. Our mission and the work of our members is not to advance or provide preferences for any particular race or ethnicity. Rather, we are focused on fair access, supporting a diverse campus community, advancing opportunities,

addressing barriers to full participation, ensuring compliance with nondiscrimination laws, and achieving outcomes that result from evidence-based strategies that are designed to advance diversity and inclusion broadly.  NADOHE supports only lawful measures and strategies for our members' work in implementing the values of inclusive excellence and opportunity for all.

10.     We service this mission in a number of ways. We regularly provide professional development, mentorship opportunities, and career counseling for our members. Two of our signature programs include the Chief Diversity Officers Fellowship and the Academic Diversity Officer Fellowship. We stay current on the issues that affect higher education and produce and publish scholarship that influences how diversity, equity, and inclusion professionals do their jobs. We also host other programs and events that connect scholars and practitioners to network, learn, and share best practices. These include virtual check-ins, an online community forum, in-person symposia, and virtual webinars. And we provide a number of different resources to assist NADOHE members in performing their duties. One such example is the peer-reviewed *Journal of Diversity in Higher Education* to make available multidisciplinary research on evidence-based practices to help guide the efforts of institutions of higher education in expanding access and achievement and pursuing inclusive excellence.

11.     NADOHE established the *Standards of Professional Practice for Chief Diversity Officers in Higher Education* to inform its work and support its members. These standards of practice are based on empirically validated research that demonstrates that the pursuit of inclusion and excellence is essential to the strength of our educational institutions and the realization of an equitable society. NADOHE's *Standards of Professional Practice* provide, for example, that Chief Diversity Officers "have ethical, legal, and practical obligations to frame their work from comprehensive definitions of equity, diversity, and inclusion." Further, the *Standards* call for

4

Chief Diversity Officers to be "committed to drawing from existing scholarship and using evidence-based practices to provide intellectual leadership in advancing equity, diversity, and inclusion."

12. NADOHE's mission has become particularly important in recent years as backlash against "DEI" on higher education campuses has caused many students, faculty, and staff from diverse and underrepresented backgrounds to feel unsupported and as our members' efforts to advance equity and combat discrimination have been eliminated or restructured. Now, more than ever, it is critical for NADOHE to support its members in their critical work of fostering inclusive academic environments.

*NADOHE Members*

13. The vast majority of NADOHE's institutional members hold federal contracts, subcontracts, or contract-like instruments with federal agencies. Some of those agencies include the Department of Defense, the Department of Labor, NASA, the Department of Health and Human Services, the Department of Commerce, the Department of Veterans Affairs, the Department of Justice, the Department of Transportation, the Environmental Protection Agency, the US Department of Agriculture, the National Science Foundation, the Department of Energy, and the Department of Homeland Security. Since 2007, our institutional members have entered into thousands of federal contracts for more than $4 billion. Currently, our institutional members hold hundreds of open contracts worth well over $2 billion. Because they are federal contractors, I understand that our institutional members will be required to comply with the clauses prescribed in Executive Order 14398, Addressing DEI Discrimination by Federal Contractors (the "Contractors Order"), as it is implemented.

5

14.    Institutional members utilize NADOHE resources to align their campus operations with national standards, i.e. to ensure that their strategies to pair inclusion and excellence are both evidence-based and legally compliant. By leveraging NADOHE's signature professional development resources, benchmarking data, and specialized leadership toolkits, our institutional members translate high-level goals into measurable organizational change and sustainable policy frameworks for access and equal opportunity.

15.    Almost all of NADOHE's individual members work at or are employed by institutions of higher education that hold federal contracts and subcontracts. These institutions have hundreds, if not thousands, of active contracts with agencies including the Department of the Interior, the Department of Health and Human Services, the Department of Defense, the Department of Justice, the Department of Veterans Affairs, the Department of Commerce, the Department of Homeland Security, the Department of Transportation, the State Department, the Department of Energy, the Department of the Treasury, and the Environmental Protection Agency, the National Science Foundation, the Department of Agriculture, and NASA. Because these institutions hold federal contracts, I understand that the institutions will be subject to the Contractors Order as it is implemented, and that their employees and contractors—including NADOHE members—will be affected.

16.    Diversity professionals and diversity officers in higher education have wide-ranging duties, which may include leading diversity, equity, inclusion, and accessibility efforts for their institution, serving as the institution's designated Equal Employment Opportunity coordinators, Americans with Disabilities Act coordinators, and Title IX coordinators, and ensuring that diversity, equity, and inclusion efforts are consistent with applicable federal and state

antidiscrimination laws. As part of their work, these members collaborate with multiple units on campus, including human resources, facilities management, and procurement.

17.     Our members are responsible for a wide range of initiatives, including strategies designed to provide access, support, and resources to a diverse student body, including low-income students, first-generation students, students from historically underrepresented racial identities and marginalized groups, veterans, women, members of the LGBTQIA community, and people with disabilities. They also work to ensure that the institution is recruiting from a diverse applicant pool as it makes nondiscriminatory hiring and other personnel decisions. Some NADOHE members are classified as human resources officers because diversity, equity, and inclusion strategies are intertwined with ensuring that an institution does not engage in racially exclusionary and unlawfully discriminatory employment practices.

18.     Many of NADOHE's individual members, including those who are academic and administrative Chief Diversity Officers, lead, facilitate, contribute to, or evaluate diversity, equity, inclusion and accessibility efforts at their schools. As part of this work, they engage in outreach, recruitment, and admission programs, including pre-college programs that introduce students from diverse backgrounds to the college experience. "Diverse backgrounds" is a broad umbrella term that includes nontraditional students, such as veterans and students with families. Diversity professionals are expected to understand the varied levels of preparation of admitted students, identify barriers to student retention and graduation, and monitor outcomes. They also examine policies and practices to ensure the recruitment, retention, and success of students, faculty, and staff. This includes assessing academic and social support programs, including career services, that address the different lived experiences of students that may impact students' abilities to achieve their career and workforce goals. Some are also responsible for strategic planning and

accountability for outcomes and nondiscrimination, which can include serving as the designated Equal Employment Opportunity coordinator, as well as making sure that diversity, equity, inclusion, and accessibility efforts are consistent with applicable laws.

19.     NADOHE members also monitor hiring and promotion efforts to assure compliance with institutional hiring and progression policies and state and federal antidiscrimination laws. Because campus culture and climate can also impact student and employee retention, diversity professionals monitor, respond to, and design interventions necessary to address incidents involving bias, discrimination, or harassment of students and employees, and often conduct trainings, including those that are required or recommended to comply with federal, state, and local laws prohibiting harassment and discrimination. NADOHE members also design, promote, and implement inclusive education and professional development programs to foster student and employee success and engagement. NADOHE members understand that this work is valuable not only because it advances both inclusion and excellence, but also because it establishes campus cultures that protect against violations of antidiscrimination laws.

20.     While some NADOHE members may perform functions that are billed as direct costs under federal contracts, nearly all NADOHE members are funded in part by federal dollars because they are inextricably linked to the federal financial ecosystem through the mechanism of Indirect Cost Recovery, also known as Facilities and Administrative ("F&A") costs. Under federal cost accounting standards (such as 2 CFR § 200), when an institution, such as our institutional members or employers of our individual members, executes a federal award or contract, the institution is entitled to a negotiated F&A rate that reimburses the institution for the "overhead" costs of supporting those federally-funded activities. These recovered funds are vital to the institution's general operating budget, providing the necessary capital to maintain the institution's

administrative infrastructure, including the infrastructure that supports human resources, as well as programmatic resources that relate to the work of diversity, equity, and inclusion practitioners. In practical terms, federal overhead dollars sustain both the "Facilities" component, such as the physical space and utilities for training and workshops, and the "Administrative" component, which supports the payroll, human resources, legal compliance, and faculty development efforts essential to an institution's mission. Thus, the work of diversity officers is intrinsically supported by federal funding, as it relies on the very institutional capacity that these indirect cost reimbursements are designed to maintain.

21.     While our mission is not to advance or preference any particular race or ethnicity, the work of NADOHE members necessarily involves work related to race and ethnicity. For example, NADOHE members advise cultural organizations and student groups. Institutional members have partnerships with or hold the federal designations of Minority Serving Institutions, Hispanic Service Institutions, Historically Black Colleges and Universities, Asian American and Native American Pacific Islander Serving Institutions, and Tribal Colleges. NADOHE members who hold faculty positions or otherwise teach courses or give talks sometimes address the history of race relations or conduct or discuss research on racial health disparities and similar trends or effects of race discrimination. Many colleges and universities celebrate their diverse communities through heritage months and other programs that are overseen or supported by individual NADOHE members.  In connection with their compliance roles, NADOHE members also conduct trainings on best practices for avoiding behavior or practices that may give rise to race discrimination or harassment claims.

*The Contractors Order Threatens Our Longterm Stability and Chills NADOHE's Association and*

*Speech*

22.     The Contractors Order threatens NADOHE's relationship with our institutional and individual members, as well as other partners in the field. Our members look to us for guidance on how best to advance inclusion and excellence on campus using lawful, evidence-based strategies. A key component of our work involves developing standards of professional practice that acknowledge the ethical, legal, and practical obligations of Chief Diversity Officers to frame their work as inclusive and ensure that it complies with the legal and regulatory requirements for their institutions. But because of the very broad definition of "racially discriminatory DEI activities," we are considering whether to change how we describe these core values or face loss of membership.

23.     Since the Contractors Order was issued on March 26, 2026, we have heard from numerous institutional members who fear that they can no longer work with us if they want to remain eligible for federal contracts and subcontracts. They believe that the Administration may consider their involvement with us to be "racially discriminatory DEI activity," especially given the broad and confusing terms in the Contractors Order about "program participation" and "allocation or deployment of an entity's resources."

24.     Institutional members play a particularly important role in our long-term success because they pay higher membership dues than individual members, and the involvement of any one institutional member shows individuals at that school and similarly situated schools that NADOHE is a respected, important organization. If any of our institutional members pull back their support or cancel their memberships because they fear that under the terms of the Contractors Order, they

will lose contracts if they keep working with or paying dues to NADOHE, it will have a particularly devastating effect.

25.     Historically, many colleges and universities—both institutional members and otherwise—have sponsored memberships for individual faculty and staff members who are interested in joining NADOHE. But these memberships, too, are threatened by the Contractors Order, if these institutions believe they will be found to violate the terms of the Order if they commit resources—both membership dues and employee time—to NADOHE.

26.     Other individual members, even those whose institutions do not sponsor their memberships, have told us that they don't know whether they will be able to continue. Some already believe that they may lose their jobs as a result of their institutions' efforts to comply with the Contractors Order and thus will not be in a position to continue to pay their dues or to pay to attend NADOHE's annual conference. Others fear that if they are seen as being aligned with NADOHE, their institutions will target them as part of the effort to comply with the requirements of the Contractors Order.

*The Contractors Order Chills Expression of NADOHE's Members*

27.     Many of our members, both institutional members and individual members, have already chilled their association and speech because of the Contractors Order, and as implementation continues, I know this will continue.

28.     I understand that this chilling is an intended result of the Contractors Order, as the next step in the Trump Administration's attack on "DEI." For example, I am aware that, on April 6, 2026, the Department of Education issued a press release touting that "Today, institutions of higher education are changing the game because President Trump is bringing back America's Golden Age — shifting the culture…. Eliminating DEI: Hundreds of colleges and universities have rooted

out Diversity, Equity, and Inclusion (DEI) efforts on their campuses…. Over 45 colleges and universities have removed DEI statements and messaging from university programs or websites…. At least 175 colleges and universities have removed or restructured DEI offices or centers at their institutions."[2]

29.    Because the Contractors Order links "DEI" activities that the Government suggests are "discriminatory" to False Claims Act liability and potential debarment, institutions are moving with extreme caution to avoid even the appearance of non-compliance. By framing any engagement in legal diversity, equity, and inclusion activities as potential fraud against the government, the Contractors Order forces institutions to choose between their values of inclusion and excellence and their financial survival, leading many to believe that the only safe way to avoid liability or loss of federal contracts is to default to total inactivity with regard to their prior support of diversity, equity, and inclusion initiatives. The Contractors Order explicitly targets "program participation," which includes training, mentoring, and leadership development programs. Institutional members are scaling back specialized workshops and affinity-based networking groups, even if these programs are open to people regardless of race or ethnicity and are legal under existing civil rights laws. The Contractors Order also mandates that prime contractors, such as our institutional members, monitor and report "any subcontractor's known or reasonably knowable conduct that may violate this clause."

30.    In my experience, when higher education institutions are concerned about liability, they require certifications and legal indemnifications from partners just to continue the work. Here, because fear of losing federal funding is so high, I know some institutions will require burdensome certifications and indemnifications from smaller vendors and community partners, including some

---

[2] See https://www.ed.gov/about/news/press-release/victories-higher-education-eliminating-dei.

NADOHE members, before signing contracts. And based on the fear that's running rampant through higher education right now, I expect other institutions will just avoid entering into subcontracts at all, including with NADOHE members who are diversity professional consultants. These are the conversations that I am currently hearing across the education sector—institutions are considering drastic cuts to the very programs that NADOHE and NADOHE members are responsible for out of fear of having their subcontractors' activities attributed to them or of failing to report conduct that the institution did not believe "may violate" the Contractors Order definition of "racially discriminatory DEI activities," but the Administration disagrees.

31.    I have had conversations with many of NADOHE's individual members who, because of the Contractors Order, are changing or considering changing their own expression, or they fear they will risk facing adverse employment consequences or endanger their institutions' federal contracts. Just since the Contractors Order was issued, I know multiple NADOHE members who fear that using words like "diversity" or "equity" will be considered "racially discriminatory DEI activities." One NADOHE member changed language on their company website out of fear that they would be seen as violating the terms of the Contractors Order and thus ineligible for work. And two NADOHE members report that their institutions changed the names of their offices out of fear that using certain words would lead to their institutions losing access to federal contracts. This is especially true for NADOHE members whose activities explicitly include advancing diversity, equity, and inclusion.

32.    For example, one of our members, NADOHE Member A, works in leadership at a medical center that has a university partnership in the western part of the United States. Both the university and the medical center are federal contractors. Because it is well understood that medical conditions show up differently in people based on factors including race and ethnicity, this

13

member's employer has sought and evaluated that data to ensure it is able to provide quality care for all people. Based on its assessment of data, the medical center has undertaken efforts to expand its reach to try to ensure equal access to critical health services. For years NADOHE Member A, on behalf of their employer, has been building a relationship and collaborating with a small number of educational institutions that predominantly serve students of color, including traveling to do on-site programs and regularly participating in an annual program at one of the universities to celebrate and advance academic achievement. Over the last year, the medical center has instructed this member to limit their role in the relationship, but the collaboration has continued, albeit in a more limited way. NADOHE Member A also helps organize an annual event for the medical center to highlight and explore patient and employee experiences that often differ dramatically based on access to services. Based on guidance from their employer, NADOHE Member A has limited discussion of race and ethnicity at the event. Because of the Contractors Order, NADOHE Member A fears that the medical center will instruct them to terminate the relationship with the other educational institutions, stop participating in collaborative programs, and cease discussion of race and ethnicity entirely in order to avoid losing federal contracts. Even if the medical center does not mandate such changes, this member is considering how to change their own expression to ensure their activities don't threaten their employer's federal funding, which accounts for the majority of its operating budget. But for NADOHE Member A, the choice is one of life and death: without funding, the medical center would have to pull back its work, which is critical to saving lives. At the same time, without being able to understand and address how race and ethnicity affect medical outcomes, people whose race or ethnicity places them at higher risk for certain conditions will die.

33.    Another member, NADOHE Member B, works in administration at a medical education institution on the west coast that is a federal contractor. NADOHE Member B has been asked by faculty members whether they will be fired for teaching or publishing work that includes references to race, including materials that reference statistically established differences in health outcomes correlated with race or ethnicity. This year, NADOHE Member B and their colleagues were instructed that the budget was cut to recruit from historically black colleges and universities (HBCUs) and predominantly Hispanic serving institutions (HSIs). NADOHE Member B reasonably fears that the Contractors Order will further incentivize the institution to monitor and dissuade speech and activities concerning race, ethnicity, diversity, equity, or inclusion, and they and their colleagues will have to chill their own speech, face employment consequences, or otherwise may be responsible for the institution losing federal contracts.

34.    NADOHE's institutional members have also experienced harm stemming from the Contractors Order. For example, NADOHE Member C, a large public university, is an institutional member of NADOHE and a federal contractor and subcontractor. Member C relies on federal contracts and subcontracts as direct funding for research and to advance its mission to drive innovation, knowledge discovery, and economic development in service of the public good. As one mechanism in service of this mission, Member C maintains a center that supports community building and academic development for students from diverse racial backgrounds through tutoring, workshops, discussions, and speakers. The center is open to students of all races and ethnicities, but is used more heavily by students from less-represented backgrounds on campus, including first-generation students and students from historically underrepresented racial groups. Evidence supports that students who avail themselves of the center's services, regardless of background, are more successful academically. Member C is reasonably concerned that the Contractors Order and

15

its implementation pose an existential threat not only to the center and other programs that touch on race, ethnicity, diversity, equity, or inclusion, but more broadly to its research enterprise and academic program. Although Member C's programs comply with federal antidiscrimination law, it reasonably fears that the administration will consider at least some of these efforts to be "racially discriminatory DEI activities" under the Contractors Order. Member C now faces a lose-lose-lose choice between maintaining its contracts, maintaining its program, or facing potential enforcement. Being put to this choice jeopardizes Member C's research enterprise and programs. Specifically, it threatens Member C's ability to recruit and retain faculty and students; to continue evidence-based programming that has helped reduce gaps in student success; to create impactful knowledge, programs, and services; and ultimately to deliver on its mission to educate each of its students to compete in a global economy.

35.     These members are not alone, and I am hearing similar experiences from members of our board and other NADOHE leaders—either they are personally struggling to figure out whether, in light of the Contractors Order, it is possible to safely express themselves on topics related to diversity, equity, and inclusion, they have already changed their expression, or they know another NADOHE member who is having the same concerns.

\* \* \*

36.     The full implementation of the Contractors Order represents an existential threat to NADOHE's core mission, placing our members in fear of criminal liability for following or advocating for the very standards of professional practice we have spent decades developing and refining. The Executive Order creates a pervasive chilling effect that punishes NADOHE's members for seeking the specialized training, research, and benchmarking that define the organization's value and core functions. This weaponization of federal oversight forces a

16

professional community built on transparency and collective growth into a posture of silence and self-censorship to avoid the risk of debarment or financial ruin. Long-term, this does not merely hinder administrative progress; it systematically erodes NADOHE's ability to serve as a national convener, threatening to dissolve the professional pipeline of equity leaders, and leaving institutions without the expert guidance necessary to navigate complex campus and national issues effectively.

37.     This Administration has had a campaign to attack the values of diversity, equity, and inclusion since even before President Trump's inauguration. Continuing our work has been challenging already, and we have already experienced a significant loss of members due to this Administration's prior attacks on diversity, equity, and inclusion initiatives. But the Contractors Order, and agencies' efforts to implement it, has already sharpened the attack on our values and core activities. This Executive Order puts a bullseye on our relationships with our members, our reputation, and the heart of our work.

Dated: June 4, 2026                                                 */s/ Emelyn A. dela Peña*
                                                                    Emelyn A. dela Peña