# EXHIBIT 5

Declaration of Wendell R. Stemley ("NAMC Decl.")

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER EDUCATION, *et al.*,<br><br>　　　　　Plaintiffs<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　Defendants. | **Case No. 8:26-cv-1532** |

## <u>DECLARATION OF WENDELL R. STEMLEY</u>

I, Wendell R. Stemley, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and under the laws of the United States of America, that the following is true and correct:

1. I am the National President of the National Association of Minority Contractors (NAMC), one of the plaintiffs in this case. NAMC is a nonprofit trade association. Our main function is to train minority contractors on how to pursue government contracting and advocate for their access to these business opportunities. We serve as a gathering space for contractors from across the country.

2. NAMC has approximately 3,500 members nationwide, including members in approximately 20 states. NAMC has 22 chapters around the country. NAMC-DMV, which is also a plaintiff in this case, is one of these chapters.

3. I am also President, and majority owner, of Black IPO, Inc. Black IPO is a C-Corp in construction, construction management, and utility project management. I have been the President since 2000, when the company was founded. We named the company IPO for "initial public

1

offering" because we were bringing something new and unique to the market. We have about 20 employees based out of offices in Philadelphia, Atlanta, Los Angeles, and San Diego, and work in California, Georgia, Nevada, and Pennsylvania.

4.      This declaration is based on my personal knowledge, gathered through my own experiences and conversations with NAMC members, chapter leaders, partners, and sponsors.

*NAMC Structure, Background, and Information*

5.      NAMC was founded in 1964 and incorporated in D.C. in 1969. NAMC worked with Parren Mitchell, Richard Nixon, and Ronald Reagan to found the Minority Business Development Agency and various minority business programs, including the DBE program. No Black or brown person had received an SBA loan before 1969.

6.      NAMC's Board of Directors runs the organization. The general membership elects the Board each year. The Board elects the Executive Committee. As a member of the Executive Committee, I am elected by the Board.

7.      As the President, I am empowered to represent NAMC's members on a day-to-day basis. It is crucial that I know my membership so I can communicate on their behalf.

8.      NAMC works with around thirty large corporate sponsors and partners. These companies provide NAMC with annual financial support, but also provide NAMC with more periodic financing for events like our annual conference and in-kind benefits for our members. Our sponsors and partners renew their partnership with NAMC every year.

9.      NAMC Members work mostly with large companies in the public works arena (funded by public dollars and controlled by government agencies like the Department of Energy, the Department of Transportation, and the Federal Aviation Administration) and, less often, on private projects with large companies (like Kaiser Permanente, Google, and Amazon). Nearly every

NAMC member works as a federal contractor or subcontractor, or with federal contractors and subcontractors. Some, like me, are majority owners of their own small contracting companies. Others are minority owners or employees for larger contracting organizations.

10. Over 90 percent of NAMC's members are contractors, and around 70 percent of them contract in the construction or engineering industry.

11. NAMC membership is open to people of all races, ethnicities, and backgrounds. If someone shows an interest in our programming and a commitment to our mission, and pays membership dues, they are welcome to join NAMC. Our membership includes people from various races and ethnicities, including contractors who are Black, White, Latino, Asian, and Middle Eastern.

12. A core part of NAMC's mission is to ensure that people who are traditionally excluded from contracting—mainly, minority contractors—have many of the same opportunities as those who have not been excluded.

13. NAMC has chapters throughout the country. Each chapter functions independently. And every chapter's relationship to NAMC is a little different and particular to their needs. While NAMC provides resources and support to these chapters, chapters like NAMC-DMV function under their own bylaws and with their own independent board, incorporation, and tax status.

14. I know most of our members and the chapters personally, and over the years, I have learned about their grievances and concerns. I conduct frequent calls with our chapters and I always ask what problems people are having—ninety-nine percent of the time, discrimination is one of those problems. We have monthly Board Meetings, which include the chapter presidents. After each board meeting, I follow up with individual chapters. Discrimination comes up almost every time I talk to a NAMC chapter or individual member. That discrimination leads to exclusion and unequal opportunities.

15.    This discrimination is sometimes implied or implicit, but often enough, it's explicit. And it creates barriers that limit many non-white contractors from being able to have the same opportunities to compete for contracts. These problems affect minority contractors disproportionately. Programs, resources, trainings, and mentorship are all important tools NAMC uses to help our members have a fair chance to compete for contracts. All of these initiatives are open to all members, irrespective of race or ethnicity, but the fact that the programming is targeted towards people with particular backgrounds or who are particularly at risk of discrimination is critical to its success and NAMC's mission.

*NAMC's Efforts to Mitigate Minority Contractors' Historic Exclusion from Contracting*

16.    NAMC was founded because of the high levels of discrimination against minority contractors. Discrimination was a constant problem in contracting in the 1960s and 1970s. Rampant discrimination led to generations of contractors being denied opportunities and excluded from industry altogether. Although some efforts by NAMC and our partners have helped, both discrimination and the resulting exclusion remain problems to this day. Examples are not hard to come by.

17.    I hear about discrimination—and the exclusion it causes—all the time from NAMC's membership. Explicit racism is tolerated in construction and many other industries, and the government often does little to prevent or address it. There is a "good old boys" network that allows racial discrimination and exclusion that includes big companies, big prime contractors, banks, and other similar companies. It's pervasive.

18.    Because of the "good old boys" network, there is a lot of pressure to have good relationships with prime contractors. Those relationships are important to getting contracts.

4

19.     It's very commonplace in the construction industry for major prime contractors to mostly use firms owned by white men and relax the standards for the white-owned firms, but not for Black-owned firms. This harmful mindset is rampant throughout contracting and across industries. The "good old boys" network does not want to give up exclusivity or control.

20.     Another example is that there is a practice of big prime contractors requesting that bonding companies provide a "Good Guy Letter" to vouch for a favored subcontractor. These letters allow certain subcontractors to have their bond requirements waived or give them an advantage in getting their bonding approved. Big prime contractors generally do not request these letters for their minority-owned subcontractors.

21.     Many minority-owned firms face explicit discrimination and exclusion on job sites, too. The Washington Post reported that 55 nooses were found at 40 different construction sites between 2015 and 2021.[1] In most cases, nothing was done. The article gave an accurate picture of the types of settings that NAMC members experience on job sites to this day.

22.     Often the government is so protective of its big prime contractors that they don't want to even hear when those prime contractors do something wrong. In many ways, the government is part of the "good old boys network." Minority-owned firms are at the mercy of big firms and their relationship with the government agencies.

23.     These issues have only gotten worse over the past year. One recent survey of Black women business owners found that the Trump Administration's anti-DEI actions and policies caused 53 percent of the respondents to lose contracts or clients.[2] The effects of losing this business can be

---

[1] Taylor Telford, *Dozens of nooses have shown up on U.S. construction sites. The culprits rarely face consequences*, Wash. Post (July 22, 2021), https://www.washingtonpost.com/business/2021/07/22/noose-construction-industry-racism/.
[2] Avis Jones-DeWeever, The Ultimate Overcomers: Black Women in Business in the Anti-DEI Era 4 (2026).

devastating. Over 70 percent of the respondents in the survey who lost contracts lost $100,000 or more in revenue, and 16 percent of respondents lost over half million dollars.[3]

24.      With the March 26, 2026, Executive Order 14358 that targets contractors (the Contractors Order), it is to the point now where most NAMC members who are employees or contractors will not even report discrimination when it happens, because they have so little faith that anything will be done about it. People just endure discrimination now, often without saying anything, because a lot of times it feels like reporting it will only make things worse.

25.      Like other NAMC members, I've experienced a lot of discrimination and exclusion during my career as a contractor. Long before I started Black IPO, I heard racial slurs on job sites, faced employment consequences, and more. On other occasions, I have faced explicit discrimination in the bid process, when the big prime contractors either refuse to provide me with information or simply do not use Black firms, no matter how competitive my bid is. These types of things happen all the time—it only takes one bad apple in management to derail a person's career or make them suffer consequences.

26.      As one example of the type of prioritization and exclusion that is common, I tried bidding a big federal job at Camp Pendleton in California building a billion-dollar hospital in roughly 2015. Initially, I bid as a subcontractor to manage and install the concrete. When I did not get that whole job, I approached the white-owned firm that got the subcontract for concrete and asked to bid to do part of the work. The white contractor told me "I don't believe in that; I give all my work to my brother-in-law." I understood that he was saying he did not believe in giving work to non-white contractors.

---

[3] *Id.* at 17-18.

27.     I have also experienced and heard about explicitly racist intimidation and bullying by white construction trade workers, both union and non-union. I believe that these efforts are intended to drive Black and other minority-owned businesses—and their employees—out of the construction business. The bottom line is that they just don't think we have a right to do this work and they will even use threats of violence to drive us out.

28.     For more than 50 years, NAMC has been a critical support system to help provide opportunities and access for contractors who would otherwise be excluded from the white-dominated industry. Because so much contracting is determined by the "good old boys" network, having our own network of contractors who are committed to expanding, rather than restricting, opportunities is one of the only ways to ensure that minority contractors have any opportunity to compete. Not all of the contractors in our network are minority contractors—it includes white-owned businesses too—the unifying theme is that everyone in our network is committed to removing barriers to access and increasing opportunities. We are trying to level the playing field for all contractors.

29.     We do a number of things to fulfill our mission. For example, NAMC's annual conference helps give members a place where they can network and create the kind of industry relationships that are essential for succeeding in contracting. We also use our annual conference to provide updates and other information about local, regional, and national policy trends. Many of our members fly in from out of state to attend the conference and get access to these resources.

30.     We also provide trainings and informational sessions about important parts of the contracting process to help make sure that NAMC members have access to the information needed to get more contracting opportunities. And we provide a forum for discussing and combatting the

7

effects of racial discrimination in the contracting industry so that we can face the problems created by such discrimination head on.

31.    We provide opportunities for minority contractors to meet with large prime contractors. These opportunities, usually at regular NAMC meetings and events, are critical because minority contractors are normally excluded from long-established business networks.

32.    Another benefit we provide for NAMC members is access to project management software, which has historically been provided by sponsors and partners, although the Contractors Order threatens that support.

*The Contractors Order Chills NAMC's Right to Free Association*

33.    The Contractors Order threatens all of the work of NAMC and our members (as well as countless others) to try to ensure fair opportunity for minority contractors at risk. The core of NAMC's mission to help overcome the barriers of discrimination is under attack because of the Contractors Order.

34.    In the past, when this Administration has taken actions regarding diversity, equity, and inclusion initiatives or federal contractors, I've always felt like I understood what the rules of the game were that we had to play by. This has been particularly important in my role as the President of NAMC when I am communicating with members, chapter leaders, and outside partners. After earlier executive orders and guidance by the Department of Justice, I was able to advise my partners and members on the best course of action. We felt like as long as we dotted our i's and crossed our t's, there was still a place for our members in federal contracting. But after the Contractors Order came out, I feel like I no longer know what is in bounds and what is out of bounds for our members and partners. And from talking with our members and partners, I know I'm not alone.

35.     The Contractors Order has chilled NAMC's association with other groups.

36.     I always work hard to advise all of our partners and sponsors fairly and honestly. I provide advice to local and state governments, universities, corporations, and other groups about how to attract the best talent to allow them to succeed in industry. For some entities, I give advice on the impact of the Trump Administration's actions against "DEI," for others, I work to help get minority participation goals or community benefit agreements applied to projects. These relationships are crucial to building trust within the industry. But since the Contractors Order has come out, I've had to be much more cautious in how I talk to them and what advice I give them. I am worried that if I talk about the discrimination and exclusion that minority contractors have faced and continue to face, or even mention the full name of our organization, that it might put our sponsors and partners at risk of losing out on their federal contracts or subcontracts if the federal government sees our work as "disparate treatment based on race or ethnicity." NAMC's leadership already feels a sense of chaos and uncertainty from this order that means we have to carefully monitor all of our activities and events.

37.     The Contractors Order is already causing significant harm to NAMC because others—local and state governments, universities, corporations, and longstanding partners—are also concerned that partnering with us in any way will be seen as violating the Contractors Order and its implementation. Because the stakes of violating the order are so high, most of the companies I have spoken with are scared of associating with us at all.

38.     Many of our long-time partners are federal contractors who depend on us to build connections with small businesses who they don't know and who are not in their networks. One of the ways that they do that is by helping support and sponsor many NAMC activities, services, and training programs. I have already seen early signs that these partnerships are suffering because

of the suggestion in the Contractors Order that contractors cannot dedicate resources to building capacity and opportunity for minority contractors without losing their own federal contracts and subcontracts. At least 70 percent of NAMC's operating funds come from these sponsorships. Without these partnerships, NAMC's efforts to empower minority contractors will suffer.

39.     For example, since the Contractors Order was issued, I had one sponsor call me to ask whether he could make out his company's annual contribution to just "NAMC" instead of the "National Association of Minority Contractors," since he didn't want to have to write down that his company was associating with an organization focused on supporting minorities. I told him that we were obligated to, and would, disclose them as a donor, even if the check was made out to NAMC. The sponsor said that he would have to check with his legal team before he could make any kind of public commitment to supporting us. He said that he was very worried that his company would have to cut off their financial support for NAMC because of the Contractors Order.

40.     I've also had conversations with about a dozen large national contractors after the Contractors Order was issued and they have told me that while they still support NAMC, they can no longer be on the front lines fighting for diversity, equity, or inclusion in contracting (or generally), and that they cannot be seen directly supporting NAMC but still want to support us if they can stay in the background. They have told me that they are not sure they are allowed to support NAMC under the Contractors Order and they are trying to protect their businesses and so they feel like they cannot continue to openly support NAMC or fight for diversity if it puts their work and their jobs at risk. There is a lot of fear among all the contractors I have spoken to about the Contractors Order.

41.     A NAMC sponsor has told me that, while he waits for a final interpretation from his legal department on the Contractors Order, he is working to purge any diversity efforts related to race

10

or ethnicity from his company's forward-facing materials and contracts. That's what he thinks the Contractors Order requires. He is going full-steam ahead with things aimed at helping women and veterans, but his interpretation is that he must stop any sort of donations, support or association with organizations, like NAMC, that help minorities or have minority in their name. Losing the support of his company is just one specific example of a harm to NAMC caused directly by the Contractors Order.

42.    This fear caused by the Contractors Order and its implementation has real financial impact on NAMC. Our sponsors and partners provide a huge amount of financial support to make NAMC's efforts possible. Through their dues and the financial support they provide for our events, like our annual conference, NAMC's sponsors provide over half of the funding for our annual programming. Sponsors and partners also provide important in-kind services. For example, some sponsors will provide NAMC members with discounted access to software that is crucial for working on major construction projects. These companies will come and train our members on how to use the software so that they can be prepared to use it whenever they get added onto big contracts. This benefits NAMC members by providing them with the tools they need to be more competitive for projects, and it benefits the sponsors by increasing the market for their software and ensuring that their major clients have more subcontractors who are ready to work with them. But these companies are no longer sure that they will be able to provide these trainings or resources for NAMC members after the Contractor's order. Without their support, NAMC does not have the resources to make up for the loss of these types of in-kind benefits all on our own.

43. Already, we are getting fewer checks, and fewer offers for support, from our sponsors because of fear over how the Contractors Order will be implemented and enforced. And other partners and supporters are noticing. Just the other week, one of the hospitality companies that we use for our annual conference told me that they believe we will not have enough funds to cover our own costs. I understand their thinking is due to pressure on companies to stop supporting NAMC out of fear of violating the Contractors Order. In this case, the company worked with us to make sure we can go forward, but even so, we are going to have to reduce both the attendance size and length of the event this year. Moreover, if sponsors and partners continue to pull back from associating with us out of fear of violating the Contractors Order, we will have trouble hosting the conference in the future.

44. This year, NAMC anticipates losing about half of our long-time sponsors and partners. Some of this attrition is because of the general chaos in contracting caused by this Trump Administration, but I'd estimate that about 80 percent of this loss is directly caused by the Contractors Order. The Contractors Order, more than any other Administration action, has been the one that has really made almost all of our contractors, sponsors, and partners stop and say that they aren't sure what they are going to do, or even what is allowed, anymore.

45. In the past, we used to have representatives of federal agencies regularly attend our annual conference. The Department of Energy has attended our conference for many years in a row, as has the General Services Administration. But this year these federal agencies have gone completely quiet, and it doesn't seem like any of them will attend. It seems like none of them want to get on the bad side of the political leaders in the Trump Administration.

12

46.     We cannot even host events that celebrate holidays or members' culture without worrying about violating the Contractors Order anymore. We do not know if we could prepare an event for MLK Day or Juneteenth without making our partners and sponsors more nervous about associating with us.

47.     I know some groups of white employees who gather amongst themselves and have private meetings without it raising any concerns. But there is such a pervasive fear that anything involving minorities will be seen as a violation of the Contractors Order and will get businesses in trouble that similar gatherings of minority employees, even if open to everyone, are seen as just too risky under the Contractors Order. The risk of a contractor or subcontractor facing termination of their contracts, debarment from contracting, or liability under the False Claims Act is just too high for minority employees to feel comfortable gathering together in any professional context.

*The Contractors Order Chills NAMC's Speech*

48.     The Contractors Order has also chilled our speech.

49.     As part of my job as NAMC President, I give speeches to groups of students at universities who are interested in getting started in the contracting industry. Students of all races and backgrounds are invited to, and do attend, these sessions to get NAMC's perspective on the real-world issues contracting can be used to address. We pride ourselves on giving honest assessments of the problems facing small communities and our country's infrastructure when other groups might not.

13

50.    Last month, I gave a speech to a group of students at Johns Hopkins University and I didn't know what I could say or how to say it. Since the Contractors Order came out, I haven't been sure how to talk to students about the role they can play in the country's future and how they can make a positive impact through their work. I've had to change how I talk about NAMC and our mission. Compared to how I was able to talk about contracting and NAMC when I was speaking at other universities in past years, or even just before the Contractors Order was issued, I am much more reserved now. I worry that the more the Contractors Order is implemented, the harder it will be to talk about our work without violating the Order.

51.    I also frequently give speeches on issues that affect local communities and have had to change my approach to those speeches as well. For example, this month I am speaking in Louisiana about an unsafe rail line where a train crashed into a minivan and killed multiple people. We have advocated for improving community safety and infrastructure like this for a long time. But now I feel more cautious about what I can say during these speeches. I'm worried that if I highlight issues regarding race or different communities it could hurt NAMC.

52.    The Contractors Order makes it harder for minority groups like NAMC to advocate about community issues that impact lots of people in America, like freight rail safety or better water infrastructure or Community Benefits Agreements. Any business that does federal contracts or works with federal contracts is likely to be anxious about asking a group that is associated with helping minorities to contribute to their advocacy or to speak to their members because doing that might be seen as a violation of the Contractors Order. And I have to be a lot more careful about how I talk about the effects of discrimination and the needs of minority contractors or communities at such events, so that I don't say anything that might make associating with us even more dangerous for members or sponsors worried about complying with the Contractors Order.

14

*The Contractors Order Chills the Speech and Association of NAMC members*

53.    The Contractors Order, and its implementation, also chills the expression of NAMC's members on key topics of public concern.

54.    For example, NAMC's members sometimes reference their status as a minority-owned businesses or talk about programming they do to help increase opportunities for other minority contractors or employees. But since the Contractors Order was issued, I have talked to multiple members who are concerned that they can no longer make these kinds of statements or they will be seen as engaging in "disparate treatment based on race or ethnicity," even if their programming remains open to anyone who wants to join. NAMC members who I have spoken with feel like they have to rethink almost everything they do to try to comply with the Contractors Order, even though they have always been very careful in all of their work.

55.    NAMC members also rely on NAMC to gain access to professional networking events as a chance to exchange information about their industries and trades and build stronger personal and professional connections. Even though these events are open to all NAMC members, and NAMC membership is open to people of all races and ethnicities, since the Contractors Order came out, I have spoken with multiple NAMC members who have told me that they are concerned that they can no longer support or participate in NAMC networking events where they associate with other NAMC members without jeopardizing their ability to work on federal contracts or subcontracts.

56.     For example, one member (NAMC Member A) is the majority owner of a construction, infrastructure, and engineering company who has decades of experience in construction operations and project supervision. Member A has worked on both federal and state, local, and private contracts, including a local government contract that requires Member A to hire workers from some economically depressed zip codes. These areas include a disproportionate number of minorities, so Member A frequently advertises in a local newspaper geared towards the Black community. I understand that Member A is worried that they will have to stop advertising in the newspaper or risk losing future contracting opportunities with that longtime partner.

57.     Several other members have told me that they are unsure what to do with Requests for Information (RFIs) and Requests for Proposals (RFPs) that ask bidders to talk about their community impact and involvement. In the past my members wrote about the types of community activities they sponsored and participated in—training, mentorships, scholarships, community benefit agreements. Now they feel like if the prime contractor thinks those activities were aimed at people who might be characterized as minorities, then the member contractors  will be disadvantaged in, or entirely cut out of, the bidding process and the prime contractors  will hire a white owned company just to avoid that problem—even if the white contractor supports organizations and does community service that might predominately serve white community members. That is totally unfair.

58.     The members say these problems are hitting them across the board—not just on federal contracts. Big federal contractors work on federal contracts, but they also work on big state, local government and private contracts. My members are worried that they have to disavow any of the important work they are doing to address discrimination and help disadvantaged communities or they will be barred from working with the big companies on any sort of contract. Many of them

are planning to stop talking about the community work they do even though they think that speaking out on these issues is critically important. Some may even stop doing as much of this work.

59.     Several members have told me that the Contractors Order doesn't just make it impossible for them to comment on important public policy issues, like race discrimination and history—it could lead to people getting hurt or even killed. Construction work is dangerous and it is crucial to make sure people fully understand all safety instructions and procedures. But is providing safety trainings in different languages a violation of what the Executive Order bans? Some of my members think it might be.

60.     Members are talking to me about the fact that the Executive Order says that businesses may not treat people of different ethnicities differently in any circumstances. Meanwhile, the Occupational Safety and Health Administration (OSHA) says businesses must provide instructions in languages people fully understand. And this makes sense to protect the health and safety of employees! But NAMC members are worried because now it seems like doing translation services that help particular ethnic groups or nationalities might be seen as racial discrimination under the Contractors Order. If a member provides translation services aimed at ensuring Haitian contractors understand their safety instructions, for example, does that count as disparate treatment based on race or ethnicity? These concerns are going to lead to people getting hurt. And given how diverse our different chapters are, these issues could end up affecting the safety of a lot of our members, specifically.

61.     Members are also telling me that they are also really worried about what they should do when they see racist symbols (like nooses) and graffiti. There is a huge problem in our industry with racist environments on the worksite. That was one of the main reasons that talking about race,

17

and working to promote inclusion specifically, is so important—to allow training and other efforts to improve the environment on work sites. But now my members are thinking they will just have to let racist environments get out of control because they understand that the Executive Order means they're not allowed to do anything about them (it could be seen as committing resources or otherwise violating the Contractors Order!).

62.     And even beyond the language in the actual Contractors Order itself, there is an added difficulty for all of our members arising from the fact that different agencies will likely have different approaches to implementing the Order, which will make it even harder for our members to figure out which rules to follow. Given how broad the terms of the Contractors Order are, compliance for one agency might not look the same as compliance for another agency, and that means all of our members are going to have to spend even more time and effort to make sure they don't accidentally violate these new contract provisions.

63.     Bottom line, NAMC members are afraid that the Contractors Order will essentially unleash racism and racial intimidation similar to what we faced in the Jim Crow era and make it impossible for anyone to complain, report it, or protect themselves. They are worried that we are going to return to a time when race discrimination, harassment and violence are sanctioned and people are too afraid to do anything about it.

\* \* \*

64.     Unless it's stopped, the long-term impacts of the Contractors Order will be catastrophic for NAMC, our members, and other businesses. The Contractors Order—and what the agencies do to implement it—seems intended to intimidate contractors, organizations, businesses, and institutions—including NAMC members, sponsors, and partners—into pulling back from their work to include people, businesses, and communities that have historically been excluded.

18

65. Contractors rely on NAMC members to help complete their projects. But I fear that many of these contractors will no longer work with NAMC or its members now that the Contractors Order makes it unclear if it will hurt their business to do so (and even suggests that it will harm them!). If the Contractors Order and its implementation are successful, no one will seek out NAMC's help and guidance in making connections and building business relationships between industry and minority contractors and minority construction workers. If that happens, it would decimate one of our most important functions.

66. Many member businesses will go belly up over the next few years if this attack continues on efforts to make federal contracting more inclusive and fair. Our sponsors already seem to be worried about working with any business that is officially associated with a "minority" association.

67. The Order will also have economic impacts for society more broadly. The "good old boys club" culture in construction and other industries—which is present amongst contractors, customers, and owners—costs everyone money by making projects less efficient and by depriving contractors access to less-utilized workforces. This order will end up costing all of us money when federal projects get more expensive and difficult to manage as the contracting industry gets less competitive.

68. A huge number of businesses in the American economy either work with the federal government or work with other companies that contract with the federal government. The Contractors Order tells all of these companies to stand away and stand down from associating with groups that are owned by or represent Black and brown people—or really anyone who is not white. This will make avoiding the discrimination that is already really present in this industry even harder to avoid. Once these norms change it will be hard to go back.

19

Dated:  6/2/2026                                          Wendell R Stemley

                                                         Wendell R. Stemley