**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| National Association of Diversity Officers in Higher Education, et al., <br><br>     Plaintiffs, <br><br>     v. <br><br> Donald J. Trump, in his official capacity as President of the United States, et al., <br><br>     Defendants. | Case No. 8:26-cv-1532 (ABA) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

ARGUMENT ................................................................................................................. 4

I.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERIT .................................................. 5

       A.     Plaintiffs are unlikely to prevail on their constitutional claims. ............................ 5

              i.     Plaintiffs are unlikely to prevail on their First Amendment claim .............. 5

              ii.    Plaintiffs are unlikely to prevail on their Fifth Amendment claim ........... 19

       B.     Plaintiffs are unlikely to prevail on their APA claim to the FAR Guidance. ........ 24

              i.     Stay of the FAR Guidance would not remedy Plaintiffs' purported
                     harms .................................................................................................. 25

              ii.    The FAR Guidance is not a final agency action ...................................... 25

              iii.   The merits of Plaintiffs' APA arguments are futile .................................. 32

II.    THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED RELIEF ......... 34

CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

**CASES**

*Abbott v. Pastides*,
900 F.3d 160 (4th Cir. 2018) ...................................................................... 16, 34

*Agency for Int'l. Dev. v. All. for Open Soc'y Int'l., Inc.,* ("AID"),
570 U.S. 205 (2013) ........................................................................................ 19

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
103 F.4th 765 (11th Cir. 2024) ......................................................................... 5

*Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*,
2025 WL 2615054 (D.D.C. Sept. 10, 2025) ................................................... 24

*Bennett v. Spear*,
520 U.S. 154 (1997) .................................................................................. 26, 27

*Berry v. City of Portsmouth*,
562 F.2d 307 (4th Cir. 1977) ........................................................................... 20

*Brnovich v. Biden*,
562 F. Supp. 3d 123 (D. Ariz. 2022) .............................................. 28, 30, 31, 32

*Carman v. Yellen*,
112 F.4th 386 (6th Cir. 2024) .......................................................................... 21

*Chadbourne & Parke LLP v. Troice*,
571 U.S. 377 (2014) ........................................................................................ 22

*City of El Cenizo, Texas v. Texas*,
890 F.3d 164 (5th Cir. 2018) ........................................................................... 22

*Corning Glass Works v. Brennan*,
417 U.S. 188 (1974) .......................................................................................... 7

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ........................................................................................ 35

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015) .......................................................................................... 8

*Equity In Athletics, Inc. v. Dep't of Educ.*,
639 F.3d 91 (4th Cir. 2011) .............................................................................. 8

*FCC v. AT&T Inc.*,

562 U.S. 397 (2011) ................................................................................................. 13

*FDA v. Wages & White Lion Invs., LLC,*
    604 U.S. 542 (2025) ............................................................................................ 32

*Forsyth Cnty., Ga. v. Nationalist Movement,*
    505 U.S. 123 (1992) ............................................................................................ 23

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ............................................................................................ 25

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490 (1949) .............................................................................................. 7

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ............................................................................................ 23

*In re Bluewater Network,*
    234 F.3d 1305 (D.C. Cir. 2000) .................................................................... 27, 31

*Int'l Bhd. of Teamsters v. United States,*
    431 U.S. 324 (1977) ..................................................................................... *passim*

*Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n,*
    105 F.4th 627 (4th Cir. 2024), *cert. denied,* 145 S. Ct. 2700 (2025) ................ 28, 32

*Johnson v. United States,*
    576 U.S. 591 (2015) ............................................................................................ 21

*Kashem v. Barr,*
    941 F.3d 358 (9th Cir. 2019) ............................................................................. 21

*Kentucky v. Biden,*
    571 F. Supp. 3d 715 (E.D. Ky. 2021),
     *aff'd as modified,* 57 F.4th 545 (6th Cir. 2023) ..................................... *passim*

*Logistics Co., Inc. v. United States,*
    163 Fed. Cl. 542 (2022) ...................................................................................... 23

*Louisiana v. Biden,*
    575 F. Supp. 3d 680 (W.D. La. 2021), *aff'd,* 55 F.4th 1017 (5th Cir. 2022) ............. 28

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................ 25

*Maracich v. Spears,*

570 U.S. 48 (2013)......................................................................................................... 22

*Maryland v. King*,
567 U.S. 1301 (2012)..................................................................................................... 35

*Mayes v. Biden*,
67 F.4th 921 (9th Cir. 2023),
*vacated as moot*, 89 F.4th 1186 (9th Cir. 2023) ................................................... *passim*

*Munaf v. Geren*,
553 U.S. 674 (2008)......................................................................................................... 4

*Murthy v. Missouri*,
603 U.S. 43 (2024)................................................................................................... 25, 26

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995)....................................................................................................... 22

*Nat'l Ass'n of Diversity Officers in Higher Educ.* v. *Trump*, *("NADOHE I")*,
167 F.4th 86 (4th Cir. 2026)..................................................................................... *passim*

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
767 F. Supp. 3d 243, 280 (D. Md.), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025), *and
vacated and remanded*, 167 F.4th 86 (4th Cir. 2026).................................................. 20

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)........................................................................................... 21, 22, 24

*Nat'\'l Urb. League v. Trump*,
783 F. Supp. 3d 61 (D.D.C. 2025) ............................................................................... 24

*New Vision Photography Program, Inc. v. District of Columbia*,
54 F. Supp. 3d 12 (D.D.C. 2014) ................................................................................. 24

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025)................................................................................................... 35

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................................... 4, 34

*Nnadozie v. Genesis Healthcare Corp.*,
730 F. App'x 151 (4th Cir. 2018)................................................................................... 8

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)....................................................................................................... 18

*Raytheon Co. v. Hernandez*,
540 U.S. 44 (2003)........................................................................................................ 6

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000).................................................................................................... 10

*Ricci v. DeStefano*,
557 U.S. 557 (2009)................................................................................................. 8, 10

*Rice v. Paladin Enterprises, Inc.*,
128 F.3d 233 (4th Cir. 1997)........................................................................................ 5

*Richmond Med. Ctr. For Women v. Herring*,
570 F.3d 165 (4th Cir. 2009)........................................................................................ 5

*Rumsfeld v. Forum for Academic & Institutional Rights., Inc.*,
547 U.S. 47 (2006)...................................................................................................7, 11

*Sackett v. EPA*,
566 U.S. 120 (2012).................................................................................................... 31

*Saint Francis Coll. V. Al-Khazraji*,
481 U.S. 604 (1987)...................................................................................................... 8

*Smith v. United States*,
508 U.S. 223 (1993).................................................................................................... 22

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023).................................................................................................... 35

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015).............................................................................................. 7, 8, 15

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023).................................................................................................... 24

*United States v. Hansen*,
599 U.S. 762 (2023).................................................................................................... 15

*United States v. Hasson*,
26 F.4th 610 (4th Cir. 2022)....................................................................................... 21

*United States v. Mazurie*,
419 U.S. 544 (1975).................................................................................................... 20

*United States v. Morales-Lopez*,

v

92 F.4th 936 (10th Cir. 2024) ................................................................................ 21

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ............................................................................................ 22

*United States v. Requena*,
  980 F.3d 30 (2d Cir. 2020) ................................................................................. 21

*United States v. Sun*,
  278 F.3d 302 (4th Cir. 2002) .............................................................................. 20

*United States v. Williams*,
  553 U.S. 285 (2008) .............................................................................. 16, 20, 23

*Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*,
  2025 WL 2374528 (D.D.C. Aug. 14, 2025) ....................................................... 24

*Vera Inst. of Just. v. U.S. Dep't of Just.*,
  2025 WL 1865160 (D.D.C. July 7, 2025) .......................................................... 24

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
  714 F.3d 186 (4th Cir. 2013) .............................................................................. 27

*Watson v. Fort Worth Bank & Tr.*,
  487 U.S. 977 (1988) .............................................................................................. 6

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................... 4, 34

*Winters v. New York*,
  333 U.S. 507 (1948) .......................................................................... 17, 18, 20, 21

**STATUTES**

5 U.S.C. § 704 ......................................................................................................... 26

5 U.S.C. § 706 ..................................................................................................... 32, 33

15 U.S.C. § 78n ....................................................................................................... 22

15 U.S.C. § 78bb ..................................................................................................... 22

18 U.S.C. § 924 ....................................................................................................... 22

18 U.S.C. § 2721 ..................................................................................................... 22

20 U.S.C. § 1681 ................................................................................................................ 8, 18

29 U.S.C. § 623 ...................................................................................................................... 8

29 U.S.C. § 1144 .................................................................................................................. 22

31 U.S.C. §§ 3729-3733 ...................................................................................................... 24

41 U.S.C. § 1701 .................................................................................................................. 33

41 U.S.C. § 1707 .................................................................................................. 29, 32, 33, 34

42 U.S.C. § 2000e ................................................................................................................ 10

42 U.S.C. § 2000e–2 ................................................................................................. 7, 8, 10, 14

42 U.S.C. § 2000e-3 ............................................................................................................. 14

42 U.S.C. § 3605 .................................................................................................................... 8

44 U.S.C. § 3518(c)(1) ......................................................................................................... 33

## REGULATIONS

7 C.F.R. § 15.4 .................................................................................................................... 33

15 C.F.R. § 8.5 .................................................................................................................... 33

28 C.F.R. § 42.105 ............................................................................................................... 33

29 C.F.R. § 31.6 .................................................................................................................. 33

29 C.F.R. § 1606.1 ................................................................................................................. 8

34 C.F.R. § 100.4 ................................................................................................................. 33

45 C.F.R. § 80.4 .................................................................................................................. 33

48 C.F.R. § 49.201 ............................................................................................................... 35

FAR 52.209-7 ...................................................................................................................... 23

FAR 1.401 ........................................................................................................................... 26

FAR 1.403 ........................................................................................................................... 26

FAR 1.404 ........................................................................................................................... 26

EO 11,246, 30 Fed. Reg. 12319 (Sept. 24, 1965) ...........................................................11

EO 14,042, 86 Fed. Reg. 50,986 (Sept. 9, 2021) .................................................... 27, 31

EO 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ............................................. 1, 9, 10, 14

EO 14,398, 91 Fed. Reg. 16,147 (Mar. 26, 2026) ....................................................... 3, 4

**RULES**

Fed. R. Civ. P. 65(c) ..................................................................................................... 35

**OTHER AUTHORITIES**

EEOC, *EEOC Enforcement Guidance on National Origin Discrimination* .................................... 8

EEOC, *Enforcement Guidance on Terms, Conditions, And Privileges of Employment* ................. 8

EEOC, *EEOC Race Discrimination Guidance* ........................................................................ 8, 14

*Issuance of Agency Deviations to Implement Executive Order 14042*, Federal Acquisition
    Regulation Council (Sep. 30, 2021)
    ("2021 FAR Guidance"),
    https://bidenwhitehouse.archives.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-
    on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf ................................... *passim*

*Memorandum on Agency Implementation of Executive Order 14398,*
    *Addressing DEI discrimination by Federal Contractors*, Federal Acquisition Regulation
    Council (Apr. 17, 2026) ("FAR Guidance" or "Guidance"),
    https://acquisition.gov/sites/default/files/page_file_uploads/FAR%20Council%20Guidance%2
    0to%20Implement%20EO%2014398.pdf ......................................................................... *passim*

W. Eskridge, Interpreting Law, 62 (2016) .................................................................................. 13

**INTRODUCTION**

This past year, some of the same Plaintiffs that bring the instant suit, brought a First Amendment claim against another Executive-Order provision, directing agencies to require recipients to certify that they do "not operate any programs promoting [diversity, equity, inclusion] DEI that violate any applicable Federal anti-discrimination laws." EO 14,173 § 3(b)(iv) ("DEI Certification"). The Fourth Circuit rejected Plaintiffs' challenge. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* ("*NADOHE I*"), 167 F.4th 86 (4th Cir. 2026). It explained that "to make out a First Amendment claim, [p]laintiffs must show that the certification requirement impermissibly restricts their ability to engage in *protected speech*." *Id.* at 103 (alteration in original) (citation omitted). Plaintiffs could not make out a claim because the DEI Certification "require[d] only that plaintiffs certify compliance with federal antidiscrimination laws, which the First Amendment doesn't confer a right to violate." *Id.*

Now, Plaintiffs launch a virtually identical facial First Amendment challenge to a certification provision that is, in many ways, narrower than the DEI Certification. This challenge fails for many of the same reasons identified in *NADOHE I*.

The at-issue Executive Order ("Order" or "EO") directs agencies to include a provision in Government contracts ("Disparate-Treatment Certification" or "Certification"), requiring contractors to certify that they will not engage in "disparate treatment based on race or ethnicity" in certain practices and activities "[i]n connection with the performance of work under the[ir] contract." As explained below, "disparate treatment" is a legal term of art that refers specifically to intentional discrimination. As the Supreme Court has made clear, "'[d]isparate treatment" is "the most obvious evil" and "easily understood" form of discrimination. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Because intentional discrimination based on race or ethnicity is not protected speech under the First Amendment, Plaintiffs' facial First Amendment

claim fails.

Plaintiffs' facial Fifth Amendment challenge fails for similar reasons. Plaintiffs claim that the Certification is unconstitutionally vague because the contours of the phrase "in connection with" leaves them guessing as to whether they can still engage in disparate treatment based on race or ethnicity *outside* the scope of their Government contracts. According to Plaintiffs, this confusion warrants facial invalidation because it infringes on their free speech. Plaintiffs are wrong again. They have no free-speech right to engage in intentional discrimination based on race or ethnicity at all (no matter who funds it). So, any "vagueness" as to the scope of the Certification does not implicate Plaintiffs' right to free speech. This alone dooms their facial Fifth Amendment claim. But regardless, "in connection with" is not unconstitutionally vague on its face. The Supreme Court has repeatedly interpreted the phrase in numerous statutes, and the Court of Federal Claims has already applied a nearly identical phrase in the context of Government contracting.

Plaintiffs also bring an Administrative Procedure Act ("APA") challenge to a guidance ("FAR Guidance" or "Guidance") by the Federal Acquisition Regulatory Council ("FAR Council") regarding the Order. This challenge fails at the threshold because the Guidance is not a final agency action under the APA. By its own terms, it merely provides *interim* guidance to agencies regarding their compliance obligations under the Order. As the Guidance also makes clear, the FAR Council will undergo notice-and-comment rulemaking to amend the FAR regulations. Until then, Plaintiffs' APA challenge is premature. As explained below, several courts have concluded that a similar interim guidance by the FAR Council was not a reviewable final agency action under the APA. Those courts' persuasive analysis is equally applicable here. Because there is no basis for the entry of a preliminary injunction, Plaintiffs' motion should be denied.

**BACKGROUND**

On March 26, 2026, the President issued Executive Order 14,398. Executive Order 14,173,

2

91 Fed. Reg. 16,147, entitled *Addressing DEI Discrimination by Federal Contractors*. As is relevant here, the Order instructs federal agencies to include the Disparate-Treatment Certification in Federal contracts requiring contractors to certify that "[i]n connection with the performance of work under this contract, [the contractor/appropriate party (contractor)] agrees as follows:" (1) it "will not engage in any racially discriminatory DEI activities, as defined in section 2 of the [Order]." *Id.* § 3(1). Section 2 of the Order defines "racially discriminatory DEI activities" as "disparate treatment based on race or ethnicity in the recruitment, employment (e.g., hiring, promotions), contracting (e.g., vendor agreements), program participation, or allocation or deployment of an entity's resources." *Id.* § 2(a). It also defines "[p]rogram participation" as "membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor." *Id.* § 2(b).

The Certification also has five additional subparts, (2) requiring contractors to certify that they will "furnish all information and reports" to contracting agencies to ascertain compliance; (3) providing for the cancellation, termination, or suspension of contracts and future ineligibility of contractors for noncompliance; (4) requiring contractors to report "known or reasonably knowable conduct that may violate this clause" by any subcontractor; (5) informing contracting agencies if a subcontractor files a suit that challenges the validity of this clause; and (6) "recogniz[ing] that compliance with the requirements of this clause are material to the Government's payment decisions for purposes of [the False Claims Act (FCA)]." *Id.* § 3(2)-(6).

The Order also directs the FAR Council to amend the Federal Acquisition Regulation ("FAR") to include the Certification, and pending the amendment to the FAR, issue "deviation and interim guidance" regarding "agency implementation" of the Certification, *id.* § 5(a)-(b).

3

On April 17, 2026, the FAR Council issued a memorandum to "provide guidance to agencies that issue contracts subject to the [FAR] to support their implementation of [the Order]." *See Memorandum on Agency Implementation of Executive Order 14398, Addressing DEI discrimination by Federal Contractors*, Federal Acquisition Regulation Council (Apr. 17, 2026) ("FAR Guidance" or "Guidance").[1] In doing so, it provided interim guidance to agencies pending the forthcoming FAR amendment, which will be issued following "rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707." *Id.* at 3.

On June 4, 2026, Plaintiffs filed a Motion for Preliminary Injunction and an accompanying Memorandum in Support. *See* ECF Nos. 28 & 28-1 ("PI"). Plaintiffs raise identical constitutional challenge to the Order and FAR Guidance, arguing that they violate the First and Fifth Amendments. *Id.* Additionally, they challenge the FAR Guidance under the Administrative Procedure Act ("APA"). *Id*. They request a preliminary injunction against the Order and FAR Guidance. *See* ECF No. 28 at 2. They further request to stay the FAR Guidance under the APA. *Id.*

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Finally, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556

---

[1]https://acquisition.gov/sites/default/files/page_file_uploads/FAR%20Council%20Guidance%20to%20Implement%20EO%2014398.pdf

U.S. 418, 435 (2009).

I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERIT:

A.    **Plaintiffs are unlikely to prevail on their constitutional claims.**

Plaintiffs' constitutional challenges are "facial" and not "as-applied." *Richmond Med. Ctr. For Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc). An "as-applied" challenge must be asserted "based on a developed factual record" and tests "the application of [the text] to a specific person." *Id*. But Plaintiffs do not request that this Court declare the Certification unconstitutional as-applied to any particular Plaintiff, contract, or in the context of "a specific enforcement action." *NADOHE I*, 167 F.4th at 104 (citation omitted). Rather, they request that the Court declare the Certification unconstitutional "*on [its] face*, as [it] appl[ies] to the population generally." *Id.* at 100 (citation omitted). "Facial invalidation is, manifestly, strong medicine that has been employed by [courts] sparingly and only as a last resort." *Id.* at 100 (alternation in original) (citation omitted). Here, as in *NADOHE I*, "it prove[s] too strong." *Id.* at 104.

*i. Plaintiffs are unlikely to prevail on their First Amendment claim.*

Plaintiffs raise a number of First Amendment challenges to the Disparate-Treatment Certification. They argue that the Certification is (1) so "vague" that "[it] impose[s] overbroad restrictions that infringe on speech and expressive association," (2) "discriminate[s] based on content," and (3) imposes "unconstitutional conditions" on contractors. PI at 9. All these arguments fail for reasons similar to those identified in *NADOHE I*: where, as here, the text of a certification only bars intentional discrimination based on race or ethnicity, it does not violate the First Amendment. *See id.* at 103 (no First Amendment right to violate antidiscrimination laws); *see also Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 243-44 (4th Cir. 1997); *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777-79 (11th Cir. 2024).

Under *NADOHE I*, "to make out a First Amendment claim, [p]laintiffs must show that [Disparate-Treatment Certification] impermissibly restricts their ability to engage in *protected speech*." 167 F.4th at 103 (first alternation in original) (citation omitted). As explained below, the Certification only bars intentional discrimination based on race or ethnicity, which is not protected speech. Thus, because the Certification is directed at unprotected conduct rather than speech, it is not facially overbroad, content-based, or an unconstitutional condition.

***The Certification only bars intentional discrimination based on race or ethnicity.*** Under Section 3 of the Order, contractors much certify that "[they] will not engage in any racially discriminatory DEI activities, as defined in section 2 of the Executive Order." EO § 3. The provision defines "'racially discriminatory DEI activities' [as] disparate treatment based on race or ethnicity in the recruitment, employment (*e.g.,* hiring, promotions), contracting (*e.g.,* vendor agreements), program participation, or allocation or deployment of an entity's resources." *Id.* § 2(a). It also defines "[p]rogram participation" as "membership or participation in, or access or admission to: training, mentoring, or leadership development programs; educational opportunities; clubs; associations; or similar opportunities that are sponsored or established by the contractor or subcontractor." *Id.* § 2(b). FAR Guidance mirrors the same language. *See* FAR Guidance at 7-9.

The text of Certification is clear about what it prohibits: "disparate treatment based on race or ethnicity"—i.e., *intentional* discrimination based on race or ethnicity. "[D]isparate treatment" (in contrast to "disparate impact") is a legal term of art that refers to intentional discrimination that springs from a clear discriminatory motive. *Teamsters,* 431 U.S. at 335 n.15. The Supreme Court has, for decades, used the phrase "disparate treatment" as a legal term of art to refer to intentional discrimination. *See, e.g., Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (referencing

6

"disparate-treatment case" and "disparate-treatment claims"); *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987-88 (1988) (referencing "disparate treatment analysis" and "conventional disparate treatment theory"). Simply put, a prohibition on "disparate treatment" is "black-letter law." *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 538 (2015). Given this well-established meaning, the use of the phrase "disparate treatment" in the Certification incorporates its meaning as a legal term of art. C*orning Glass Works v. Brennan*, 417 U.S. 188, 202 (1974) (explaining that when interpreting "terms of art, 'it (is) proper to explain them by reference to the art or science to which they (are) appropriate" (citation omitted)).

Intentional discrimination based on race or ethnicity is not protected speech. *See Rumsfeld v. Forum for Academic & Institutional Rights., Inc.*, 547 U.S. 47, 62 (2006). And no amount of incidental "expressive speech," PI at 12, can bring intentional discrimination based on race or ethnicity—at least in a facial posture—within the scope of the First Amendment. In *Rumsfeld*, for instance, the Supreme Court recognized that "prohibit[ing] employers from discriminating in hiring on the basis of race . . . . will require an employer to take down a sign reading 'White Applicants Only'" but that does not "mean[] that the law should be analyzed as one regulating the employer's speech rather than conduct." 547 U.S. at 62. The same is true here. If Plaintiffs engage in "disparate treatment based on race or ethnicity," they are not engaging in protected expression or association. *See Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").

Not surprisingly, a wide range of "disparate treatment" is already barred by Civil Rights Laws. Most relevant here, Title VII of the Civil Rights Act, *see* 42 U.S.C. § 2000e–2(a)(1), already

prohibits "disparate treatment" in employment practices on the basis of "race, color, religion, sex, or national origin," *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (citation omitted).[2] Indeed, the Supreme Court has dubbed the relevant Title VII provision, *see* 42 U.S.C. § 2000e–2(a)(1), as Title VII's "disparate-treatment provision," *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015), and has explained that "disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII." *Teamsters,* 431 U.S. at 335 n.15. Notably, Title VII is "read in the broadest possible terms" "to include a wide range of activities or practices which occur in the work place." EEOC, *Enforcement Guidance on Terms, Conditions, And Privileges of Employment*, Part § 613.1(a); *see* 42 U.S.C. §§ 2000e–2(a)(1),  2(b), 2(c)(1), 2(d) (barring discrimination in, among other things, hiring and terminations decisions; "compensation, terms, conditions, or privileges of employment"; reference for employment; "membership"; as well as "training programs"); *see also* EEOC, *EEOC Race Discrimination Guidance*, Part 15-VI(A)-(B) (Title VII prohibits discrimination in, among other things, "recruitment practices," "advertisements," "work assignments, performance measurements, pay, training, mentoring or networking, discipline").

Civil Rights Laws other than Title VII also bar "disparate treatment." *See, e.g., Texas Dep't of Hous. & Cmty. Affs.*, 576 U.S. at 535 (explaining that "disparate treatment" is barred under the Fair Housing Act, 42 U.S.C. § 3605(a), and the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)); *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 102 (4th Cir. 2011) ("disparate treatment" is barred under Title IX, 20 U.S.C. § 1681).

---

[2] *See also* EEOC, *EEOC Enforcement Guidance on National Origin Discrimination*, Part II.B (explaining that "Title VII prohibits employment discrimination against individuals because of their . . . . 'ethnic group'" (citing 29 C.F.R. § 1606.1); *see also Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 162-63 (4th Cir. 2018) ("[I]n the title VII context, national origin, ethnicity, and ancestry often 'overlap as a legal matter.'") (quoting *Saint Francis Coll. V. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring)).

In short, the Certification covers "the most obvious evil" and "easily understood" form of discrimination—i.e., intentional discrimination. *See Teamsters,* 431 U.S. at 335 n.15. And because discrimination based on race or ethnicity is not protected speech, the Certification does not violate the First Amendment. In this way, the Disparate-Treatment Certification mirrors the DEI Certification at issue in *NADOHE I*, which required that the recipient "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Executive Order 14,173, 90 Fed. Reg. 8633, entitled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (EO 14,173), § 3(b)(iv)(B). In fact, the Disparate-Treatment Certification is in many ways narrower in scope and more specific in its description of prohibited conduct than the DEI Certification. Whereas the DEI Certification only made a generic reference to *all* "Federal anti-discrimination laws," barred the prohibited conduct even *outside* the scope of the funded activity, and applied to contractors *and grantees*, EO 14,173 § 3(b)(iv), the Disparate-Treatment Certification expressly bars "disparate treatment based on race or ethnicity," only bars the prohibited conduct "*[i]n connection with* the performance of work under th[e] contract," and applies only to Government *contractors*. EO §§ 2-3 (emphasis added).

This case is governed by *NADOHE I*, which explained that "plaintiffs have no protectable speech interest in operating, and no constitutional right to operate[,] DEI programs that violate federal antidiscrimination law." 167 F.4th at 103-104 (alternation in original) (citation omitted). From there, the court had little trouble dispensing with plaintiffs' litany of First Amendment grievances—i.e., overbreadth, view-point discrimination, and infringement on speech. *Id.* at 103-104. After all, "existing federal law already demand[ed] [the Certification's] compliance, and plaintiffs ha[d] not challenged existing law as viewpoint-discriminatory or as over or underinclusive." *Id*.

9

Plaintiffs try mightily to distance themselves from their challenge to the DEI Certification in *NADOHE I*. They argue that the DEI Certification was a "less intrusive alternative" because it "target[ed] only activities that violate antidiscrimination law, which already prohibits racial discrimination," whereas the Disparate-Treatment Certification "explicitly restrict[s] lawful expressive activities." *Id.* Plaintiffs' attempt to distinguish *NADOHE I* is unavailing.

To be sure, the Certification's discrimination bar—"disparate treatment based on race or ethnicity"—is not identical to prohibitions under Civil Rights Laws. For instance, while Title VII is limited to "employers" that have "fifteen or more employees," 42 U.S.C. § 2000e–(b), the Certification does not include any such limitation. But more notably, the Certification is in many ways *narrower* than recipients' existing legal obligations. For instance, while Title VII bars discrimination based on a number of protected characteristics, *Ricci*, 557 U.S. at 577, the Certification only focuses on discrimination based on race or ethnicity.

But regardless, the fact that the Certification is not identical to existing Civil Rights Laws does not change the fact that it only bars "disparate treatment based on race or ethnicity"—i.e., intentional discrimination based on race or ethnicity. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). And Plaintiffs have no colorable argument that a prohibition on intentional discrimination based on race or ethnicity "explicitly restrict[s] lawful expressive activities" on its face. PI at 15. As explained above, Congress routinely bars intentional discrimination through Civil Rights Laws, and *NADOHE I* held that those prohibitions do not violate the First Amendment. 167 F.4th at 103-104. There is no reason to distinguish between the Certification and Civil Rights Laws for purposes of the First Amendment. That is because Plaintiffs have no viable claim that a prohibition on "disparate treatment" raises a First Amendment problem if issued by the *Executive*, but not if issued by *Congress*. After all, Congress does not have any

10

greater constitutional leeway than the President to violate the First Amendment. At bottom, the Certification survives First Amendment scrutiny for the same reason that Civil Right Laws do: "discriminat[ion]" based on race or ethnicity is not protected speech. *Rumsfeld*, 547 U.S. at 62.[3]

For their part, Plaintiffs recognize that intentional discrimination based on race or ethnicity is not protected speech. So, they argue that the Certification goes beyond merely barring international discrimination. Specifically, they attempt to shoehorn "expressive speech" and "association," PI at 12, within the scope of the Certification by (1) reading subtext into text, (2) misreading the text to bar something other than "disparate treatment," or (3) misunderstanding the meaning of the phrase "disparate treatment." All three attempts are futile.

**1. Plaintiffs improperly read subtext into text.** Just like they did in *NADOHE I*, Plaintiffs encourage this Court to ignore the Certification's text and focus instead on how the Executive *may* enforce it in the future. As Plaintiffs see it, regardless of what the Certification actually says, the Court should judge it with the assumption that "Defendants' goal is to eliminate all [DEI] activities." PI at 17. This argument is baseless. The text of the Certification does not require Plaintiffs to certify that they will eliminate all their DEI programs. And Plaintiffs cannot sustain a facial challenge to the Certification by reading "subtext" into its text. *NADOHE I*, 167 F.4th at 104. We know this because they already tried. In *NADOHE I*, Plaintiffs advanced their First

---

[3] But regardless, even if this Court concludes that the First Amendment somehow bars the President from prohibiting a narrow subset of intentional discrimination that is not already barred under Civil Rights Laws, *NADOHE I* would still control. As even Plaintiffs admit, *NADOHE I* held that a Certification that is coextensive with recipients' obligations under existing laws does not violate the First Amendment. 167 F.4th at 103-104. By that same logic, a Certification that is *nearly* coextensive with recipients' obligations under Civil Rights Laws is also not *facially* unconstitutional, either. That is because, as outlined above, any divergence in coverage under the Certification and Civil Rights Laws is very narrow, and thus does not involve "a *substantial* number of [the provision's] applications . . . judged in relation to [its] plainly legitimate sweep." *Id.* at 100 (4th Cir. 2026) (citation omitted) (alterations in original) (emphasis added).

Amendment claim by arguing that "defendants view all DEI programs as illegal under existing antidiscrimination law." *Id.* "They point[ed] to internal agency memoranda and other agency communications that they claim show that defendants are targeting DEI-related activity beyond what's already prohibited by federal antidiscrimination laws." *Id.* at 103. The Fourth Circuit, however, rejected plaintiffs' invitation to "read subtext into the Provision's text." *NADOHE I*, 167 F.4th at 104. Instead, as it explained, it was "bound by the text" itself.  *Id*. That approach controls here. Because "the text" only pertains to intentional discrimination based on race or ethnicity, Plaintiffs' First Amendment claim fails regardless of whatever "subtext" they attempt to read into it. *Id*.

For similar reasons, Plaintiffs cannot sustain their First Amendment claim by "chill[ing] their own speech and association" based on their fears about how the Executive *may* apply the Certification to their programs. PI at 11. These allegations merely reflect Plaintiffs' concerns that the Executive will misapply the "intentional discrimination" standard. But those fears do not provide "fertile ground for a facial attack." *NADOHE I*, 167 F.4th at 104. As the Fourth Circuit held, if Plaintiffs fear misapplication of the relevant standard by the Executive, they can bring an as-applied challenge "in a specific enforcement action." *Id.* (citation omitted). Evidently, instead of waiting for "a specific enforcement action," Plaintiffs decided to launch another facial attack. This second attempt is just as futile as the first one: any argument regarding future enforcement "in relation to plaintiffs' DEI programming" does not provide "fertile ground for a facial attack." *Id*.  This Court should follow *NADOHE I*'s directive and reject Plaintiffs' atextual arguments. In a facial posture, the Court is "bound by the text." *Id.*

**2. Plaintiffs misread the text.** Where Plaintiffs do grapple with the text of the Certification, they often misread it. Instead of acknowledging that the Certification bars "disparate

treatment" based on race or ethnicity, they often describe the scope of the Certification by using the word "disparate" in isolation. *See, e.g.*, PI at 12 ("disparate 'allocation or deployment of an entity's resources'"); *id.* at 13 ("'disparate' manner 'based on race'"); *id.* ("disparate negative health outcomes"); *id.* at 14 ("disparate experiences"). But as explained above, "disparate treatment" is a legal term of art. Thus, it must be interpreted in its *composite* form. *See supra* 6-7. Plaintiffs' use of the word "disparate" in isolation ignores the fact that the word does not appear in isolation in the Certification.  As a way of analogy, "a golden cup [is] a cup made of or resembling gold" but "[a] golden boy" "is one who is charming, lucky, and talented." *See FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011). Similarly, here, disparate treatment means something "more particular" than "simply the sum of its two words." *See id.* Courts routinely apply this logic when interpreting text. In *AT&T*, for instance, the Supreme Court concluded that the phrase "personal privacy" cannot be interpreted by simply focusing on the words "personal" and "privacy" in isolation because the combination of the two words has a "more particular" meaning. *Id.*; *see also* W. Eskridge, Interpreting Law, 62 (2016) (identifying this as the "pet fish" canon of statutory interpretation: "the prototypical 'pet' is a dog or a cat; the prototypical 'fish' is a salmon or cod— but the prototypical 'pet fish' is neither a dog nor a salmon").

Plaintiffs also seemingly suggest that the Certification prohibits the mere act of association or membership in certain organizations. PI at 26-29. Once again, Plaintiffs misread the text. The only prohibited conduct identified in the text is "disparate treatment." EO §§ 2-3 (barring "disparate treatment . . . in [activities]").  To be sure, the text refers to "membership" and "associations," but it does not *bar* them; it only prohibits "disparate treatment" in decisions regarding membership and associations. *Id.* Read correctly, the text bars "disparate treatment based on race or ethnicity . . . in . . . program participation," including "membership or participation in,

or access or admission to . . . associations." *Id.* In other words, the Certification bars intentional discrimination on the basis of race or ethnicity in decisions regarding admission and participation in associations, which is not protected under the First Amendment. *Cf.* 42 U.S.C. § 2000e–2(c)(1) ("It shall be an unlawful employment practice for a labor organization . . . to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of [protected characteristic].").

**3. Plaintiffs misunderstand the meaning of "disparate treatment."** Occasionally, Plaintiffs acknowledge that the Certification uses "disparate treatment" as a composite term. *See, e.g.*, PI at 15. But from there, their argument takes a puzzling turn as they argue that some of their "advertising" and "recruit[ment]" practices actually "involve 'disparate treatment based on race.'" *Id.* at 12. The Government will not weigh in on whether Plaintiffs' practices qualify as "disparate treatment based on race,"[4] but *if* they do, they are discriminatory and thus not protected under the First Amendment. *See* 42 U.S.C. § 2000e-3(b) (barring discrimination in "advertisement"); *see also* EEOC, *EEOC Race Discrimination Guidance*, Part 15-VI(A)-(B) (Title VII prohibits discrimination in, among other things, "recruitment practices" and "advertisements").

But regardless of whether Plaintiffs' characterization of their own conduct was accurate or an inadvertent, it highlights a fundamental problem with their constitutional theory: it is premised on a misunderstanding of what constitutes "disparate treatment." After all, Plaintiffs seem to think that their practices are *both* "nondiscriminatory" and "disparate treatment based on race." PI at 12. But both of those things cannot be true at the same time: any "disparate treatment" based on race or ethnicity *is* discriminatory. Indeed, it is "the most obvious evil" form of discrimination because

---

[4] Because this case does not arise in the context of a "specific enforcement action," *NADOHE I*, 167 F.4th at 104 (citation omitted), the application of the Certification to Plaintiffs' specific practices is not at issue in this suit.

14

it is intentional. *Teamsters,* 431 U.S. at 335 n.15. Once again, "disparate treatment" is a legal term of art, which refers to intentional discrimination. So, to the extent that Plaintiffs' argument is premised on some colloquial understanding of the words "disparate" and "treatment" in isolation, they are mistaken. *See United States v. Hansen*, 599 U.S. 762, 775 (2023) (reasoning that the court erred when it "stacked the deck in favor of ordinary meaning" even though the "context" made clear that the terms carry their "specialized meanings"). Nor can Plaintiffs be excused for their failure to recognize the significance of "disparate treatment" as a legal term of art. As far back as nearly half a Century ago, the Supreme Court described "'[d]isparate treatment' . . . . [as] the most easily understood type of discrimination." *Teamsters,* 431 U.S. at 335 n.15. And since then, it has used the phrase as a term of art. *See Texas Dep't of Hous. & Cmty. Affs*., 576 U.S. at 538 (describing a prohibition on disparate treatment as "merely restat[ing] black-letter law").

Similar errors plague Plaintiffs' argument that "disparate treatment" may encompass some protected "expressive speech" or "association." *See, e.g*., PI at 12. Take, for instance, Plaintiffs' claim that the Certification "prohibit[s] 'disparate treatment based on race or ethnicity'—*including in lawful speech or association*." *Id.* at 15 (emphasis added). This argument assumes that "disparate treatment" can include some protected speech and association. But as explained above, that assumption is wrong. *See supra* 7; *see also Rumsfeld*, 547 U.S. at 62.

In short, to the extent that Plaintiffs think "disparate treatment based on race or ethnicity" covers protected speech or association, they misunderstand the caselaw regrading "disparate treatment." And they cannot leverage that misunderstanding to advance a First Amendment challenge (let alone a facial one). That is true even though Plaintiffs claim that they are "chilling their own speech and association." PI at 1-2. However sincerely felt, fear of adverse action cannot be objectively reasonable if it is based on an objectively incorrect understanding of the law. *See*

15

*Abbott v. Pastides*, 900 F.3d 160, 169 (4th Cir. 2018) (alleged "chilling effect" under the First Amendment must be "objectively reasonable" (citation omitted)).

Predictably, because the Certification does not extend beyond intentional discrimination based on race or ethnicity, all of Plaintiffs' First Amendment claims fall apart.

***The Certification is not vague or overbroad.*** Plaintiffs argue that the Certification is "overbroad" because it "'caus[es] Plaintiffs, their members, and 'others not before the court to refrain from constitutionally protected speech' and association." PI at 14 (citation omitted). The Certification does no such thing. A text is overbroad only if "it is unclear whether it regulates a substantial amount of *protected* speech." *United States v. Williams*, 553 U.S. 285, 304 (2008) (emphasis added). The Certification only covers intentional discrimination based on race or ethnicity—not protected speech (let alone "a *substantial* amount of protected speech." *Id.* (emphasis added)). This is fatal to Plaintiffs' "overbroad" argument. *See NADOHE I*, 167 F.4th at 103-104.

Plaintiffs also argue that the text has an "unconstitutionally vague scope that leaves open whether it applies beyond federally-funded projects." PI at 13. In making this claim, Plaintiffs take issue with the Certification's qualifier, which limits its scope to illegal discrimination "[i]n connection with the performance of work under this contract." EO § 3. This argument is also unavailing. A text is unconstitutionally vague under the First Amendment only if it "permit[s] within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech." *Winters v. New York*, 333 U.S. 507, 509 (1948). Here, there is no such concern. Plaintiffs have no First Amendment right to discriminate regardless of whether the discrimination is "in connection with" their Government contracts. *See NADOHE I,* 167 F.4th at 103-104 (upholding the constitutionality of the DEI Certification even though it "require[d]

16

certification as to 'any programs,' not just federally funded ones"). Consider, for instance, a certification that prohibits tax fraud "in connection with" a Government contract. Plaintiffs would have no plausible First Amendment claim that the text leaves them confused as to whether they can commit tax fraud *outside* the scope of their Government contracts. They have no First Amendment right to commit tax fraud *at all.* The same is true here. Plaintiffs have no First Amendment right to engage in intentional discrimination based on race or ethnicity outside the scope of their Government contracts. So, Plaintiffs cannot complain that their free speech is curtailed because the phrase "in connection with" leaves them confused as to when and how they can still discriminate based on race or ethnicity. Thus, any vagueness as to whether the Certification is (or is not) limited to the scope of the contract is irrelevant for purposes of the First Amendment.

*The Certification does not discriminate based on content.* Plaintiffs also bring a content-based discrimination claim, arguing that the Certification bans "'disparate treatment based on race or ethnicity'—including in lawful speech or association" but it "*does not* reach sexual harassment trainings or advocacy against animal abuse." PI at 15 (emphasis in original). This argument is a nonstarter.

To begin with, it fails because it relies on the mistaken assumption that "'disparate treatment based on race or ethnicity' . . . include[s] . . . lawful speech or association." *Id.* Moreover, to the extent that Plaintiffs believe that the Certification discriminates based on content because it focuses on a particular *category* of intentional discrimination, they are badly mistaken. By that logic, Title IX of the Civil Rights Act, for instance, violates the First Amendment because it bars discrimination "on the basis of sex," 20 U.S.C. § 1681(a), as opposed to *all* forms of discrimination. Tellingly, even Plaintiffs do not go that far. *See NADOHE I*, 167 F.4th at 103-104 (rejecting Plaintiffs' viewpoint discrimination claim because the DEI Certification only barred

illegal discrimination and Plaintiffs did not argue that the antidiscrimination laws themselves discriminated based on viewpoint).[5]

Besides, the Supreme Court has already explained that any reason that is "neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). Here, because a prohibition on intentional discrimination on the basis of race or ethnicity does not violate the First Amendment, a prohibition on a subset of such intentionally discriminatory acts (as specified in the Certification) does not violate the First Amendment, either. *See, e.g., id.* at 388–89 ("[A] State may choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection) . . . is in its view greater there.").

***The Certification does not impose an unconstitutional condition.*** Finally, Plaintiffs argue that the Certification amounts to an unconstitutional condition for two reasons. First, it discriminates based on content with the "goal . . . to eliminate all [DEI] activities," and thus "lack[s] any apparent connection to the antidiscrimination goals that the government purports to advance across all federal contracts." PI at 17, 18 (citation omitted). Second, its scope "extends to activities that fall 'outside of the contours of the program.'" PI at 18 (quoting *Agency for Int'l. Dev. v. All. for Open Soc'y Int'l., Inc. ("AID")*, 570 U.S. 205, 214-15 (2013)).

The first argument fails because—much like virtually all of Plaintiffs' arguments—it assumes that the Certification covers protected speech. Stripped of that erroneous assumption, the

---

[5] Although not explicitly addressed in *NADOHE I*, Plaintiffs also asserted a content-based discrimination challenge to the DEI Certification in that case. *See* Appellees' Brief, *NADOHE I*, No. 25-1189, ECF No. 25 at 29-35 (4th Cir. May 8, 2025). So, in rejecting Plaintiffs' First Amendment claim, the Fourth Circuit implicitly rejected their content-based discrimination argument.

argument fails outright. Plaintiffs' second argument is also unavailing. The Certification only applies to intentional discrimination "[i]n connection with" the contractor's performance on the Government contract. EO § 3. But regardless, even if the Certification applied outside the scope of the federally funded contract, it would not violate the First Amendment. The unconstitutional-conditions doctrine only bars the Government from imposing a funding condition that "effectively prohibit[s] the recipient from engaging in the *protected* conduct outside the scope of the federally funded program." *AID*, 570 U.S. at 218-19 (emphasis added). As explained above, there is no such protected conduct at issue here because Plaintiffs have no First Amendment right to discriminate based on race or ethnicity. So, even if the Certification applied "outside the scope of the federally funded program," *Id.* at 219 (citation omitted), it would survive First Amendment scrutiny.

### ii. Plaintiffs are unlikely to prevail on their Fifth Amendment claim.

Plaintiffs also bring a facial Fifth Amendment challenge to the Disparate-Treatment Certification. They argue that the phrase "in connection with" in the Certification, EO § 3, is so vague that it "'fails to provide a person of ordinary intelligence fair notice of what is prohibited,' [and] 'is so standardless that it authorizes or seriously encourages discriminatory enforcement.'" PI at 18 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

Plaintiffs further allege that this alleged "vagueness" problem implicates their First Amendment right. PI at 18 (arguing that the text "so vague as to 'permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech.'" (quoting *Winters*, 333 U.S. at 509). In other words, Plaintiffs' Fifth Amendment challenge overlaps with their First Amendment "vagueness" challenge. That overlap makes sense. As Plaintiffs seemingly acknowledge, they can only assert a facial vagueness under the Fifth Amendment if they *also* claim that the alleged "vagueness" implicates their First Amendment right. *See* PI at 18

19

(recognizing that they can challenge an allegedly vague law as "void on its face" if it implicates "free speech" (quoting *Winters*, 333 U.S. at 509). This recognition is prudent. "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975). Consistent with that principle, the Fourth Circuit routinely rejects a freestanding facial Fifth Amendment challenge that does not implicate the First Amendment. *See, e.g., United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002) (a facial vagueness challenge cannot be asserted under the Due Process Clause); *see also Berry v. City of Portsmouth*, 562 F.2d 307, 312 (4th Cir. 1977) (rejecting a facial challenge for vagueness under the Due Process Clause as "premature" because it "d[id] not involve First Amendment freedoms").

*NADOHE I* is also instructive on this score. There, the court explained that the general rule for a facial challenge is that plaintiffs must show that the text "is unconstitutional in all of its applications, or that [it] lacks any plainly legitimate sweep," and that the exception to the rule arises in the First Amendment context. *NADOHE I*, 167 F.4th at 100 (citation omitted) (alteration in original). There, Plaintiffs brought a facial (albeit, futile) challenge under the Fifth Amendment while *also* arguing, as they do here, that the provision's vagueness implicates their free speech. *See* Appellees' Brief, *NADOHE I*, No. 25-1189, ECF No. 25 at 35-41 (4th Cir. May 8, 2025). In rejecting that claim, the Fourth Circuit invoked *Finley*, which treated a similar vagueness challenge under the Fifth Amendment as synonymous with a First Amendment challenge. *See NADOHE I*, 167 F.4th at 101-102 (relying on *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998)).[6]

---

[6] In its prior ruling in *NADOHE I*, this Court relied on *Johnson v. United States,* 576 U.S. 591 (2015), to uphold Plaintiffs' facial vagueness challenge. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 280 (D. Md.), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025), *and vacated and remanded*, 167 F.4th 86 (4th Cir. 2026).

Plaintiffs cannot sustain their facial Fifth Amendment challenge because they cannot show that the phrase "in connection with" also infringes on their First Amendment right. As explained above, Plaintiffs have no First Amendment right to discriminate regardless of whether the discrimination occurs "in connection with" their performance under their Government contracts. *See supra* 16-17. So, even if the phrase "in connection with" has no limiting principle—i.e., it encompasses *all* of Plaintiffs' conduct—it would still not infringe on Plaintiffs' free speech. To iterate, this conclusion follows from *NADOHE I* itself, which upheld the DEI Certification even though it plainly applied to conduct outside the scope of Government funds. 167 F.4th at 103-104 (concluding that the DEI Certification was constitutional even though it "burden[ed] actors outside Executive-Branch purview and requires certification as to 'any programs,' not just federally funded

---

Defendants, respectfully, disagree with this Court's reliance on the *Johnson* exception. Courts of appeals—including the Fourth Circuit—have been virtually unanimous in limiting the application of *Johnson* and its progeny to their facts. *See United States v. Hasson*, 26 F.4th 610, 618 (4th Cir. 2022) (rejecting the argument that following *Johnson*, "a defendant may raise a facial vagueness challenge without regard to whether the statute is vague as applied to him" (citation omitted)); *See also United States v. Requena*, 980 F.3d 30, 42 (2d Cir. 2020) ("*Johnson*'s license to strike down a criminal statute . . . as facially vague even where it has some valid applications extends only to the exceptional circumstances present in that case and its progeny."(citation omitted)); *United States v. Morales-Lopez*, 92 F.4th 936, 942 (10th Cir.), *cert. denied,* 145 S. Ct. 241 (2024) (reversing a "district court[, which] became the first and to date only federal court to read *Johnson* as overturning a significant number of Supreme and Circuit Court precedents and telling us facial challenges to criminal statutes are now readily available to defendants"); *Carman v. Yellen*, 112 F.4th 386 (6th Cir. 2024) (rejecting a facial vagueness challenge); *Kashem v. Barr*, 941 F.3d 358, 376-78 (9th Cir. 2019) ("[T]o the extent *Johnson* and *Dimaya* bypassed as-applied challenges and proceeded directly to facial vagueness, that approach appears to have turned on the exceptional circumstances of the provisions at issue." (citation omitted)); *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 191 (5th Cir. 2018) (refusing to accept a facial vagueness challenge because "[i]n contrast to the extreme circumstances in *Johnson*, the posture of this case calls for judicial restraint").

In sum, the *Johnson* exception "extends only to the exceptional circumstances present in that case and its progeny," *Requena*, 980 F.3d at 42, and thus has no application where, as here, the relevant text is materially distinct from the violent-felony residual clause of the Armed Career Criminal Act analyzed in that case, *Johnson*, 576 U.S. at 593. But regardless, this issue is purely academic in this case because Plaintiffs do not assert a freestanding facial Fifth Amendment claim (nor invoke the *Johnson* exception).

21

ones" (citation omitted)). Because any vagueness associated with the phrase "in connection with" does not implicate the First Amendment, Plaintiffs' facial Fifth Amendment claim fails outright. *See Winters*, 333 U.S. at 509.

**The phrase "in connection with" is not unconstitutionally vague.** But even if Plaintiffs could assert a facial Fifth Amendment claim independent of a viable First Amendment claim, the claim would still fail. Tellingly, Plaintiffs have not identified any support in the caselaw for the notion that the phrase "in connection with" renders a text unconstitutionally vague on its face— nor could they. The Supreme Court routinely interprets provisions that include phrases such as "in connection with," "in relation to," and "relate to." *See, e.g., Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 383 (2014) ("a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" (quoting 15 U.S.C. § 78bb(f)(1)(A)); *Maracich v. Spears*, 570 U.S. 48 (2013) ("For use in connection with any civil, criminal, administrative, or arbitral proceeding" (quoting 18 U.S.C. § 2721(b)(4)); *United States v. O'Hagan*, 521 U.S. 642, 667 (1997) ("fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer" (quoting 15 U.S.C. § 78n(e))); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 651 (1995) (ERISA 'shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan' covered by the statute" (quoting 29 U.S.C. § 1144(a)); *Smith v. United States*, 508 U.S. 223, 225 (1993) ("'use' of a firearm 'during and in relation to . . . [a] drug trafficking crime'" (quoting 18 U.S.C. § 924(c)(1)).

Notably several of these provisions imposed criminal liability, which triggers a more stringent vagueness standard than the one applied outside the criminal context. *See Finley*, 524 U.S. at 588. And yet, instead of outright declaring these provisions unconstitutionally vague, the Supreme Court examined the provisions' context to determine whether the at-issue conduct was

"in connection with" the relevant set of facts. Similarly, here, any inquiry regarding whether "disparate treatment" occurred "[i]n connection with the performance of work under th[e] contract," EO § 3, must be examined in light of the relevant facts. Indeed, the Court of Federal Claims has already interpreted a nearly identical phrase in Government contracting. In *Logistics Co., Inc. v. United States*, the court examined the scope of FAR 52.209-7(c), which "mandates disclosure of proceedings that occurred 'within the last five years, in connection with the award to or performance by the offeror of a Federal contract or grant.'" 163 Fed. Cl. 542, 554 (2022) (quoting FAR 52.209-7(c)(1)). Without resolving the "precise bounds of the phrase 'in connection with,'" it concluded that "[d]isputes over payment for services performed pursuant to a federal government contract are plainly performed 'in connection with the award to or performance by the offeror of a Federal contract or grant.'" *Id.* at 555 n.3 (quoting FAR 52.209-7(c)(1)).

Plaintiffs argue that the phrase "leaves implementing agencies with unbounded discretion to move the line in different cases." PI at 19. But the "mere fact that close cases can be envisioned [does not] render[] a [text] vague" given that "[c]lose cases can be imagined under virtually any [text]." *Williams*, 553 U.S. at 306. The Constitution tolerates text that is "marked by flexibility and reasonable breadth" even if it is not "meticulous[ly] specific[]." *Grayned v. City of Rockford*, 408 U.S. 104, 111 (1972). Here, we know that the phrase "in connection with" meets that standard because the Supreme Court routinely gives it meaning (and that the Court of Federal Claims has already given meaning to a nearly identical phrase in the context of a Government contracting). Thus, it cannot be *facially* vague under the Fifth Amendment.

Notably, Plaintiffs' vagueness argument is even less palatable in the context of Government funding. EO § 4(a)(i) (consequences associated with the Certification include contract cancellation, termination, suspension, etc.). To begin with, Plaintiffs have no constitutionally

23

protected property right in their Government contracts. *See, e.g., Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, 2025 WL 2615054, at *19 (D.D.C. Sept. 10, 2025); *Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, 2025 WL 2374528, at *23 (D.D.C. Aug. 14, 2025); *Vera Inst. of Just. v. U.S. Dep't of Just.*, 2025 WL 1865160, at *16 (D.D.C. July 7, 2025); *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 93 (D.D.C. 2025); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014)). Moreover, as *NADOHE I* explains, vagueness claims pertaining to Government funding decisions are governed by *Finely*, which urges courts to "afford greater latitude for vagueness in funding decisions than they would 'in a criminal statute or regulatory scheme.'" 167 F.4th at 102 (quoting *Finley*, 524 U.S. at 588).

To be sure, contractors can also face *civil* liability under the FCA,[7] *see* EO § 4(d)(i), but importantly, "FCA's scienter element refers to respondents' knowledge and subjective beliefs," and it requires a defendant to act "knowingly," which means that the government must establish that the person acted with "either actual knowledge, deliberate ignorance, or recklessness." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749-50 (2023). That provides ample protection against the sort of unfair liability that worries Plaintiffs.

Regardless of whether this Court applies the more forgiving *Finley* standard or the one applied outside the funding context, Plaintiffs' claim fails because "in connection with" can survive even the most stringent vagueness standard applied to criminal statutes. *See supra* 22-23.

**B.    Plaintiffs are unlikely to prevail on their APA claim to the FAR Guidance.**

Plaintiffs' APA challenge to the FAR Guidance, *see* PI at 20-24, fails for several independent reasons. *First*, the claim fails at the threshold because a stay of the FAR Guidance

---

[7] Contrary to Plaintiffs' claim, *see* PI at 5, there is no criminal liability under the FCA. *See* 31 U.S.C. §§ 3729-3733.

would not remedy Plaintiffs' purported harms (let alone warrant emergency injunctive relief). *Second*, the FAR Guidance is not a reviewable final agency action under the APA. *Third*, even assuming the FAR Guidance is reviewable under the APA, it survives scrutiny.

### *i. Stay of the FAR Guidance would not remedy Plaintiffs' purported harms.*

"[P]laintiffs must demonstrate standing for each claim that they press." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). Plaintiffs' APA claim fails to satisfy the redressability prong of standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs' asserted injury stems from the alleged "chilling" effect associated with the Certification. *See* PI at 8-9. But the Certification appears in both the FAR Guidance and the Order, and this Court can only stay the FAR Guidance under the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) (explaining that the President is not subject to the APA). In other words, even if this Court stays of the Guidance, Defendant agencies still remain bound by the Order's instruction to include the Certification in Government contracts. *See* EO § 3. Because the Order survives constitutional security, *see supra* Part I.A, Plaintiffs lack standing to seek a stay of the Guidance, which, even if granted, could not (on its own) remedy Plaintiffs' alleged harm, *see Murthy*, 603 U.S. at 73 (holding that plaintiffs lacked standing because the requested relief against the Government would not remedy their purported harms).

### *ii. The FAR Guidance is not a final agency action.*

The APA provides for review of a "final agency action." 5 U.S.C. § 704. Agency action is final if: it (1) marks "the 'consummation' of the agency's decisionmaking process," and (2) determines "rights or obligations" or carries "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). The FAR Guidance does not satisfy this standard.

The Order directs the FAR Council to amend the FAR in two steps: (1) in Section 5(b), it instructs the FAR Council to "issue deviation and *interim guidance* . . . as appropriate and consistent with applicable law, regarding agency implementation of the [Certification]," EO § 5(b) (emphasis added); and (2) in Section 5(a), it instructs the FAR Council "to the extent permitted by law. . . amend the [FAR] to . . . provide for inclusion [of the Certification]," *id*. § 5(a). As the Order explains, the interim guidance in step (1) must occur "*before completion* of the amendments under [Section 5(a) in Step (2)]." *Id*. § 5(b) (emphasis added). In other words, the FAR Guidance is merely step (1)—i.e., "interim guidance"—pending step (2)—i.e., amendment to the FAR.

This interim guidance makes sense because the Order requires agencies to begin implementing the Certification *prior* to the FAR amendment. *See* Order § 4(c) ("Within 120 days of the date of this order [July 24, 2026], each agency head shall review the agency's *implementation* of section 3 of this order and report to the Assistant to the President for Domestic Policy regarding its *compliance* with that section." (emphases added)). In circumstances such as this one, where agencies must deviate from existing FAR until it is amended, they are permitted to issue "deviations" from the FAR, *see* FAR 1.401, 1.403, 1.404. Issuing such deviations, however, is the responsibility of the agencies (not the FAR Council). But the FAR Council can provide *guidance* to agencies to assist them in implementing such deviations pending the forthcoming amendment to the FAR. That is precisely what the FAR Guidance does. It plainly states that the "purpose of this memorandum is to provide guidance to agencies that issue contracts subject to the [FAR] to support their implementation of [the Order]." Guidance at 1. As it also makes clear, the FAR amendment itself is still forthcoming: "[t]he FAR Council intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707" to amend the FAR to

reflect the Order. *Id.* at 3. In the meantime, it merely seeks to "support" agencies' "implementation" of the Order via "guidance." *Id.* at 1.

The FAR Guidance is thus a classic interim guidance. The "consummation" of the FAR Council's decisionmaking process will occur, and "legal consequences" will flow, once the Council issues the FAR amendment. *Bennett*, 520 U.S. at 177-78 (citation omitted); *see also In re Bluewater Network*, 234 F.3d 1305, 1313 (D.C. Cir. 2000) ("[A]n agency's pronouncement of its intent to defer or to engage in future rulemaking generally does not constitute final agency action reviewable by this court."). In the meantime, Plaintiffs' APA challenge is premature.

For these reasons, courts previously concluded that a similar FAR Council guidance (also issued as a memorandum to help agencies implement an Executive Order) was not a final agency action. *See Issuance of Agency Deviations to Implement Executive Order 14042*, Federal Acquisition Regulation Council (Sep. 30, 2021) ("2021 FAR Guidance").[8] The 2021 FAR Guidance—much like the Guidance at issue here—was issued pursuant to an Executive Order, which "tasked the [FAR] Council with 'amend[ing] the [FAR]'" to reflect new COVID-19-compliance requirements for government contractors. *Kentucky v. Biden*, 571 F. Supp. 3d 715, 720 (E.D. Ky. 2021), *aff'd as modified*, 57 F.4th 545 (6th Cir. 2023) (quoting Executive Order 14042, 86 Fed. Reg. 50,986, entitled *Ensuring Adequate COVID Safety Protocols for Federal Contractors*). Prior to amending the FAR, "the [FAR] Council issued Guidance in the form of a memo to assist agencies responsible for mandating contractor and subcontractor compliance with the vaccination requirement until the [FAR] can be officially amended." *Id.* Several reviewing courts concluded that the 2021 FAR Guidance was not a final agency action, and thus not subject

---

[8]https://bidenwhitehouse.archives.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf

to APA review. *See id.* at 731; *Brnovich v. Biden*, 562 F. Supp. 3d 123, 160 (D. Ariz. 2022) ("[T]he [2021 FAR Guidance] is not final agency action and is therefore not subject to judicial review under the APA.");[9] *Mayes v. Biden*, 67 F.4th 921, 944 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023) ("The district court correctly held that the [2021 FAR Guidance] 'is not binding of its own force' and 'does not compel agencies to take any specific action.'").[10]

The reasoning adopted by *Kentucky*, *Brnovich*, and *Mayes* applies equally here because the scope and posture of the FAR Guidance and the 2021 FAR Guidance are nearly identical. Like the FAR Guidance at issue in this case, the 2021 FAR Guidance (1) contained similar purpose language regarding implementing an executive order, (2) directed agencies to adopt new language in contracts by a date certain, (3) required agencies that do not adopt the desired new language to

---

[9] The *Brnovich* (district court) and *Mayes* (Ninth Circuit) opinions are associated with the same case. Both opinions were ultimately vacated because the FAR Council eventually rescinded the 2021 FAR Guidance as the COVID-19 pandemic abated. The full citation is *Brnovich v. Biden*, 562 F. Supp. 3d 123, 160 (D. Ariz. 2022), *judgment entered*, No. CV-21-01568-PHX-MTL, 2022 WL 19560411 (D. Ariz. Feb. 10, 2022), and *appeal dismissed and remanded sub nom. Mayes v. Biden*, 89 F.4th 1186 (9th Cir. 2023), *vacated sub nom. Mayes v. Biden*, No. CV-21-01568-PHX-MTL, 2024 WL 5252500 (D. Ariz. Jan. 9, 2024), and *rev'd sub nom. Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023), and *appeal dismissed and remanded sub nom. Mayes v. Biden*, 89 F.4th 1186 (9th Cir. 2023).

[10] The district court in *Louisiana v. Biden* considered the 2021 FAR Guidance "ripe" for review without determining whether it was a final agency action under the APA. 575 F. Supp. 3d 680, 693 (W.D. La. 2021), *aff'd*, 55 F.4th 1017 (5th Cir. 2022). The court observed that in the Fifth Circuit, "whether agency action is ripe for review" examines whether (1) the issue is "purely legal," (2) there has been a "final agency action," (3) existence of "direct and immediate" "impact," and (4) whether resolution "will foster effective administration of the statute." *Id.* (citation omitted). The court proceeded to merits review after concluding that factors (1), (3), and (4) were satisfied, without explicitly addressing factor (2)—i.e., final agency action. *Id.*

*Louisiana* does not help Plaintiffs in the Fourth Circuit where "finality under the APA is a jurisdictional requirement." *Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 2700 (2025). And *Louisiana*'s reasoning is inapplicable in any event because unlike the plaintiffs in that case, Plaintiffs here do not present "purely legal" challenges to the FAR Guidance under the APA, *Louisiana*, 575 F. Supp. 3d at 693, because they also claim that the Guidance was arbitrary and capricious.

engage in further consultations, and (4) included language encouraging agencies to make their deviations effective until the FAR is amended by rulemaking.[11] These are precisely the characteristics that *Kentucky*, *Brnovich*, and *Mayes* considered in concluding that the 2021 FAR Guidance was not a final agency action.

Just like the FAR Guidance at issue here, which merely seeks to "encourage[] [agencies] to make their class deviations effective until implemented in the FAR," Guidance at 3, the 2021 FAR Guidance also sought "to 'support agencies in meeting the applicability requirements and deadlines set forth in' the executive order, and to encourage agencies to 'exercise their authority' in helping contractors and subcontractors insert deviation clauses into their contracts," *Kentucky*, 571 F. Supp. 3d at 731. Neither Guidance is "binding of its own force. Instead, [they both]

---

[11] The two memos have very similar language:

(1) *compare* FAR Guidance at 1 ("The purpose of this memorandum is to provide guidance to agencies that issue contracts subject to the [FAR] to support their implementation of [the Order]") *with* 2021 Guidance at 1 ("The purpose of this memorandum is to provide agencies that award contracts under the Federal Acquisition Regulation (FAR) with initial direction for the incorporation of a clause into their solicitations and contracts to implement guidance issued by the Safer Federal Workforce Task Force (Task Force) pursuant to Executive Order 14042.").

(2) *compare* Guidance at 2 ("To implement section 3 of the E.O., *agencies must* . . . " (emphasis added)) *with* 2021 FAR Guidance at 2 ("In accordance with section 5 of the order, *agencies are required* to . . . (emphasis added)).

(3) *compare* Guidance at 2 ("Unless an agency has existing statutory direction that requires reconciliation with this guidance, agencies must request approval from the Council before adopting FAR text that differs from the Council's model deviation text.") *with* 2021 FAR Guidance at 3 ("[I]f a civilian agency intends to use clause text different than the deviated clause text provided, the agency must consult with the CAAC Chair, William Clark, who will consult with OMB and the Task Force to ensure consistency with Administration policy.").

(4) *compare* Guidance at 3 ("The FAR Council intends to conduct rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707. Agencies are encouraged to make their class deviations effective until implemented in the FAR.") *with* 2021 FAR Guidance at 3 ("The FAR Council has opened a case . . . to make appropriate amendments in the FAR to reflect the requirements of the order. Agencies are encouraged to make their deviations effective until the FAR is amended . . . .").

'encourage[]' agencies to use their independent authority to temporarily deviate from the FAR." *Brnovich*, 562 F. Supp. 3d at 160 (second alteration in original). As such, neither Guidance "compel[s] agencies to take any specific action but rather instruct[] contracting officers to adhere to 'the direction[s] . . . issued by their respective agencies' for implementing the . . . guidance." *Id.* (third alteration in original); *see also Mayes*, 67 F.4th at 944 (same).

Courts also observed that the 2021 FAR Guidance's intent to amend the FAR in the *future* showed that the 2021 FAR Guidance itself was not a final agency action. *See, e.g.*, *Brnovich*, 562 F. Supp. 3d at 160 (concluding that the 2021 FAR Guidance itself does not "provide the FAR Council's final guidance regarding COVID-19 safety clauses" because it states that "the FAR Council has opened a case . . . to make appropriate amendments in the FAR to reflect the requirements of [EO 14042]" (citation omitted) (alterations in original)). The same intention appears in the at-issue FAR Guidance. *See* Guidance at 3. Furthermore, neither Guidance "appear[s] in the Code of Federal Regulations or the FAR." *See Brnovich*, 562 F. Supp. 3d at 160. For these reasons, *Kentucky*, *Brnovich*, and *Mayes* all concluded that the 2021 FAR Guidance is not a final agency action, and thus not reviewable under the APA. *Kentucky*, 571 F. Supp. 3d at 731; *Brnovich*, 562 F. Supp. 3d at 160; *Mayes*, 67 F.4th at 944. The at-issue FAR Guidance is similarly not a final agency action.

Plaintiffs hardly defend their claim that the FAR Guidance is a final agency action. *See* PI at 20-21. In a singular analytical paragraph, Plaintiffs simply declare that the Guidance is a final agency action while dismissing—in a footnote—the fact that the FAR Guidance makes clear that the final rule itself (i.e., FAR amendment) will be issued following "'rulemaking.'" PI at 21 n.39 (quoting Guidance at 3). To Plaintiffs, the fact that the final rule is still forthcoming is, evidently, "besides the point." *Id.* But as *Kentucky*, *Brnovich*, and *Mayes* all explained, the fact that a FAR

30

rule is still forthcoming is key to the final agency action analysis. *Kentucky*, 571 F. Supp. 3d at 731; *Brnovich*, 562 F. Supp. 3d at 160; *Mayes*, 67 F.4th at 944. Contrary to Plaintiffs' characterization, the FAR Guidance's explicit declaration that the Council intends to undergo rulemaking is not akin to a "mere *possibility* that an agency might reconsider . . . [a] *final agency action*." PI at 21 n.39 (quoting *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (emphases added)). The FAR regulation has not yet been issued; so, there is no "final agency action" to "reconsider." The Guidance's explicit declaration regarding a *future* FAR regulation is a "pronouncement of [the FAR Council's] intent . . . to engage in future rulemaking," but it is not itself a "final agency action." *In re Bluewater Network*, 234 F.3d at 1313.

Plaintiffs also state that the FAR Guidance "determines rights, obligations, and from which legal consequences flow," because it uses the word "must" in instructing agencies. PI at 21. That is a red herring. The Guidance uses the word "must" to describe the agencies' obligations *under the Order*; it is not creating any *new* obligations. *See, e.g.,* Guidance at 2 (describing what the "agencies must" do in order "*[t]o implement* section 3 of the E.O." (emphasis added)).[12] The 2021 FAR Guidance used similar language to describe agencies' obligations under EO 14,042. *See* 2021 FAR Guidance at 2 ("In accordance with section 5 of the order, agencies are required to . . . ."). In other words, both memos use mandatory language to describe the agencies' obligations under the respective Orders. But those obligations come from the Orders themselves, not the memos.

At bottom, the FAR Guidance's "purpose . . . is to provide guidance to agencies . . . to support their implementation of [the Order]." Guidance at 1. In doing so, it merely "encourge[s]" agencies "to make their class deviations effective until" the final rule is "implemented into the

---

[12] As Plaintiffs acknowledge, the July 24, 2026, compliance date appears in the Order itself. *See* PI at 2 ("July 24, 2026, deadline imposed by the Contractors Order and FAR Implementation"); *See* Order § 4(c).

FAR," which will occur following "rulemaking pursuant to the notice and comment process set forth at 41 U.S.C. 1707." *Id.* at 3. Because the FAR Guidance is not a final agency action, Plaintiffs' APA claim fails outright. *See Jake's Fireworks Inc.*, 105 F.4th at 631.

### *iii. The merits of Plaintiffs' APA arguments are futile.*

Because the FAR Guidance is not a final agency action, Plaintiffs' arguments regarding alleged failures by the FAR Council to "provide a reasoned explanation" for the forthcoming FAR amendment, *see* PI at 22-24, are premature. If, after the FAR amendment is issued (following notice-and-comment), Plaintiffs continue to maintain that the FAR Council did not provide requisite support for the rule, did not consider serious reliance interests, or failed to consider reasonable alternatives, they may, at *that* time, challenge the rule under the APA. But until the final rule is issued, Defendants are "entitled to a presumption of regularity." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 577 (2025) (citation omitted). Thus, this Court should not reach the merits of Plaintiffs' APA arguments. *See Kentucky*, 571 F. Supp. 3d at 731; *Brnovich*, 562 F. Supp. 3d at 160; *Mayes*, 67 F.4th at 944. But even if the Court concludes that the FAR Guidance is, in its current form, a "final agency action," it should still reject Plaintiffs' APA challenges.

Plaintiffs' arguments under 5 U.S.C. § 706(2)(B), that the FAR Guidance is unconstitutional, *see* PI at 24, are duplicative of their constitutional arguments and fail for the same reasons, *see supra* Part I.A.

Plaintiffs' arguments under 5 U.S.C. § 706(2)(A), that the FAR Guidance is arbitrary and capricious, *see* PI at 20-24, flows from their mistaken constitutional arguments. Specifically, Plaintiffs claim that the FAR Council failed "to provide a reasonable justification," and failed to consider "alternatives," the impact of altering "longstanding policies," the "costs and lost labor, of upending the federal contracting process," and "reliance interests." *Id*. All of these arguments,

32

however, assume that the Certification will require Plaintiffs to do something other than merely refrain from engaging in intentional discrimination based on race or ethnicity. Stripped of that assumption, Plaintiffs' arbitrary-and-capricious grievances fall by the wayside. After all, it is eminently reasonable for the Executive to refuse to enter into contracts with entities that engage in intentional discrimination based on race and ethnicity. Indeed, the Government has, for decades, required recipients of federal funds to refrain from engaging in discriminatory practices. *See, e.g.*, 7 C.F.R. § 15.4(a)(1); 15 C.F.R. § 8.5(a); 28 C.F.R. § 42.105(a)(1); 29 C.F.R. § 31.6(a)(1); 34 C.F.R. § 100.4(a)(1); 45 C.F.R. § 80.4(a)(1). It is not "arbitrary" or "capricious" for the Executive Branch to continue that practice. *See* 5 U.S.C. § 706(2)(A).

Lastly, Plaintiffs argue that the FAR Guidance "violate[s] the requirements of the Paperwork Reduction Act [(PRA)] and the notice and comment procedures required by 41 U.S.C. § 1701 [sic]."[13] PI at 22. As for the PRA, the FAR Guidance explicitly says that it "is seeking clearance from the Office of Management and Budget (OMB) under the [PRA] for the information collections." Guidance at 3. It also makes clear that "agencies will be expected to enforce full compliance with these requirement" only "*[o]nce* OMB approves the information collection under the PRA." *Id.* (emphasis added). But "until that time . . . agencies may still enforce the requirement . . . in connection with individual investigations." *Id.*; *see also* 44 U.S.C. § 3518(c)(1) (permitting collections in connection with investigations). In other words, the FAR Guidance—consistent with its intent to provide "guidance"—advises agencies on the interaction between their obligations under the PRA and the Order. So, to the extent that Plaintiffs worry that the FAR Guidance somehow subjects them to unlawful collection prior to OMB's approval, *see* PI at 22-23 n.41, they are mistaken. Moreover, the requirement to undertake notice-and-comment rulemaking only

---

[13] Plaintiffs inadvertently cite to 41 U.S.C. § 1701 instead of 41 U.S.C. § 1707.

33

applies to the forthcoming FAR rule—not the FAR Guidance, which "is not a 'procurement policy, regulation, procedure, or form.'" *Mayes*, 67 F.4th at 944 (quoting 41 U.S.C. § 1707). And the Guidance explicitly states that the FAR Council intends to issue the forthcoming FAR rule *after* notice-and-comment rulemaking under 41 U.S.C. § 1707. Guidance at 3. Ultimately, these arguments further highlight the premature nature of Plaintiffs' APA challenges to the FAR Guidance, which is an interim guidance pending the issuance of the final rule.

## II. THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED RELIEF.

Plaintiffs have not shown that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Moreover, any injunction that bars the Executive Branch from enforcing the law irreparably injures both the Government and the public, whose interests "merge" in this context. *Nken*, 556 U.S. at 435. And these injuries are not outweighed by the purported benefits of relieving plaintiffs' "fears" about how the Executive *may* enforce the Certification.

In arguing that the preliminary-injunction factors weigh in their favor, Plaintiffs either speculate about future negative consequences or identify alleged self-harm. *See* PI at 24-30. But as explained above, the Certification only bars intentional discrimination based on race or ethnicity. *See supra* 6-11. So, Plaintiffs are either (1) censoring their own protected speech and association based on an objectively unreasonable reading of the Certification, or (2) self-correcting genuinely discriminatory conduct. Neither type of harm would warrant injunctive relief. After all, plaintiffs have no cognizable interest in discrimination. Nor are they entitled to an injunction to remedy their self-inflicted harm based on an objectively unreasonable reading of the Certification. *See Abbott*, 900 F.3d at 169.

Meanwhile, on the other end of the balancing test, there is no question that eradicating discrimination is in the interest of the public. *See Students for Fair Admissions, Inc. v. President*

*& Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). Moreover, "[a]ny time [the Government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Additionally, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless enjoined from doing so, such funds may not be retrievable afterwards. *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (finding the government irreparably harmed where plaintiffs failed to commit to "repay[ing] grant money if the Government ultimately prevails"). By contrast, if Plaintiffs' contracts are terminated unlawfully, they may be entitled to recovery of costs, or even reasonable profits. *See* 48 C.F.R. §§ 49.201, 31.205-42. Thus, the remaining factors favor denial of Plaintiffs' request for a preliminary injunction.

## CONCLUSION

For the reasons above, Defendants respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction. If the Court grants an injunction, Defendants respectfully request entry of a bond. *See* Fed. R. Civ. P. 65(c); *cf. Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025).

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Pardis Gheibi*
PARDIS GHEIBI
D.C. Bar No. 90004767
Trial Attorney, U.S. Department of Justice
ESAM K. AL-SHAREFFI

35

D.C. Bar No. 90010174
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2026, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.


*/s/ Pardis Gheibi*