**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER EDUCATION, *et al.*,<br>*Plaintiffs*,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>*Defendants*. | Case No. 26-cv-1532-ABA |

**MEMORANDUM OPINION**

In January 2025, the President ordered federal agencies to include in "every contract or grant award" a term certifying that the grant recipient "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Exec. Order No. 14,173 § 3(b)(iv), 90 Fed. Reg. 8633 (Jan. 21, 2025). The Fourth Circuit held that the provision did not facially violate the First Amendment because it "requires only that plaintiffs certify compliance with federal antidiscrimination laws, which the First Amendment doesn't confer a right to violate." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 103 (4th Cir. 2026) ("*NADOHE I*").

In March 2026, the President issued a narrower executive order, entitled "Addressing DEI Discrimination by Federal Contractors." Exec. Order No. 14,398, 91 Fed. Reg. 16,147 (Mar. 26, 2026) (hereinafter, the "Order" or the "Contractors Order"), directing that government contracts include language prohibiting contractors from engaging in "disparate treatment based on race or ethnicity" in recruitment, employment, contracting, program participation, or allocation of resources. *Id.* Under well-settled federal law, "disparate treatment" refers to "intentional discrimination." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015).

Plaintiffs are five organizations whose membership includes government contractors. They assert that the Contractors Order is unconstitutional on its face and seek a preliminary injunction against it as well as a stay of a memorandum by the Federal Acquisition Regulatory ("FAR") Council implementing it (the "FAR Memo"). But "existing federal law already demands" that federal contractors not engage in intentional discrimination, "and plaintiffs have not challenged existing law as viewpoint-discriminatory or as over or underinclusive." *NADOHE I*, 167 F.4th at 104. And Plaintiffs press a First Amendment overbreadth challenge, which requires Plaintiffs to establish that the Contractors Order is "unconstitutional in all of its applications" or "lacks any plainly legitimate sweep." *Id.* at 100 (quoting *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021)).

Because Plaintiffs have not made that showing, and have not shown a likelihood of success on their Fifth Amendment claim or irreparable harm warranting preliminary relief against the FAR Memo, their motion for a preliminary injunction and stay (ECF No. 28) will be denied.

## I. BACKGROUND[1]

Plaintiffs are five associations whose members include government contractors and/or individuals who work for entities that hold government contracts. Three of the Plaintiffs represent members who are employed in higher education: the National Association of Diversity Officers in Higher Education ("NADOHE"), the American

[1] For purposes of Plaintiffs' motion for a preliminary injunction, the Court does not assume the complaint's allegations are true, but rather must decide whether Plaintiffs have established a likelihood of success on the merits. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Association of University Professors, and the United Academics of Maryland-University of Maryland, College Park. ECF No. 26 ¶¶ 8–10. The other two Plaintiffs are nonprofit trade associations comprised of contractors in the construction business: the National Association of Minority Contractors and the National Association of Minority Contractors, DMV Chapter. *Id.* ¶¶ 11–12.

Plaintiffs primarily challenge the March 26, 2026, Executive Order entitled "Addressing DEI Discrimination by Federal Contractors." Exec. Order No. 14,398. The Contractors Order (§ 3) directs "executive departments and agencies" to ensure that agreements with contractors and subcontractors include certain language related to diversity, equity and inclusion ("DEI") within 30 days, "to the extent permitted by law." The Order provides model contractual language that must be included in government contracts:

> In connection with the performance of work under this contract, [the contractor/appropriate party (contractor)] agrees as follows:
>
> 1. The contractor **will not engage in any racially discriminatory DEI activities, as defined in section 2 of the Executive Order of March 26, 2026** (Addressing DEI Discrimination by Federal Contractors);
> 2. The contractor will furnish all information and reports, including providing access to books, records, and accounts, as required by the contracting agency pursuant to the Executive Order of March 26, 2026 (Addressing DEI Discrimination by Federal Contractors), for purposes of ascertaining compliance with this clause;
> 3. In the event of the contractor's or a subcontractor's noncompliance with this clause, this contract may be canceled, terminated, or suspended in whole or in part, and the contractor or subcontractor may be declared ineligible for further Government contracts.

*Id.* (emphasis added).

The Contractors Order, in turn, defines "racially discriminatory DEI activities" as follows:

> For the purposes of this order, **"racially discriminatory DEI activities" means disparate treatment based on race or ethnicity** in the recruitment, employment (*e.g.*, hiring, promotions), contracting (*e.g.*, vendor agreements), program participation, or allocation or deployment of an entity's resources.

Contractors Order § 2(a) (emphasis added). Thus, the specific contractual prohibition imposed by the Contractors Order is a prohibition against engaging in "disparate treatment based on race or ethnicity" in recruitment, employment, contracting, program participation, or allocation or deployment of resources.

The Contractors Order specifies penalties that may be levied against noncompliant contractors. *Id.* § 4. Among these penalties, the Contractors Order directs the Attorney General to "consider whether to bring actions under the False Claims Act against any contractors or subcontractors that violate" the provisions of the required contractual language. *Id.* § 4(d)(i).

Plaintiffs also challenge the FAR Council's implementation of the Contractors Order. The FAR Council consists of the Administrator for Federal Procurement Policy, the Administrator of General Services, the Secretary of Defense, and the Administrator of National Aeronautics and Space. 41 U.S.C. § 1302(b). It exists to coordinate and maintain procurement policy and regulations across the federal government. *Id.* §§ 1302(a), 1303. On April 17, 2026, the FAR Council issued guidance concerning the Contractors Order that provided model contractual language and dates for implementation. ECF No. 26 ¶¶ 119–20; *see also* Memorandum on Agency Implementation of Executive Order 14398, Addressing DEI Discrimination by Federal

Contractors, Federal Acquisition Regulation Council (Apr. 17, 2026), https://perma.cc/YH8M-SHZ4 (hereinafter, the "Memo" or the "FAR Memo"). The FAR Memo states that "agencies must . . . [m]odify existing contracts" to comply with the Contractors Order "by July 24, 2026." FAR Memo at 2. The government later stipulated to delay initiating any False Claims Act enforcement actions related to the FAR Memo or Contractors Order until August 7, 2026. ECF No. 29-1. The FAR Memo also includes model contract language that is identical to the language provided in Section 3 of the Contractors Order (quoted in relevant part above). FAR Memo at 5–9; *see also* ECF No. 26 ¶ 121.

Plaintiffs contend that they and their members are being harmed by the Contractors Order and FAR Memo. Along with their motion for a preliminary injunction, Plaintiffs have included numerous member declarations attesting to concerns regarding lost work or canceled contracts related to the new required contractual language and/or its chilling effect. *See, e.g.*, ECF No. 28-3 ¶ 31 (declaration of NADOHE's president and CEO attesting that she has "had conversations with many of NADOHE's individual members who, because of the Contractors Order, are changing or considering changing their own expression, or they fear they will risk facing adverse employment consequences or endanger their institutions' federal contracts" and is aware of "multiple NADOHE members who fear that using words like 'diversity' or 'equity' will be considered 'racially discriminatory DEI activities.").

Plaintiffs' amended complaint asserts seven counts. In Counts I and II, Plaintiffs claim that the Contractors Order violates the First Amendment on its face because it is overbroad, discriminates on the basis of content, and imposes unconstitutional conditions. ECF No. 26 ¶¶ 189–226. Count III asserts an ultra vires claim challenging

the False Claims Act enforcement provision of the Contractors Order on the ground that "[n]o source of law authorizes" the President to direct such enforcement activities (though Plaintiffs do not separately rely on Count III as a basis for the preliminary relief sought in the pending motion). *Id.* ¶¶ 227–35. In Count IV, Plaintiffs allege that the Contractors Order violates the Due Process Clause of the Fifth Amendment because it is too vague. *Id.* ¶¶ 236–44. In Counts V, VI, and VII, Plaintiffs argue that the FAR Memo violates the Administrative Procedure Act ("APA") because it is arbitrary and capricious, unconstitutional, and did not comport with required procedures. *Id.* ¶¶ 245–75.

Plaintiffs request that the Court preliminarily enjoin the Contractors Order as unconstitutional and stay or enjoin the FAR Memo under the APA. ECF No. 28-1 at 39.[2] That motion is fully briefed. ECF Nos. 32, 35. The Court held a hearing on August 5, 2026.

## II. STANDARD OF REVIEW

A preliminary injunction is a form of equitable relief intended to prevent irreparable harm while a lawsuit remains pending. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). To obtain a preliminary injunction, plaintiffs must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *See Winter*, 555 U.S. at 20; *League of Women Voters of N.C.*, 769 F.3d at 236; *Am. Fed'n of State, Cnty. & Mun. Emps. v. Soc. Sec. Admin.*, 172 F.4th 361, 366 (4th Cir. 2026) (en banc).

[2] Citations to docket filings refer to the page numbers generated by CM/ECF, which may differ from the pagination used by the parties.

The third and fourth factors merge when, as here, the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The same factors govern a request to stay agency action under 5 U.S.C. § 705. *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 949–50 (D. Md. 2020). A plaintiff must satisfy all four requirements to obtain preliminary relief. *See Am. Fed'n of State, Cnty. & Mun. Emps.*, 172 F.4th at 366.

## III. DISCUSSION

Plaintiffs have not shown a likelihood of success on the merits of their constitutional claims against the Contractors Order for the same reasons as those the Fourth Circuit articulated in *NADOHE I*. Defendants do not dispute Plaintiffs' standing to challenge the Contractors Order for purposes of this motion, and the Court independently concludes that Plaintiffs have shown a substantial likelihood of establishing standing. *See* n.3, *infra*. But on the First Amendment claim, the Order's operative phrase—"disparate treatment based on race or ethnicity"—has a settled antidiscrimination-law meaning that materially narrows the provision's reach, and Plaintiffs have not shown that unconstitutional applications are substantially disproportionate to the Order's lawful sweep. Nor have Plaintiffs shown that the Order is impermissibly vague in violation of the Fifth Amendment, because it provides adequate notice of the proscribed conduct. Finally, whatever the ultimate merits of Plaintiffs' APA claims, Plaintiffs have not shown that they are suffering irreparable harm attributable to the FAR Memo sufficient to warrant preliminary relief.

### A. First Amendment

#### i. Overbreadth

The First Amendment prohibits the federal government from "abridging the freedom of speech." U.S. Const., amend. I. As Plaintiffs confirmed at the hearing, their

First Amendment challenge is a facial one. ECF No. 44 at 10–11. A plaintiff bringing a facial challenge "normally 'must establish that *no set of circumstances* exists under which the [law] would be valid.'" *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (emphasis added in *Hansen*). But that requirement is somewhat relaxed when a plaintiff brings a First Amendment overbreadth challenge. "[T]he overbreadth doctrine instructs courts 'to hold [government action] facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute *can* be lawfully applied.'" *United States v. Arthur*, 160 F.4th 597, 606 (4th Cir. 2025) (quoting *Hansen*, 599 U.S. at 769). The reason for this difference is the chilling effect that an overbroad restriction may have on speech. *See Hansen*, 599 U.S. at 770 ("Overbroad laws 'may deter or "chill" constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'") (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)). Accordingly, to succeed in an overbreadth challenge and "justify facial invalidation," a plaintiff must show that "a law's unconstitutional applications [are] realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Id.*

A typical overbreadth analysis proceeds in three steps. The first step is to "construe the challenged statute" to determine what activity it actually prohibits. *United States v. Williams*, 553 U.S. 285, 293 (2008). The second step is to "determine whether, so construed, the statute '[prohibits] a substantial amount of protected expressive activity.'" *United States v. Miselis*, 972 F.3d 518, 531 (4th Cir. 2020) (quoting *Williams*, 553 U.S. at 297)). That is, a court asks whether the law's unconstitutional applications are "substantially disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at

770. "[A]t this step, the court must consider whether the proscribed speech falls within one of the few categories of *unprotected* speech." *Arthur*, 160 F.4th at 606. "Finally, if the statute proves 'impermissibly overbroad,'" a court "must assess whether 'the unconstitutional portion' is 'severable' from the remainder; if so, only that portion 'is to be invalidated.'" *Miselis*, 972 F.3d at 531 (quoting *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982)).

Applying these standards, Plaintiffs have not demonstrated a likelihood of success as to their overbreadth challenge because the Contractors Order does not prohibit a "substantially disproportionate" amount of constitutionally protected speech. *See Hansen*, 599 U.S. at 770.[3]

In *NADOHE I*, the Fourth Circuit held that the "Certification Provision" of one of the challenged Orders in that case was not overbroad. 167 F.4th at 102–04. That provision, as noted above, required agencies to include in "every contract or grant award . . . [a] term requiring [the] counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* at 94 (quoting Exec. Order No. 14,173). The Fourth Circuit held that this requirement was not overbroad because it "requires only that plaintiffs certify

[3] Defendants have not contested that Plaintiffs have standing to challenge the Contractors Order, at least for the purposes of this motion. In any event, Plaintiffs have shown a substantial likelihood of Article III standing at this stage. In *NADOHE I*, the Fourth Circuit held that NADOHE and AAUP had organizational and associational standing to challenge the earlier Certification Provision because the provision forced them and their members to choose between altering their activities, risking consequences under the certification, or forgoing federal funds or contracts. 167 F.4th at 97–100. Plaintiffs submit declarations here describing materially similar injuries arising from a mandatory clause in covered federal contracts. *See, e.g.*, ECF No. 28-3 ¶¶ 15, 22–33.

compliance with federal antidiscrimination laws, which the First Amendment doesn't confer a right to violate," especially because "existing federal law already demands such compliance, and plaintiffs have not challenged existing law as viewpoint-discriminatory or as over or underinclusive." *Id.* at 103–04.

The Contractors Order here is not overbroad for the same reasons. The model contractual language in the Contractors Order does not require compliance with federal antidiscrimination laws *expressly*, but it does so impliedly—and with sufficient clarity to render implausible Plaintiffs' facial overbreadth challenge. It requires contractors to refrain from engaging in "racially discriminatory DEI activities." Contractors Order § 3. If that were the full contours of the contractual prohibition, that may very well have run afoul of the First Amendment, because "racially discriminatory DEI activities" is far from self-explanatory. What one person considers "DEI activities" may bear little resemblance to another person's notion. Indeed, an ample swath of the types of speech that Plaintiffs are concerned would be deterred by the Contractors Order likely would constitute constitutionally protected speech. *See, e.g.*, ECF No. 28-1 (stating that Plaintiffs wish to engage in "courses or . . . research efforts on topics relating to race, ethnicity, diversity, equity, or inclusion" and "[p]ublishing materials relating to improving diversity, inclusion, and equity," among other activities).

But Plaintiffs' facial overbreadth challenge runs aground on the rest of the sentence: "The contractor will not engage in any racially discriminatory DEI activities, **as defined in section 2 of the Executive Order of March 26, 2026**." Contractors Order § 3 (emphasis added). And that provision states that "'racially discriminatory DEI activities' **means disparate treatment based on race or ethnicity** in the recruitment, employment (*e.g.,* hiring, promotions), contracting (*e.g.,* vendor

agreements), program participation, or allocation or deployment of an entity's resources." Contractors Order § 2(a) (emphasis added).

"Disparate treatment" is a common legal term essentially synonymous with unlawful intentional discrimination. "Disparate-treatment cases present the most easily understood type of discrimination, and occur where an employer has treated a particular person less favorably than others because of a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (cleaned up, citations omitted)). "A disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related [or other] action." *Id.* (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988)); *see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015) ("Title VII of the Civil Rights Act of 1964 . . . prohibits two categories of employment practices. . . . These two proscriptions [are] often referred to as the 'disparate treatment' (or 'intentional discrimination') provision and the 'disparate impact' provision."). As with the Executive Orders at issue in *NADOHE I*, then, the Contractors Order only prohibits contractors from engaging in conduct that is already prohibited by federal law: intentional discrimination on the basis of race or ethnicity. Accordingly, the Contractors Order will not silence a substantially disproportionate amount of protected speech and thus is not unconstitutionally overbroad.

Plaintiffs contend that the Contractors Order differs significantly from the Order at issue in *NADOHE I* by not explicitly invoking federal antidiscrimination law. They note that the term "disparate treatment," while it may have a well-known legal definition, is not defined in the Contractors Order itself and therefore must be understood through the plain meaning of the words "disparate" and "treatment"—which, according to Plaintiffs, "suggest treating things differently." ECF No. 35 at 11; *see*

*also* ECF No. 28-1 at 20–23. Under this definition, Plaintiffs argue, the Contractors Order "sweeps in an extraordinary amount of protected speech and association" because it "purports to reach nearly all speech and association that touches race or ethnicity and results in disparate 'allocation or deployment of an entity's resources'—including 'recruitment,' 'contracting,' and other protected programs—if such expression relates to federal contract work." ECF No. 28-1 at 21. Plaintiffs provide several examples of expression or associative conduct that they argue a lay person might consider to constitute "disparate treatment," such as recruitment "designed to ensure that qualified non-white applicants have an opportunity to apply," "trainings and . . . other efforts" to address racism in workplace environments, and/or scientific study of diseases that have "disparate negative health outcomes for particular races." *Id.* at 22–23.

This argument is unpersuasive. Particularly in the context of a facial challenge, the Court is not required to ignore the standard legal definition of "disparate treatment" as Plaintiffs suggest. Legal terms of art are generally given their established legal meaning. *See McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) ("'[S]eaman' is a maritime term of art. In the absence of contrary indication, we assume that when a statute uses such a term, Congress intended it to have its established meaning."); *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023) ("In the absence of statutory text to the contrary, we would assume that 'Congress intends to incorporate the well-settled meaning' of . . . a common-law term.") (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016)). As outlined above, "disparate treatment" has a settled, specific meaning under the law—intentionally treating a person "less favorably than others because of" a protected trait,

*Ricci*, 557 U.S. at 577 (quoting *Watson*, 487 U.S. at 985–86)—and the Contractors Order must be interpreted in light of that settled meaning.

This interpretation is supported by the context that surrounds the phrase "disparate treatment" in the Contractors Order. The Court "must . . . consider 'the specific context in which that language is used, and the broader context of the [Order] as a whole.'" *United States v. Spirito*, 36 F.4th 191, 204 (4th Cir. 2022) (quoting *Yi v. Fed. Bureau of Prisons*, 412 F.3d 526, 530 (4th Cir. 2005)). In other words, courts should not interpret text "in a vacuum." *Tyler v. Cain*, 533 U.S. 656, 662 (2001). Here, "disparate treatment" defines the phrase "racially discriminatory DEI activities." Contractors Order § 2. The inclusion of the term "racially discriminatory" confirms that "disparate treatment" is to be interpreted based upon its established meaning in the context of federal laws that prohibit discrimination on the basis of race.

The Order's text does not reach the principal examples on which Plaintiffs rely. Studying diseases that have "disparate negative health outcomes for particular races," ECF No. 28-1 at 22, does not, without something more, treat anyone less favorably than others because of race or ethnicity. Such research is directed at the disease, and people who do not have (and are not at risk of) the disease are not similarly situated to those who do. Likewise, "[t]eaching courses or leading research efforts on topics relating to race, ethnicity, diversity, equity, or inclusion" and "[p]ublishing materials relating to improving diversity, inclusion, and equity," *id.* at 34, are forms of expression *about* race. They do not necessarily involve "disparate treatment based on race or ethnicity" in "recruitment, employment . . . , contracting . . . , program participation, or allocation or deployment of an entity's resources." Contractors Order § 2(a). If the government were to bring or threaten a False Claims Act enforcement action against a contractor based on

such speech or programs, that not only would be unauthorized by the Contractors Order, but could very well violate the First Amendment and thereby give rise to an as-applied challenge to such enforcement action.

Finally, the government's representations in this litigation are consistent with the Court's reading of the text and context—though the Court's conclusions rest on the text and context, not on those representations. The government acknowledged that scientific or medical studies of diseases that affect one race disproportionately would not be barred by the model language in the Contractors Order. *See* ECF No. 44 at 22 ("Those are not instances in which the physicians or the scientists . . . are trying to discriminate based on . . . someone's race or ethnicity. There may be a correlation between race and ethnicity and medical condition, but it's not intentional discrimination."). The government also confirmed that a contract "could not be terminated" on the basis of a contractor merely "talking about historical examples of racial disparities . . . because that would not be disparate treatment based on race or ethnicity." *Id.* at 34–35. The government confirmed these representations at the hearing. And as the government conceded before the Fourth Circuit in *NADOHE I*, "there is 'absolutely' DEI activity that falls comfortably within the confines of the law." *NADOHE I*, 167 F.4th at 104 (Diaz, C.J., concurring).

If the government were to enforce the Contractors Order consistent with a broader interpretation—by, for example, bringing FCA actions or canceling contracts in relation to DEI-related activity that does not constitute disparate treatment under existing law—the targets of such enforcement could bring an as-applied challenge, as noted above, and also point to the government's numerous representations in this case and in *NADOHE I*. *See United States v. Craig*, 142 F.4th 192, 198 (4th Cir. 2025)

("[T]he government, like any party, has a duty of candor to the court."); *NADOHE I*, 167 F.4th at 100 (noting that facial challenges "are disfavored because they run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.") (quoting *Edgar v. Haines*, 2 F.4th 298, 313 (4th Cir. 2021)). In this facial challenge, however, Plaintiffs have not established that the Order's unconstitutional applications, if any, are "substantially disproportionate to the [Order's] lawful sweep." *Hansen*, 599 U.S. at 770. They have not established a likelihood of success as to their overbreadth claim.

**ii. Content Discrimination and Unconstitutional Conditions**

Plaintiffs also contend that the Contractors Order impermissibly regulates speech based upon its content and places an unconstitutional condition on the exercise of their First Amendment rights.

Regarding content discrimination, the First Amendment bars the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley,* 408 U.S. 92, 95 (1972)). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* Plaintiffs contend that strict scrutiny should apply here because the Contractors Order "bans expression that celebrates particular ethnicities or recognizes and/or addresses different experiences based on race." ECF No. 28-1 at 24.

Under the unconstitutional conditions doctrine, "the government may not deny a benefit to a person because he exercises a constitutional right." *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 545 (1983). Plaintiffs contend that the Contractors Order "improperly imposes 'a disproportionate burden calculated to drive . . . from the marketplace' any expressive activity that celebrates a particular racial or ethnic group or attempts to address discrimination or differences in experience based on race." ECF No. 28-1 at 26 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998)).

Plaintiffs have not demonstrated a likelihood of success as to either of these arguments, for largely the same reasons articulated above. "[P]laintiffs have no protectable speech interest in operating, and 'no constitutional right to operate[,] DEI programs *that violate federal antidiscrimination law*.'" *NADOHE I*, 167 F.4th at 103–04 (emphasis added, quoting *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 102 (D.D.C. 2025)); *see also Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) ("There is no constitutional right . . . to discriminate in the selection of who may attend a private school or join a labor union."). As explained above, the Order's definition of "racially discriminatory DEI activities" as "disparate treatment based on race or ethnicity" means that any conduct prohibited by the Order is also prohibited by federal antidiscrimination law. That is true even of discrimination by employers too small to be covered by Title VII, because 42 U.S.C. § 1981 independently prohibits intentional discrimination in making and enforcing contracts, including employment contracts, regardless of the employer's size. *See* 42 U.S.C. § 1981(a)–(b); *id.* § 2000e(b).

Plaintiffs lack a protectable First Amendment interest in speech that is prohibited by the Contractors Order because they lack an interest in speech that is prohibited by

federal antidiscrimination law. And to the extent the Order does reach intentional discrimination that federal antidiscrimination statutes do not, such as discrimination by employers too small to be covered by Title VII, *see* ECF No. 44 at 42–43, Plaintiffs have not shown that the First Amendment protects such discrimination. *See Hishon*, 467 U.S. at 78. In other words, the Order does not impermissibly regulate the content of speech or impose unconstitutional conditions because it mandates compliance with existing laws (and those laws are not challenged here).

Accordingly, Plaintiffs have not established a likelihood of success as to their content discrimination or unconstitutional conditions arguments.

**B. Fifth Amendment**

"The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law." *NADOHE I*, 167 F.4th at 101 (quoting U.S. Const. amend. V). A regulatory enactment "is void for vagueness if its prohibitions are not clearly defined." *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). "The vagueness inquiry asks whether a regulation 'provide[s] a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)).

Plaintiffs' vagueness claim focuses on the preface of the model contractual language in the Order. The preface states that the contract language at issue applies "[i]n connection with the performance of work under this contract." Contractors Order § 2. Plaintiffs contend this is impermissibly vague, because it leaves open the question of whether the language covers "only that portion of work that is directly funded by the covered contract" or "any expression by a contractor or subcontractor[.]" ECF No. 28-1

at 28. And if so, this would be problematic because under the First Amendment although the government may "impose limits on the use of such funds to ensure they are used in the manner Congress intends," *Agency for Int'l Dev. v. All. for Open Soc'y*, 570 U.S. 205, 213 (2013) (quoting *Rust v. Sullivan*, 500 U.S. 173, 195 n.4 (1991)), it may not "prohibit[] the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 217 (quoting *Rust*, 500 U.S. at 197).

The Contractors Order does not leave open the questions that Plaintiffs contend it does. The model language directs that contractors agree to certain provisions "[i]n connection with ***the performance of work under this contract***." Contractors Order § 3 (emphasis added). The Contractors Order expressly applies only to work the contractor is performing for the government pursuant to the contract in which the model language appears. The meaning of the Executive Order is not impermissibly vague. *See Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cnty., Virginia*, 355 F. Supp. 3d 386, 412 (E.D. Va. 2018) ("Although 'we can never expect mathematical certainty from our language,' all that the Due Process Clause requires is that reasonably intelligent people be able to understand 'what the ordinance as a whole prohibits.'") (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)). To the extent Plaintiffs' members are concerned that the government will attempt to enforce the provisions of the Contractors Order against them for conduct or speech outside the contract, such enforcement action may well be unconstitutional retaliation, as counsel for the government directly acknowledged. *See* ECF No. 44 at 32 ("[T]he government is not allowed to bar . . . protected speech outside of the scope of the contract."); *see also Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 686 (1996) ("[W]e recognize the right of independent government contractors not to be terminated for

exercising their First Amendment rights."). If the government does undertake such action, the proper course for Plaintiffs and/or their members is to bring as-applied challenges. *See NADOHE I*, 167 F.4th at 104 ("If the President, his subordinates, or another grantor misinterprets federal antidiscrimination law, plaintiffs 'can challenge that interpretation in a specific enforcement action.'") (quoting *Nat'l Urb. League*, 783 F. Supp. 3d at 103). The Contractors Order is not so vague *on its face* that it violates the Fifth Amendment. *See NADOHE I*, 167 F.4th at 102 ("[I]f government actors have terminated grants or contracts without regard to their legality, then plaintiffs can sue *those* actors for terminating *those* contracts.") (quotations omitted).

**C. APA**

Plaintiffs contend that the FAR Memo is arbitrary and capricious because it fails to provide a reasoned explanation, fails to take into account the reliance interests of government contractors, and fails to consider important aspects of the issue, particularly the impact and cost of implementing the model contract language. ECF No. 28-1 at 32–34. Defendants contend that Plaintiffs lack Article III standing to challenge the FAR Memo because the Contractors Order imposes identical requirements of federal agencies and that the FAR Memo is not a final agency action subject to review under the APA. ECF No. 32 at 34–36.

At the outset, Plaintiffs have shown, for purposes of their motion, that they likely have standing to challenge the FAR Memo. Defendants contend that Plaintiffs' alleged injury from the FAR Memo is not redressable (thereby defeating Plaintiffs' standing to challenge it) because "even if this Court stays . . . the [Memo], Defendant agencies still remain bound by the Order's instruction to include the Certification in Government contracts." ECF No. 32 (citing Contractors Order § 3). Defendants are correct as to the

overlapping effect of the Memo and the Order. But that does not defeat Plaintiffs' *standing* to separately challenge the Memo based on their alleged First Amendment and monetary injuries stemming from both the Order and the Memo. *See* ECF No. 26 ¶¶ 133–62, 176–88; *see also NADOHE I*, 167 F.4th at 98–100 (finding that plaintiffs there had Article III standing to challenge similar Executive Order provisions).

Nonetheless, in light of the Court's conclusions above regarding the Contractors Order, Plaintiffs have not shown a likelihood of success on the merits that would justify a stay or injunction of the FAR Memo. Plaintiffs contend that the FAR Memo "imposes obligations that have legal consequences for Plaintiffs but that appear nowhere in the Order." ECF No. 35 at 21. Plaintiffs contend that these new obligations include requiring agencies to update certain of their existing FAR class deviations by April 27, 2026, and to "modify existing contracts . . . by July 24, 2026." *Id.* at 21–22 (quoting FAR Memo at 2).[4] Plaintiffs further contend that these dates are nowhere to be found in the Contractors Order. ECF No. 35 at 21. But the dates in the FAR Memo, April 27 and July 24, stem directly from the Contractors Order. The Order directs agencies to "ensure that contracts . . . include the following clause" "within 30 days of the date of this order" (i.e., April 27, 2026) and directs each agency head to "review the agency's implementation" of the Order and "report . . . regarding its compliance" by "[w]ithin 120 days of the date of this order" (i.e., July 24, 2026).

Because the requirements imposed by the FAR Memo are substantially identical to the requirements imposed by the Order, and because this Court declines to

---

[4] A FAR "deviation" is, among other things, an agency's use of a policy, procedure, or contract clause that is inconsistent with the FAR, and a "class deviation" is one that "affect[s] more than one contract action." 48 C.F.R. §§ 1.401(a), 1.404.

preliminarily enjoin the Order, Plaintiffs have not shown a likelihood of success on the merits of their claim that the FAR Memo is unconstitutional. Nor have they shown that they are likely to suffer irreparable harm absent a stay or injunction of the FAR Memo, because the harms they identify flow from the contract clause that the Order independently requires. *See Winter*, 555 U.S. at 22. Plaintiffs point to other respects in which the FAR Memo elaborates on how agencies are to implement the Order, *see* ECF No. 35 at 21–22, but they have not shown that any of those provisions, as distinct from the contract clause itself, is likely to cause them irreparable harm. The Court therefore need not, and does not, decide the parties' remaining disputes regarding the FAR Memo, including whether it is final agency action and whether Plaintiffs are likely to succeed on the merits of their other APA claims. *See* ECF No. 32 at 34–41; ECF No. 28-1 at 29–33; ECF No. 35 at 18–25.

## IV. CONCLUSION

For the reasons articulated above, the Court will deny Plaintiffs' motion for a preliminary injunction and stay (ECF No. 28). A separate order follows.

Date: October 14, 2026

*/s/*
Adam B. Abelson
United States District Judge